1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  DAVID MARROSO (S.B. #211655)
   dmarroso@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 8th Floor
4  Los Angeles, California 90067-6035
   Telephone:    +1 310 553 6700
5  Facsimile:    +1 310 246 6779

6  Attorneys for Plaintiffs CPHP DEVELOPMENT,
   LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK
7  50, LLC ; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53,
   LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55,
8  LLC; HPS1 BLOCK 56/57, LLC,
   and LENNAR CORPORATION
9

10            **UNITED STATES DISTRICT COURT**

11          **NORTHERN DISTRICT OF CALIFORNIA**

12 | Case No. _____

13 | **COMPLAINT AGAINST TETRA TECH AND THE UNITED STATES FOR:**

14 |

15 CPHP DEVELOPMENT, LP; HPS | **(1) INTENTIONAL MISREPRESENTATION (AGAINST TT)**
   DEVELOPMENT CO., LP; HPS1 BLOCK 50,
16 LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK | **(2) NEGLIGENCE (AGAINST TT)**
   53, LLC; HPS1 BLOCK 54, LLC; HPS1
17 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; | **(3) NEGLIGENCE (AGAINST US)**
   and LENNAR CORPORATION,
18 | **(4) NEGLIGENT HIRING, SUPERVISION, RETENTION (AGAINST TT)**
                Plaintiffs,
19 | **(5) NEGLIGENT HIRING, SUPERVISION, RETENTION (AGAINST US)**
        v.
20 | **(6) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TT)**
21 TETRA TECH, INC.; TETRA TECH EC,
   INC.; UNITED STATES OF AMERICA; and
   DOES 1–50,
22 | **(7) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST US)**
                Defendants.
23 | **(8) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TT)**

24 | **(9) EQUITABLE INDEMNIFICATION (AGAINST TT)**

25 |

26 | **(10) EQUITABLE INDEMNIFICATION (AGAINST TT)**

27 |

28 | **JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................... 1

II.  PARTIES ............................................................................................. 3

III.  JURISDICTION AND VENUE ............................................................ 4

IV.  FACTS .................................................................................................. 5

    A.  The Hunters Point Naval Shipyard ........................................... 5

    B.  San Francisco And The Homebuilder's Redevelopment Of The Shipyard ............. 6

    C.  Tetra Tech's Misconduct at The Shipyard Under United States' Supervision ........ 7

    D.  Tetra Tech's False Statements in Radiological Removal Action Completion Reports ............. 9

    E.  The United States and Tetra Tech Concealed Information from Homebuilders ... 13

    F.  Harm Suffered by the Homebuilders ...................................... 14

V.  PRINCIPAL/AGENT LIABILITY ...................................................... 15

VI.  CAUSES OF ACTION ....................................................................... 17

    A.  FIRST CLAIM: INTENTIONAL MISREPRESENTATION AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ......................... 17

    B.  SECOND CLAIM: NEGLIGENCE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ................................... 18

    C.  THIRD CLAIM: NEGLIGENCE AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT LLC, HPS1 BLOCK 50, HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1 BLOCK 54) ............................................................................... 20

    D.  FOURTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) .. .................................................................................................... 22

    E.  FIFTH CLAIM: NEGLIGENT HIRING, SUPERVISION AND RETENTION AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT LLC, HPS1 BLOCK 50, HPS1 BLOCK 51, HPS1 BLOCK 53, AND HPS1 BLOCK 54) .............................. 23

    F.  SIXTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ................................................................... 24

    G.  SEVENTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT LLC, HPS1 BLOCK 50, HPS1 BLOCK 51, HPS1 BLOCK 53, AND HPS1 BLOCK 54) ................................................................... 27

H.    EIGHTH CLAIM: INTENTIONAL INTERFERENCE  WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ...................................................................................... 28

I.    NINTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE TETRA TECH DEFENDANTS (BY HPS DEVELOPMENT CO., HPS1 BLOCK 50,  HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1 BLOCK 54, AND LENNAR) .............................. 30

J.    TENTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE UNITED STATES  (BY HPS1 BLOCK 50, HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1 BLOCK 54, AND LENNAR)) ...................................................................................................... 31

VII. PRAYER FOR RELIEF ...................................................................................................... 32

VIII.    DEMAND FOR JURY TRIAL............................................................................................. 33

1

2

## I.    INTRODUCTION

3

1.    Housing in San Francisco is scarce and in demand.  The Hunters Point Naval

4

Shipyard ("HPNS" or "the Shipyard") presented an opportunity to help address those issues by

5

transforming a former Navy base into an area with state-of-the-art residential, commercial, and

6

recreational facilities.

7

2.    In 1991, the United States Navy announced plans to close HPNS, ensure its safety

8

to residents, and then—only then—transfer the land in phases for potential redevelopment.  After

9

receiving assurances from the Navy and City of San Francisco, the plaintiff Homebuilders began

10

developing the Shipyard.[1]  Homebuilders started building homes in 2013 on a part of the Shipyard,

11

referred to as "Parcel A" or "the Hilltop."  In that area, Homebuilders have built residences and

12

sold many of them to residents.

13

3.    Homebuilders agreed to include in the broader Shipyard community affordable

14

housing and public open spaces, all while employing many San Francisco residents.

15

Homebuilders also built substantial infrastructure to support the Hilltop community, such as a

16

water distribution system, a reclaimed water system, a high bandwidth telecommunication system,

17

sanitary and storm sewers, streets, sidewalks, street lights, fire hydrants, bus stops, traffic signals,

18

and extensive landscaping.

19

4.    Prior to undertaking this massive investment, Homebuilders requested and received

20

from the Navy directly and Tetra Tech indirectly representations that clean-up activities had been

21

performed and performed adequately.[2]  Homebuilders relied on these representations, warranties,

22

and statements from the Navy and Tetra-Tech and incurred hundreds of millions of dollars in

23

expenses in performing development activities on the site, building homes, engaging in entitlement

24

planning work, incurring additional debt, obtaining City approvals, and performing other actions

25

in the anticipation of creating new homes.

26

[1] For convenience, we refer to Plaintiffs CPHP Development, LLC; HPS Development Co., LP; HPS1 Block 50, LLC; HPS1 Block 51, LLC; HPS1 Block 53, LLC; HPS1 Block 54, LLC; HPS1 Block 55, LLC; and HPS1 Block 56/57, LLC as "the Homebuilders" or "Homebuilder Plaintiffs." Homebuilders are subsidiaries of Plaintiff Lennar Corporation ("Lennar").

27

[2] Herein, "Tetra Tech" refers to Defendants Tetra Tech, Inc. and Tetra Tech EC, Inc.

28

LENNAR'S COMPLAINT AGAINST
TETRA TECH DEFS.

5.      In 2000, the United States Department of the Navy, acting as part and on behalf of defendant United States of America (herein after referred to as the "United States," "the Government," or "the Navy") hired contractor Tetra Tech EC, Inc., a subsidiary of Tetra Tech, Inc. (collectively, "Tetra Tech"), to test for and remediate radioactivity that might exist as a result of historical Navy activities at the Shipyard.  The Navy paid Tetra Tech hundreds of millions of dollars to investigate and (if necessary) remediate the area.  Homebuilders reasonably relied on the Navy to properly hire, supervise, and oversee Tetra Tech in this important work, and reasonably believed that Tetra Tech was properly and competently completing the work it was hired to do.

6.      Homebuilders recently learned information withheld from them for years that establishes they have been the victim of negligence, gross negligence, and fraud.  In May of 2018, federal criminal plea agreements from Tetra Tech employees were made public for the first time. These plea agreements disclosed that Tetra Tech had not properly complete the work it contracted to do, and instead, while under the Navy's negligent oversight, performed work negligently, cut corners, and even fabricated soil testing data to reduce costs and maximize Tetra Tech's own profits.  With the assistance of the Navy, Tetra Tech actively and systematically concealed from the Homebuilders and others the scope, extent, and magnitude of its scheme.

7.      Specifically, the pleas unsealed in May of 2018 revealed to the Homebuilders and the public that two former Tetra Tech employees pled guilty to felonies for their roles in fabricating data.  The United States Department of Justice has since sued Tetra Tech alleging widespread misconduct in its investigation and remediation work.  Tetra Tech's wrongful conduct has received widespread, negative media attention and unfairly stigmatized The Shipyard—even the Hilltop portion of the Shipyard, on which Tetra Tech did no remediation work.  Tetra Tech's wrongful conduct also spawned numerous lawsuits against the Homebuilders, even though they had absolutely nothing to do with any investigation or remediation and are actually victims of Tetra Tech's and the Navy's wrongful conduct.

8.      Although it was previously concealed and hidden, Homebuilders learned in and after May 2018 that the United States failed to properly supervise Tetra Tech pursuant to its

2

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

contractual, statutory and other legal obligations to do so.  The United States withheld information in its possession about Tetra Tech's activities, and instead advised the Homebuilders that the project would remain on schedule.  The Navy deliberately withheld from the Homebuilders key information about Tetra Tech's misconduct, all while the United States conducted a full investigation into Tetra Tech's fraud and negligence.

9.    As a result of the Navy's negligence and Tetra Tech's negligent and intentional acts and omissions, and fraud, the pace of development on Parcel A and at the Shipyard generally has been interrupted and sales of completed units on Parcel A have been impacted negatively.  The allegation of pollutants on portions of the Shipyard other than Parcel A, without the Homebuilders' consent or knowledge, has interrupted its business, has caused it harm, and has resulted in more allegations that pollutants also remain on Parcel A.  That stigma that has damaged and continues to damage Homebuilders, even as further testing and scientific evidence confirms there is no safety risk to homeowners at Parcel A.

10.    Indeed, in 2018 and 2019, the California Department of Public Health ("CDPH") performed a Radiological Health and Safety Survey of the area known as The Hilltop and concluded "no radiological health and safety hazards to the residents … were observed."  Independent scientists from the University of California, San Francisco and the University of California, Berkeley audited the CDPH's survey and concluded that the tests chosen "were appropriate as a health and safety survey."  Despite these findings of independent experts, Homebuilders continue to be damaged by lingering stigma to the property, impacted development schedules, unjustified lawsuits, and reputational harm.  All of this is the direct result of the wrongful conduct of Tetra Tech and the Navy.

## II.    PARTIES

11.    Defendant Tetra Tech, Inc. ("TTI") is a Delaware corporation with its headquarters and principal place of business in Pasadena, California.  TTI does business in the state of California, including in San Francisco, and was involved in testing and remediating the soil and buildings at the Shipyard.

3

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

12.     Defendant Tetra Tech EC, Inc. ("TTEC") is a wholly owned subsidiary of Tetra Tech, Inc., with its headquarters and principal place of business in Morris Plains, New Jersey. TTEC does business in California, including in San Francisco, and was involved in testing and remediating the soil and buildings at the Shipyard.

13.     Defendant the United States of America is named based upon the activities and liability of its Department of the Navy.  The United States is responsible for transfer of the Shipyard pursuant to the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

14.     The Homebuilders are ignorant of the true names and capacities of Defendants sued as Does 1 through 50, inclusive, and therefore sues these defendants by such fictitious names.  The Homebuilders will amend this Complaint to allege the true names and capacities of these defendants when ascertained.  Each of the fictitiously named defendants is, or will be, responsible for the occurrences alleged in this Complaint and for the Homebuilders' injuries, both existing and prospective.  Each Doe defendant legally and proximately caused damage to the Homebuilders. Each and every Doe defendant had a duty to the Homebuilders to use reasonable care in performing the tasks related to radiological investigation and remediation of the Shipyard.

15.     Plaintiffs CPHP Development, LLC, HPS1 Block 50, LLC; HPS1 Block 51, LLC; HPS1 Block 53, LLC; HPS1 Block 54, LLC; HPS1 Block 55, LLC; and HPS1 Block 56/57, LLC, are limited liability companies incorporated in the state of Delaware.  HPS Development Co., LP is a limited partnership.  These entities are subsidiaries of Lennar Corporation, and do business in the state of California, including in or around San Francisco.  These entities own or owned certain real property in the Shipyard and have been harmed by Defendants' negligent and/or fraudulent activities.

### III.    JURISDICTION AND VENUE

16.     This is a civil action against the United States brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*.  Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b).

4

COMPLAINT AGAINST TETRA TECH AND THE UNITED STATES

17.   Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1441(a) because the conduct giving rise to this action occurred in part on a federal enclave within the Shipyard.

18.   Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of property that is the subject of the action is situated in this district.

19.   Assignment to the San Francisco Division of the Northern District of California is proper, per Northern District of California Civil Local Rule 3-2(c), because the events giving rise to this complaint occurred in San Francisco County.

20.   Plaintiffs CPHP Development, LLC, HPS1 Block 50, LLC, HPS1 Block 51, LLC, HPS1 Block 53, LLC, HPS1 Block 54, LLC, and Lennar properly exhausted their administrative remedies against the United States.  On June 26, 2019, the United States received a completed written demand on Standard Form 95 from each of CPHP Development, LLC, HPS1 Block 50, LLC, HPS1 Block 51, LLC, HPS1 Block 53, LLC, HPS1 Block 54, LLC, and Lennar for specified damages, and in which each of these plaintiffs gave notice of tort claims against the United States under the Federal Tort Claims Act ("FTCA").  The United States did not respond to any of the claims "within six months" concerning disposition of the claims, which shall "be deemed a final denial of the claim" under 28 U.S.C. § 2675.

**IV.   FACTS**

**A.   The Hunters Point Naval Shipyard**

21.   The Hunters Point Naval Shipyard is located on a promontory in southeastern San Francisco and consists of approximately 936 acres.  The Navy purchased the property in 1939 and used the site for ship repair during World War II and the Korean War.  The Navy deactivated the Shipyard in 1974.  In 1991, the Shipyard was selected for closure pursuant to the terms of the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

22.     In 1992, the Navy delineated the Shipyard into separate parcels, including Parcels A, B, C, D, and E.

**B.      San Francisco And The Homebuilder's Redevelopment Of The Shipyard**

23.     On January 21, 1994, the Navy, the City and County of San Francisco, and the City and County of San Francisco Redevelopment Agency ("SFRA"), executed a memorandum of understanding to establish the process for conveying HPNS to the City and County of San Francisco for reuse.  Pursuant to a Conveyance Agreement between the Navy and City and Country of San Francisco, the Shipyard is to be transferred in phases.  Each portion of the Shipyard is scheduled to be transferred after the Navy completes environmental remediation on that portion and is able to issue a Finding of Suitability to Transfer ("FOST") for that specific portion of the Shipyard.

24.     On July 14, 1997, the City and County of San Francisco approved a Redevelopment Plan for the Shipyard by Ordinance No. 285-97.

25.     On April 22, 1998, the SFRA issued a Request for Qualifications for the conveyance, management, and redevelopment of the Shipyard.  On March 30, 1999, the SFRA determined that an affiliate of Lennar, Lennar - BVHP LLC, was the most qualified of the developer teams that had submitted responses, and selected Lennar - BVHP LLC as the master developer for the entire Shipyard.

26.     On June 1, 1999, the SFRA and Lennar - BVHP LLC entered into an Exclusive Negotiations Agreement setting forth the terms and conditions under which the parties would negotiate the conveyance, management, and redevelopment of the Shipyard.

27.     On July 22, 2003, the SFRA approved the Conceptual Framework for Phase 1 of the development of the Shipyard.  Phase 1 called for Lennar - BVHP LLC to build approximately 1,600 residential units, at least 32% of which would be affordable to low- and moderate-income residents, and a mix of approximately 30% rental units and 70% for-sale units, commercial space, community development facilities, and active and passive open space.

6

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

28.     Lennar - BVHP LLC and the SFRA entered into a Disposition and Development Agreement dated December 2, 2003, formally recognizing that Lennar - BVHP LLC and the SFRA were "committed to developing the entire Shipyard."

29.     In 2004, the United States Department of the Navy issued a FOST for Parcel A, and transferred Parcel A to the City of San Francisco.

30.     In 2005, the SFRA conveyed the majority of Parcel A to Lennar - BVHP LLC. HPS Development Co. succeeded Lennar - BVHP LLC and sold land to the Block entities as vertical developers.

31.     The Homebuilders broke ground on the first new homes in Parcel A in 2013, expended hundreds of millions of dollars in infrastructure and development costs, and built in excess of 300 homes by May 2018.

32.     At least two plaintiffs—HPS1 Block 55, LLC; and HPS1 Block 56/57, LLC—currently own real property in the Shipyard that was formerly owned by the United States government and occupied by the United States Navy.  HPS Development Co. owns property that is slated for redevelopment, including home building.  HPS1 Block 55, LLC and HPS1 Block 56/57, LLC own real property that has been partially redeveloped—some homes have been built and sold on their former property, and more homes are currently being built and sold on their current property.

33.     At least four plaintiffs—HPS1 Block 50, LLC, HPS1 Block 51, LLC, HPS1 Block 53, LLC, and HPS1 Block 54, LLC—previously owned and redeveloped real property in the Shipyard, including by building and selling homes, but have completed all sales and no longer own any property.  These four entities, along with HPS1 Block 55, LLC, HPS1 Block 56/57, LLC, have been sued by those who bought homes from them.  These homeowners also sued Lennar.

**C.**     **Tetra Tech's Misconduct at The Shipyard Under United States' Supervision**

34.     From 2003 to 2014, Tetra Tech entered into approximately fifteen different contracts with the United States to perform services related to radiological sampling and remediation of radioactive materials at the Shipyard.  Under these contracts, as well as governing

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

federal law such as the Defense Base Closure and Realignment Act, the United States was obligated to supervise and oversee remediation of the Shipyard to ensure proper remediation and timely transfer to entities such as the Homebuilders.

35.     On February 16, 2005, Tetra Tech submitted a Radiological Work Plan under Navy Contract No. N6871198-D-5713.  That plan identified specific "release criteria."  Before each parcel of the Shipyard could be released for redevelopment, Tetra Tech was required to test soils and surfaces to ensure any radioactivity was below the release criteria.

36.     In 2006, Tetra Tech assigned William Dougherty as the General Manager at the Shipyard to lead Tetra Tech's work at the site, and hired one or more subcontractors who, in turn, hired Radiation Control Technicians ("RCTs"), who were tasked with radiological fieldwork, such as soil sample collection.

37.     In May of 2018 with the unsealing of Tetra Tech employee criminal pleas in this Court, the Homebuilders learned key information about Tetra Tech's and the RCT's conduct:

    a.     Samples are taken to examine whether radiological contamination remained in the soil.  Tetra Tech oversaw and directed the falsification of soil samples from areas other than the Hilltop.  Specifically, RCT Supervisors Stephen Rolfe and Justin Hubbard, Dougherty, and Tetra Tech Construction Superintendent Dennis McWade, instructed RCTs and others to destroy soil samples from contaminated areas and their related documentation, and to take new samples from areas known to not be contaminated. Tetra Tech employees and subcontractors submitted false samples under the direction of Hubbard and Rolfe.

    b.     Tetra Tech gave unqualified employees responsibility for overseeing sampling and testing at the Shipyard.  As a result, soil samples were collected

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

and tested improperly.  Tetra Tech hired unqualified individuals to save money.  Tetra Tech also fired employees who threatened to reveal its improper conduct.

38.    In 2017, unbeknownst to the Homebuilders and following a confidential investigation by the United States Department of Justice ("DOJ"), Rolfe and Hubbard pled guilty to destruction, alteration, or falsification of records in federal investigations.  Rolfe and Hubbard admitted they substituted clean soil in place of legitimate samples from the areas designated for testing.  Rolfe admitted he had instructed his subordinates to substitute clean soil for legitimate samples on other occasions in 2012.  Rolfe and Hubbard's pleas and sentencing were sealed and secret from Plaintiffs until they were unsealed by this Court on May 2, 2018.

39.    Tetra Tech knew that its work at the Shipyard was intended to prepare the Shipyard for redevelopment by the Homebuilders into residential and commercial properties.  Tetra Tech knew that at least as early as 2004, the City of San Francisco had selected an affiliate of Lennar as the master developer for the Shipyard, and that affiliates or subsidiaries of Lennar would build residences on Parcel A.  Tetra Tech knew, at least as early as 2013, that the Homebuilders had begun construction of residences on Parcel A.

**D.    Tetra Tech's False Statements in Radiological Removal Action Completion Reports**

40.    Each time Tetra Tech purportedly completed work on a parcel of the Shipyard, the Navy directed it to prepare a Radiological Removal Action Completion Report (Rad-RACR) for each parcel.  The purpose of the Rad-RACRs was to "summarize the results of the radiological work activities performed for" each parcel of the Shipyard, including affirming that radiological work was complete and that any remaining "residual radioactivity levels . . . meet the established release criteria."  Tetra Tech knew or should have known that completed and signed Rad-RACRs were necessary before each parcel could be transferred by the Navy to the City of San Francisco and the Homebuilders for redevelopment.

41.    Tetra Tech prepared at least four Rad-RACRs.  The first two were dated March 2, 2011, and related to Parcels UC-1 and UC-2 as well as Parcel G.  The third was dated December

16, 2011, and related to Parcel D-2.  The fourth was dated March 2, 2012, and related to Parcel B.

Parcels UC-1, UC-2, D-2, and B are all adjacent to (but not on) Parcel A.  All three Rad-RACRs

were signed by William Dougherty, listed as the "TtEC Project Manager" and contained material

misstatements as set forth below.  Homebuilders did not know and had no reason to know of the

material misstatements.

42.    In the May 2, 2011 Rad-RACR relating to UC-1 and UC-2, Tetra Tech explained

that it had conducted "storm drain and sanitary sewer removal actions" on UC-1 and UC-2, to

"protect the public health, welfare, and the environment from actual or potential releases of

radiologic contaminants."  Tetra Tech's Executive Summary concluded:

> "The completed remedial actions were protective of human health and the
> environment, complied with federal and state statutes and regulations that are
> applicable or relevant and appropriate, and were cost-effective.  In addition, the
> removal actions resulted in a reduction of the potential risks to levels below
> remediation goals associated with potential exposures to the radionuclides of
> concern.  Based on the results of the Parcels UC1 and UC2 storm drain and
> sanitary sewer removal actions, residual dose and risk modeling efforts,
> implementation of the as low as reasonably achievable (ALARA) process, and the
> radiological survey and release of Building 819, the classification of
> "radiologically impacted" may be removed from Parcels UC1 and UC2 and no
> further actions are required."

43.    Tetra Tech knew this representation about Parcels UC-1 and UC-2 was, at best,

incomplete and misleading and, at worst, false.  Unbeknownst to the Homebuilders, Tetra Tech

knew it had not complied with applicable statutes and regulations, it had not verified that risks of

exposure to radionuclides were below goals, and had not conducted complete removal actions.

44.    Tetra Tech supported this conclusion with numerous representations in the

Executive Summary of the Parcels UC-1 and UC-2 Rad-RACR, including:

- "Excavated soil from Parcels UC1 and UC2 was transported to selected
  screening pads in Radiological Screening Yard 2 (RSY2) for dewatering
  and radiological processing.  The radiological survey process resulted in a
  100 percent surface scan."

- "Areas of excavated soil placed on the screening pads that showed the
  potential presence of radiation levels greater than the established
  investigation limits were further evaluated, and biased soil samples were
  collected, as appropriate. Any contamination identified was characterized
  and remediated."

10

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

- "A total of 2,631 soil samples were collected from the Parcels UC1 and UC2 storm drains and sanitary sewer excavated soil during processing in RSY2."

- "During the removal action activities, a total of 798 soil samples were collected from the 20 trench survey units that resulted from the excavation of the storm drain and sanitary sewers in Parcels UC1 and UC2."

45.    Tetra Tech knew that its factual assertions listed in the paragraph above were incomplete, misleading, and/or false.

46.    In the Parcel D-2 Rad-RACR, Tetra Tech explained that it had conducted a building survey and "storm drain and sanitary sewer radiological removal actions" on Parcel D-2 to "protect the public health, welfare, and the environment from actual or potential releases of radiological contaminants."  Tetra Tech's Executive Summary concluded that "[t]he information provided in this RACR, the seven [Survey Unit Project Reports], and the Building 813 [Final Status Survey] results support the [Navy's] conclusion that Parcel D-2 is ready for unconditional, unrestricted radiological free release."

47.    Tetra Tech knew this statement regarding Parcel D-2 was incomplete, misleading, and/or false.  Tetra Tech knew that it had not verified that Parcel D-2 was "ready for unconditional, unrestricted radiological free release."

48.    Tetra Tech represented in the Executive Summary of the Rad-RACR that: "The revised [Survey Unit Project Reports] demonstrate that identified residual radioactivity levels inside the excavated trenches and within the overburden or excavated soils and/or imported fill used as backfill meet the established release criteria."  Tetra Tech knew when it made this statement that it was incomplete, misleading, and/or false.

49.    In the Parcel B Rad-RACR, Tetra Tech explained that it conducted radiological survey and remediation of storm drain systems, sanitary sewer systems, buildings, and former building sites.  Tetra Tech's Executive Summary concluded:

"The information summarized in this Radiological RACR, each of the 70 [Survey Unit Project Reports], and the building/structure and former building site radiological results support the [Navy's] conclusion that Parcel B is ready for unconditional, unrestricted radiological free release.  The potential risks associated with exposure to residual [radionuclides of concern] on Parcel B have been

11                    COMPLAINT AGAINST TETRA TECH
                                                      AND THE UNITED STATES

reduced to levels below the release criteria and remediation goals and present no threat to human health or the environment."

50.     Tetra Tech knew this representation regarding Parcel B was incomplete, misleading, and/or false.

51.     Nevertheless, Tetra Tech represented in the Executive Summary of the Parcel B Rad-RACR that its conclusion was supported by facts, including:

- "The 5,432 truckloads of soil derived from the excavation of the Parcel B storm drain and sanitary sewers transferred to the RSYs for radiological processing were spread on specially constructed screening pads . . . . During processing in the RSYs, gamma scans were performed for each of the survey units processed in the RSYs. Radioactive material identified during the gamma scan activities was collected, segregated, and stored in appropriate containers for subsequent disposal by the DON radiological waste contractor.  Areas of soil that showed the potential presence of radiation levels greater than the established investigation limits were further evaluated, and biased soil samples were collected, as appropriate. Identified radiological contamination was characterized and remediated."

- "Radiological surveys were performed on a total of 1,443 sections of pipe and 137 manholes during the Parcel B removal action."

- "Gamma scans were performed on the exposed trench surfaces and numerous soil samples were collected from the sidewalls and bottom of the excavated trenches to determine whether radiologic contamination was present. A minimum of 18 systematic soil samples were collected from each of the 70 Parcel B trench survey units and analyzed by the laboratory using gamma spectroscopy. As necessary, remediation was performed to remove any identified radiologic contamination followed by the collection and analysis of verification soil samples."

- "During the Parcel B removal action, a total of 5,588 soil samples (including investigative, characterization, verification, and FSS samples) were collected from the 70 trench survey units and analyzed by the laboratory."

- "Radiological surveys were performed for each of the impacted Parcel B buildings/structures and former building sites, which typically included surface gamma scans, static measurements, and swipe samples or soil samples collected at discrete locations."

52.     Tetra Tech knew that these factual assertions were incomplete, misleading, and/or false.  The Homebuilders relied on the Rad-RACRs prepared by Tetra Tech in investing in and planning redevelopment of the Shipyard.  At no time did Tetra Tech disclose to the Homebuilders that these statements from the Rad-RACRs were incomplete, misleading, and/or false.  The

12

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

1    Homebuilders built residences on Parcel A in reliance on the statements referenced above, along

2    with other representations and warranties by Tetra Tech and the Navy.

3    **E.**    **The United States and Tetra Tech Concealed Information from Homebuilders**

4         53.    The Homebuilders reasonably relied on the United States to supervise and oversee

5    Tetra Tech in the remediation of the Shipyard.  The United States is subject to contractual and

6    statutory obligations to ensure a proper investigation and effective remediation.  The United States

7    was obligated to prevent misconduct such as that perpetrated by Tetra Tech, and under an

8    obligation to be truthful and complete with the Homebuilders (and others) about what Tetra Tech

9    had done and not done, and the impact it would have on redevelopment of the Shipyard.

10   However, the United States and Tetra Tech concealed, covered up, and minimized Tetra Tech's

11   misconduct.

12        54.    Although the misconduct occurred earlier, Homebuilders did not learn and could

13   not reasonably have learned of the scope, extent or magnitude of the misconduct until on or around

14   May 2, 2018, when the indictments against Hubbard and Rolfe were unsealed by the federal court.

15   Before that time, Homebuilders were not injured and their causes of action against the United

16   States and Tetra Tech had not yet accrued.

17        55.    Prior to May 2018, Homebuilders routinely communicated with the Navy and

18   diligently sought out real-time information about the progress of the cleanup efforts to plan for the

19   timely development under the transfer schedule provided by the United States.  Although the

20   United States was aware or should have been aware of the full extent of Tetra Tech's misconduct,

21   it did not inform Homebuilders of the extent, scope, or magnitude of Tetra Tech's misconduct, that

22   the misconduct persisted, or that the misconduct threated to delay the transfer schedule.

23        56.    In fact, the Department of Justice had commenced a criminal investigation and was

24   actively investigating Tetra Tech and its employees for years, which culminated with criminal

25   indictments that remained under seal until May 2018.  However, the United States consistently

26   failed to disclose the full extent of Tetra Tech's misconduct or the type and scope of investigation,

27   even when responding to inquiries by Homebuilders and others about the potential for delay.

28

13

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

57.     Furthermore, despite knowing of Tetra Tech's wrongful conduct, the Navy permitted Tetra Tech to continue its work at the Shipyard.

58.     It was not May 2018 that Homebuilders were informed of the nature, type, and scope of the investigation conducted by the United States or the extent of Tetra Tech's misconduct—and even then the disclosure came by way of unsealed plea agreements.  By that time, of course, Homebuilders already had incurred hundreds of millions of dollars in expenditures and had made significant progress developing the property—progress that could not be (and was not) abandoned.

59.     Through reasonable diligence, the Homebuilders could not have discovered earlier the facts underlying the causes of action herein because they had been concealed, covered up, and minimized by Tetra Tech and the United States.

**F.     Harm Suffered by the Homebuilders**

60.     Tetra Tech's conduct has caused massive harm to the Homebuilders, even though there is no scientific evidence of safety risks to residents of the Shipyard.

61.     As a result of Tetra Tech's misconduct, the development of the Shipyard has been interrupted and sale of completed units has been impacted.  The development of the surrounding community, including the development of extensive public open spaces and retail and other commercial spaces, has been delayed.

62.     The Navy's negligent failure to supervise Tetra Tech also has caused harm to the Homebuilders.  As a result of the Navy's supervisory negligence, the development of the Shipyard has been interrupted and sales of completed units have been impacted.  The development of the surrounding community, including the development of extensive public open spaces and retail and other commercial spaces, has been delayed.

63.     These delays have in turn increased construction costs and negatively impacted the Homebuilders and the overall development of the Shipyard.  The Homebuilders also have incurred substantial costs in responding to the effects of Tetra Tech's negligence and fraud and the United States' negligence, including costs associated with the lawsuits brought by homeowners in the

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

Shipyard and others naming the Homebuilders but arising out of Tetra Tech's misconduct and the United States' negligence.

64.    In 2018, the California Department of Public Health ("CDPH") performed a Radiological Health and Safety Survey to ensure Parcel A-1 residents were not exposed to unsafe levels of radiation in light of the recent discovery of Tetra Tech's data falsification.  The CDPH issued a final report on February 5, 2019, which found that "[u]pon completion of this radiation survey, no radiological health and safety hazards to the residents of Parcel A-1 were observed."

65.    This finding was audited by a committee of independent scientists at the University of California, San Francisco ("UCSF") and the University of California, Berkeley ("UCB").  In its final audit report, dated January 17, 2020, the committee "judge[d] the gamma scanning of the surface soil of Parcel A performed by the Radiological Health Branch of the CDPH to be appropriate as a health and safety survey."  Despite the corroborated findings of these independent scientific experts, home sales have continued to slow, development at the Shipyard has been interrupted, and the Homebuilders continue to suffer harm as a result of Tetra Tech's negligence and fraud and the Navy's negligence.

66.    Moreover, Plaintiffs have been (wrongly) sued by homeowners and nearby residents, accusing them of selling homes that have lost value on account of the May 2018 revelations of Tetra Tech misconduct and of developing property that caused nearby residents psychological harm.

## V.    PRINCIPAL/AGENT LIABILITY

67.    Tetra Tech is liable for the acts of its employees, subcontractors, and other agents involved in fabricating the radiological investigation at HPNS.  The risk that Tetra Tech's employees and agents, and the employees and agents of its subcontractors, would engage in the wrongful acts described herein was an inherent and foreseeable consequence of Tetra Tech's conduct.

68.    Tetra Tech's acts and omissions in furtherance of fabricating the radiological investigation at the Shipyard that were made by agents and employees of Tetra Tech were

1  undertaken pursuant to the direction and control, and with the permission, consent, and

2  authorization of, Tetra Tech.

3    69.    The Tetra Tech employees, subcontractors, and other agents that executed the

4  improper radiological investigation described herein were acting within the scope of their

5  employment and/or contractual obligations.  Activities such as collecting soil samples and

6  conducting building surveys were primary functions of their employment and/or contractual

7  obligations.

8    70.    Tetra Tech ratified the acts of its agents and employees by continuing to employ

9  them and instructing them to repeat the same wrongful conduct.

10    71.    TTI is liable for the acts of its wholly owned subsidiary, TTEC.  TTI has admitted

11  that TTEC's acts should be attributed to TTI due to their close relationship.  For example, TTI

12  stated that "[TTI's] and [TTEC's] routine business practices generally, and their respective

13  particular actions in connection with the subject Project were at all material times taken on behalf

14  and at the direction of the other in their roles as parent and wholly-owned subsidiary, and as

15  business units of the same company."

16    72.    TTI and TTEC were closely connected.  Some individuals who serve as officers of

17  TTI also serve as officers of TTEC.  TTEC and TTI routinely act very closely and in concert in

18  carrying out business operations.  TTEC has conducted business as a business unit of TTI and has

19  been a vehicle for TTI to enter into contracts with the United States Government.  TTI exercises

20  full management and control over TTEC.  Occasionally, TTEC and TTI enter into subcontracts on

21  behalf of one another regardless of which entity had formal contractual privity with the

22  Government.  Some or all revenues received by TTEC are attributed to TTI and some or all

23  obligations of TTEC are discharged by TTI.

24    73.    Tetra Tech has indicated that TTI received at least one contract related to the

25  Shipyard.  TTEC and TTI personnel were jointly involved in managing, controlling, and directing

26  the investigation at the Shipyard.  Tetra Tech is liable for the acts of its subcontractors and agents

27  and their employees.

28

16

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

# VI.    CAUSES OF ACTION

**A.    FIRST CLAIM: INTENTIONAL MISREPRESENTATION AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

74.    The Homebuilders re-allege and incorporates by reference Paragraphs 1 through 73 above as if fully set forth herein.

75.    In the Rad-RACRs, Tetra Tech intentionally misrepresented critical facts, which it knew to be false, about its investigation of the Shipyard.  Tetra Tech repeatedly and knowingly misrepresented that it had conducted radiological surveys, sampling, and investigation throughout the Shipyard, such that it had determined that certain areas of the Shipyard were not contaminated (or at risk of contamination) with radiation above safe levels.  Tetra Tech knew these misrepresentations were false when made or made the representations recklessly and without regard for their truth.

76.    Tetra Tech knew and intended that the Homebuilders would rely on Tetra Tech's misrepresentations.  Tetra Tech (a) held itself out to the public as a reliable environmental remediation company, (b) knew that its investigation and remediation work was necessary for the Homebuilders' redevelopment work, and (c) knew that the Navy was distributing the Rad-RACRs to the Homebuilders.

77.    Tetra Tech knew that the Homebuilders were relying on Tetra Tech's misrepresentations when the Homebuilders began building homes at the Hilltop.

78.    The Homebuilders relied on Tetra Tech's intentional misrepresentations at the time they were made.

79.    Tetra Tech knew that public discovery of Tetra Tech's misrepresentations would delay development at the Shipyard, increase construction costs, and negatively impact the Homebuilders and the overall development.

80.    As a direct and proximate result of Tetra Tech's fraudulent deceit, the Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**B.      SECOND CLAIM: NEGLIGENCE AGAINST THE TETRA TECH DEFENDANTS**
(BY HOMEBUILDER PLAINTIFFS)

81.      The Homebuilders re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

82.      Tetra Tech's work was initiated by the United States and was intended to, and did, affect the Homebuilders.  Defendants were aware that its work was intended to prepare the Shipyard for redevelopment into residential and commercial space.  Defendants were aware that an affiliate of Lennar was selected as the master developer, and that the Homebuilders would take title to and develop Parcel A.

83.      Tetra Tech owed a duty to the Homebuilders to exercise reasonable and ordinary care in investigating and remediating the Shipyard and to avoid causing economic and other injury to the Homebuilders.  That duty arises from the nature of the work Tetra Tech was contracted to perform and the interdependency of Tetra Tech's work and the redevelopment of the Shipyard for residential and commercial purposes.

84.      Tetra Tech negligently, carelessly, tortiously, and wrongfully breached its duty to the Homebuilders through misconduct including, but not limited to, falsifying soil samples and building surveys, destroying and falsifying records, and hiring and failing to supervise unqualified employees and contractors.

85.      It was reasonably foreseeable that Tetra Tech's misconduct would significantly delay and/or hinder redevelopment of the property, deter property buyers and lenders, and harm the Homebuilders.

86.      Tetra Tech's conduct is ethically and morally blameworthy because Tetra Tech placed its profits ahead of the safety of others and the development of badly needed housing in San Francisco by failing to properly investigate the Shipyard.  Tetra Tech has no reasonable excuse for these failures, which have delayed the development of the Shipyard and harmed the Homebuilders.

87.      Tetra Tech's conduct violated statutes and regulations, including at least:

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

- 10 C.F.R. 20.1501(a), which requires that each Nuclear Regulatory Commission licensee "shall make or cause to be made, surveys of areas, including the subsurface, that . . . are reasonable under the circumstances to evaluate the magnitude and extent of radiation levels; and concentrations or quantities of residual radioactivity; and the potential radiological hazards of the radiation levels and residual radioactivity detected."

- 10 C.F.R. 20.2103, which provides that licensees "shall maintain records showing the results of surveys" required by the regulations.

- 18 U.S.C. § 1519, which states that "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

88.    Pursuant to California Code of Evidence § 669, Tetra Tech's negligence is presumed under the doctrine of negligence per se because it violated these laws.

89.    The Homebuilders' harm resulted from conduct that the foregoing statute and regulations were designed to prevent, and the Homebuilders are within the class of persons they are intended to protect.

90.    The acts and omissions of Tetra Tech were conducted with malice, fraud, deceit, and/or oppression as described in this complaint.

91.    The Homebuilders have been harmed as a direct and proximate result of Tetra Tech's negligence and gross negligence.

92.    As a direct and proximate result of Tetra Tech's negligence and gross negligence, the Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs

19

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

1    associated with the lawsuits, including any judgments and settlement expenses incurred or to be

2    incurred.

3    **C.       THIRD CLAIM: NEGLIGENCE AGAINST THE UNITED STATES** (BY CPHP
         DEVELOPMENT LLC, HPS1 BLOCK 50,  HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1
4        BLOCK 54)

5            93.      CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and

6    HPS1 Block 54 re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully

7    set forth herein.

8            94.      The Navy owed a duty to CPHP Development LLC, HPS1 Block 50, HPS1 Block

9    51, HPS1 Block 53, HPS1 Block 54 to exercise reasonable and ordinary care to avoid causing

10   economic and other injury to them.  That duty arises from the nature of the environmental

11   investigation, testing, and remediation work Tetra Tech was performing, which was initiated

12   pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense

13   Base Closure and Realignment Act of 1990.  This duty also arises from the contracts between the

14   United States and Tetra Tech to perform the environmental investigation, testing, and remediation

15   work.  Moreover, the Navy agreed to ensure effective environmental investigation of the Shipyard

16   and remediation for redevelopment by companies such CPHP Development LLC, HPS1 Block 50,

17   HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 when it executed a Conveyance Agreement

18   in 2004 with San Francisco and the SFRA to establish the process for conveying the Shipyard for

19   redevelopment.  The Navy repeatedly confirmed its obligations through the FOST process, as well

20   as communications to CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block

21   53, and HPS1 Block 54, the public, and public officials—even though those communications

22   failed to provide notice of the extensive fraud perpetrated by Tetra Tech under United States

23   supervision.

24           95.      The Navy had a duty of care to CPHP Development LLC, HPS1 Block 50,  HPS1

25   Block 51, HPS1 Block 53, and HPS1 Block 54 as third parties with significant and foreseeable

26   financial interest dependent on the Navy's contractor, Tetra Tech, sufficiently performing its

27   testing and remediation obligations under the Navy's supervision.

28

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

96.     It was foreseeable that the Navy's misconduct would significantly delay and/or hinder redevelopment of the Hilltop, deter property buyers and lenders, and harm the CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54.

97.     The United States negligently, carelessly, tortiously, and wrongfully breached its duty to CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 through misconduct that included, but is not limited to, negligent supervision of Tetra Tech and Tetra Tech's employees; negligent enforcement of rules instituted to prevent any fraudulent activities by Tetra Tech; and negligent communication of information concerning Tetra Tech's fraudulent activities to the Homebuilders.

98.     The Navy's conduct is ethically and morally blameworthy because the Navy failed to adequately supervise Tetra Tech when at stake was the safety of the public and the development of badly needed housing in San Francisco.  The Navy has no reasonable excuse for its failure to supervise Tetra Tech, which has delayed the development of the Shipyard and harmed CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54.

99.     The Navy's conduct is contrary to the public policy interests of the state of California because it erodes the public confidence in the reliability of environmental remediation work and deters potential developers from building much-needed housing on former military bases.

100.     The United States (based upon the conduct of the Navy) is liable to CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 for the damages described herein pursuant to the FTCA, 28 U.S.C. § 2674.

101.     The United States' conduct violated its own authority to ensure proper environmental investigation and ultimate transfer of the Shipyard properties under the Defense Base Closure and Realignment Act of 1990 and related regulations.

102.     Pursuant to California Evidence Code § 669, the United States' negligence is presumed under the doctrine of negligence per se because it violated these laws and related regulations.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

103.    CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 have been harmed as a direct and proximate result of the Navy's negligence and gross negligence.

104.    As a direct and proximate result the Navy's negligence and gross negligence, CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**D.    FOURTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

105.    The Homebuilders re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

106.    Tetra Tech owed a duty to the Homebuilders to exercise reasonable care in hiring employees, independent contractors, and other agents, supervising them, and/or retaining them.

107.    Tetra Tech breached its duty by hiring employees, independent contractors, and/or other agents that were unfit and incompetent.  Tetra Tech also negligently failed to supervise those contractors and employees, and negligently retained them after it became apparent to Tetra Tech that they were unfit and/or incompetent.

108.    Tetra Tech knew or should have known that hiring, failing to supervise, and/or negligently retaining those individuals created a particular risk or hazard of fabricating the radiological investigation of the Shipyard.  Certain employees were unskilled at detecting radiological contamination and others were asked to investigate potential contamination at the Shipyard because Tetra Tech had determined that they were susceptible to pressure to fabricate certain aspects of the surveys and investigation.

109.    Tetra Tech knew or should have known that those individuals were willing to or had a propensity to participate in fabricating survey and other aspects of the radiological investigation.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

110.    The particular risk or hazard materialized when those employees fabricated surveys and other aspects of the radiological investigation.

111.    The unfitness and incompetence of those employees was a factor in causing the Homebuilders' harm.

112.    As a direct and proximate result of Tetra Tech's negligent hiring, supervision, or retention, the Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**E.    FIFTH CLAIM: NEGLIGENT HIRING, SUPERVISION AND RETENTION AGAINST THE UNITED STATES** (BY CPHP DEVELOPMENT LLC, HPS1 BLOCK 50,  HPS1 BLOCK 51, HPS1 BLOCK 53, AND HPS1 BLOCK 54)

113.    CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

114.    The United States through the Navy owed a duty to CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 to exercise reasonable care in hiring employees, independent contractors, and other agents, supervising them, and/or retaining them.

115.    The United States breached its duty by continuing to hire and contract with employees, independent contractors, and other agents that were unfit and incompetent, including Tetra Tech, Tetra Tech's employees, and individuals associated with Tetra Tech who were investigated by the United States.

116.    The United States knew or should have known that Tetra Tech was willing to or had a propensity to participate in fraudulent activities, fabricating surveys, and other aspects of the improper radiological investigation.

117.    The United States knew or should have known that retaining and continuing to hire Tetra Tech for new contracts at the Shipyard—even after evidence of fraud surfaced that was not

revealed to CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54, or the public—created a particular risk or hazard of continuing to misrepresent data at the Shipyard.

118.    The United States knew or should have known that Tetra Tech hired individuals that created a particular risk or hazard of fabricating the radiological investigation of the Shipyard.

119.    The Navy knew or should have known that those individuals were willing to or had a propensity to participate in fabricating survey and other aspects of the radiological investigation.

120.    The particular risk or hazard materialized when those employees fabricated surveys and other aspects of the radiological investigation.

121.    The unfitness and incompetence of those employees was a factor in causing the harm to CPHP Development LLC, HPS1 Block 50,  HPS1 Block 51, HPS1 Block 53, HPS1 Block 54.

122.    The unfitness and incompetence of Tetra Tech, who was repeatedly hired by the United States and whose contracts were renewed by the United States, was a factor in causing the Homebuilders' harm.

123.    The United States (on behalf of the Navy) is liable to the Homebuilders for the damages described herein pursuant to the FTCA 28 U.S.C. § 2674.  As a direct and proximate result of the Navy's negligent supervision, the Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**F.    SIXTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

124.    The Homebuilders re-allege and incorporates by reference Paragraphs 1 through 73 above as if fully set forth herein.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

125.    The Homebuilders have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A of the Shipyard and with banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A.

126.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to the Homebuilders.

127.    Tetra Tech knew or should have known of these existing and prospective economic relationships.  Tetra Tech knew that the Shipyard was being developed for residential purposes and that Homebuilders intended to sell homes at the site to future homeowners.

128.    Tetra Tech owed a duty to the Homebuilders to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of the Homebuilders.

129.    Tetra Tech knew or should have known that, if it failed to act with reasonable care, the existing and prospective economic relationships the Homebuilders had with potential homeowners would be interfered with and disrupted.

130.    Tetra Tech breached that duty to the Homebuilders through its misconduct.

131.    Tetra Tech was negligent and failed to act with reasonable care in connection with its work.

132.    Tetra Tech engaged in wrongful acts and/or omissions in connection with its work. Tetra Tech interfered with the Homebuilders' existing and prospective economic relationships by, among other things, intentionally failing to investigate potential radiological contamination in the Shipyard and covering up, concealing, and minimizing the scope of extent of its misconduct. Tetra Tech's misconduct constituted an act that was independently wrongful of its interference with the Homebuilders' prospective economic relations.  Among other things, the misconduct of Tetra Tech and its agents violated:

- 10 C.F.R. 20.1501(a), which requires that each Nuclear Regulatory Commission licensee "shall make or cause to be made, surveys of areas, including the subsurface, that . . . are reasonable under the circumstances to evaluate the

25

1    magnitude and extent of radiation levels; and concentrations or quantities of

2    residual radioactivity; and the potential radiological hazards of the radiation levels

3    and residual radioactivity detected."

4    • 10 C.F.R. 20.2103, which provides that licensees "shall maintain records showing

5    the results of surveys" required by the regulations.

6    • 18 U.S.C. § 1519, which states that "[w]hoever knowingly alters, destroys,

7    mutilates, conceals, covers up, falsifies, or makes a false entry in any record,

8    document, or tangible object with the intent to impede, obstruct, or influence the

9    investigation or proper administration of any matter within the jurisdiction of any

10    department or agency of the United States . . . , or in relation to or contemplation of

11    any such matter or case, shall be fined under this title, imprisoned not more than 20

12    years, or both."

13    • fraud/deceit

14    • Tetra Tech's statutory and common law duties of care.

15    133.    As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions,

16    the existing and prospective economic relationships the Homebuilders had with potential

17    homeowners were interfered with and disrupted.

18    134.    As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions,

19    the Homebuilders have suffered and will suffer economic harm, injury, and losses, such as

20    increased construction costs, costs of delays to the overall development, and costs associated with

21    the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

22    135.    Tetra Tech's wrongful acts and/or omissions were a substantial factor in causing the

23    harm, injury, and losses.

24

25

26

27

28

26

**G.    SEVENTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE UNITED STATES** (BY CPHP DEVELOPMENT LLC, HPS1 BLOCK 50,  HPS1 BLOCK 51, HPS1 BLOCK 53, AND HPS1 BLOCK 54)

136.    CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

137.    CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A of the Shipyard and with banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A.

138.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54.

139.    The United States knew or should have known of these existing and prospective economic relationships.  The United States knew that the Shipyard was being developed for residential purposes and that CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 intended to sell homes at the site to future homeowners.

140.    The United States owed a duty to the CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of the Homebuilders.

141.    The United States knew or should have known that, if it failed to act with reasonable care, the existing and prospective economic relationships the CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 had with potential homeowners would be interfered with and disrupted.

142.    The United States breached that duty to the CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 through its misconduct.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

143.    The United States was negligent and failed to act with reasonable care in connection with its work.

144.    The United States engaged in wrongful acts and/or omissions in connection with its work.  The United States' interfered with the Homebuilders' existing and prospective economic relationships by, among other things, negligently hiring, supervising, and retaining Tetra Tech. The United States misconduct constituted an act that was independently wrongful of its interference with the Homebuilders' prospective economic relations.  Among other things, the misconduct of The United States facilitated its contractors' violations of Title 18 U.S.C. § 1519 (destruction, alteration, of falsification of records), 10 C.F.R. 20.1501(a), and 10 C.F.R. 20.2103, and violated the United States' duties of care.

145.    As a direct and proximate result of the United States' wrongful acts and/or omissions, the existing and prospective economic relationships CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 had with potential homeowners were interfered with and disrupted.

146.    As a direct and proximate result of the United States' wrongful acts and/or omissions, CPHP Development LLC, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, and HPS1 Block 54 have suffered and will suffer economic harm, injury, and losses, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

147.    The United States' wrongful acts and/or omissions were a substantial factor in causing the harm, injury, and losses.

**H.    EIGHTH CLAIM: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

148.    The Homebuilders re-allege and incorporates by reference Paragraphs 1 through 73 above as if fully set forth herein.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

149. The Homebuilders have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A of the Shipyard and with banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A.

150. These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to the Homebuilders.

151. Tetra Tech knew of these existing and prospective economic relationships. Tetra Tech knew that the Shipyard was being developed for residential purposes and that Homebuilders intended to sell homes at the site to future homeowners.

152. Tetra Tech knew that, if it failed to act with reasonable care, the existing and prospective economic relationships the Homebuilders had with potential homeowners were certain or substantially certain to be interfered with and disrupted.

153. Tetra Tech engaged in wrongful acts and/or omissions in connection with its work. Tetra Tech interfered with the Homebuilders' existing and prospective economic relationships by, among other things, intentionally failing to investigate potential radiological contamination in the Shipyard and covering up, concealing, and minimizing the scope of extent of its misconduct. Tetra Tech's misconduct constituted an act that was independently wrongful of its interference with the Homebuilders' prospective economic relations. Among other things, the misconduct of Tetra Tech and its agents violated Title 18 U.S.C. § 1519 (destruction, alteration, of falsification of records), constituted fraud/deceit and violated Tetra Tech's statutory and common law duties of care.

154. As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, the existing and prospective economic relationships the Homebuilders had with potential homeowners were interfered with and disrupted.

155. As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, the Homebuilders have suffered and will suffer economic harm, injury, and losses, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

156.    Tetra Tech's wrongful acts and/or omissions were a substantial factor in causing the harm, injury, and losses.

**I.    NINTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE TETRA TECH DEFENDANTS** (BY HPS DEVELOPMENT CO., HPS1 BLOCK 50,  HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1 BLOCK 54, AND LENNAR)

157.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

158.    Due to the negligent and/or fraudulent conduct of the Tetra Tech Defendants, HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar have been named as defendants to litigation. These lawsuits generally allege that HPS Development Co., and HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar are responsible to the plaintiffs in those actions for injuries resulting from Tetra Tech's conduct at the Shipyard.

159.    HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar deny any liability as to any claims arising from these claims and, to the extent liability is affixed, responsibility lies with the Tetra Tech Defendants.  HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar are entitled to equitable indemnification and/or contribution from the Tetra Tech Defendants for the costs incurred in responding to claims arising from the conduct as alleged herein.

160.    Specifically, in the event liability should be established in any action described above involving HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar, which liability is expressly denied, such liability would arise by reason of the conduct and negligence and fraudulent actions of the Tetra Tech Defendants.  Tetra Tech is therefore obligated and bound to defend, indemnify, and hold harmless HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred or to be incurred in response to claims arising from the Tetra Tech Defendants' conduct as alleged herein.

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

161.    As a further direct and proximate result of the Tetra Tech Defendants' negligence and/or fraud, HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to claims arising from the Tetra Tech Defendants' conduct as alleged herein, in an amount to be determined according to proof at trial.

162.    To prevent a multiplicity of actions, a determination of the comparative fault, if any, of HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar on the one hand, and the Tetra Tech Defendants on the other should be made at trial of this action herein.  If any party, in an action arising from the Tetra Tech Defendants' conduct as alleged herein, recovers a judgment against HPS Development Co., HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar, then those entities are entitled to be indemnified by the Tetra Tech Defendants for the amount of any damages awarded in favor of that party pursuant to and in accordance with the proportion of relative fault or liability attributed to defendants.

**J.    TENTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE UNITED STATES  (BY HPS1 BLOCK 50, HPS1 BLOCK 51, HPS1 BLOCK 53, HPS1 BLOCK 54, AND LENNAR))**

163.    HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

164.    Due to the negligent and/or fraudulent conduct of the Navy, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar have been named as defendants to litigation. These lawsuits generally allege that HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar are responsible to the plaintiffs for injuries resulting from Tetra Tech's conduct at the Shipyard, which was made possible by the Navy's negligent hiring, failure to adequately supervise, and retention of Tetra Tech.

165.    HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar deny any liability as to any claims arising from these claims and, to the extent liability is affixed, responsibility lies with the United States.  HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1

31

Block 54, and Lennar are entitled to equitable indemnification and/or contribution from the United States for the costs incurred in responding to claims arising from the conduct as alleged herein.

166.    Specifically, in the event liability should be established in any action described above involving HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar, which liability is expressly denied, such liability would arise by reason of the conduct and negligence of the Navy.  The United States is therefore obligated and bound to defend, indemnify, and hold harmless HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred or to be incurred in response to claims arising from the Navy's conduct as alleged herein.

167.    As a further direct and proximate result of the Navy's negligence and/or fraud, HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to claims arising from the Navy's conduct as alleged herein, in an amount to be determined according to proof at trial.

168.    To prevent a multiplicity of actions, a determination of the comparative fault, if any, of HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar on the one hand and the Navy on the other should be made at trial of this action herein.  If any party, in an action arising from the Navy's conduct as alleged herein, recovers a judgment against HPS1 Block 50, HPS1 Block 51, HPS1 Block 53, HPS1 Block 54, and Lennar, then those entities are entitled to be indemnified by the United States for the amount of any damages awarded in favor of that party pursuant to and in accordance with the proportion of relative fault or liability attributed to defendants.

## VII.    PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for relief as follows:**

169.    For compensatory and special damages, according to proof at trial;

170.    For interest thereon at the maximum legal rate;

171.    For punitive damages;

32

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES

172.    For costs of suit and reasonable attorneys' fees incurred herein; and

173.    For an award holding Tetra Tech, Inc. and Tetra Tech EC, Inc. jointly and severally liable for all of the requested damages, costs, fees, and interest arising from Tetra Tech, Inc.'s and Tetra Tech EC, Inc.'s joint tortious conduct.

174.    For an award holding the United States liable for all of the requested damages, costs, fees, and interest arising from the United States' tortious conduct.

175.    For any and all other relief the Court deems just and proper.

### VIII.    DEMAND FOR JURY TRIAL

176.    Plaintiffs demand a jury trial on all triable issues.


Dated:  February 27, 2020

                                        DANIEL M. PETROCELLI
                                        DAVID MARROSO
                                        O'MELVENY & MYERS LLP


                                        By:        */s/ David Marroso*
                                                   David Marroso

                                        Attorneys for Plaintiffs CPHP
                                        DEVELOPMENT, LLC; HPS
                                        DEVELOPMENT CO., LP; HPS1 BLOCK 50,
                                        LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK
                                        53, LLC; HPS1 BLOCK 54, LLC; HPS1
                                        BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC,
                                        and LENNAR CORPORATION

33

COMPLAINT AGAINST TETRA TECH
AND THE UNITED STATES