DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
DAVID MARROSO (S.B. #211655)
dmarroso@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone:     +1 310 553 6700
Facsimile:     +1 310 246 6779

Attorneys for Plaintiffs CPHP DEVELOPMENT,
LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK
50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53,
LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55,
LLC; HPS1 BLOCK 56/57, LLC;
and LENNAR CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CPHP DEVELOPMENT, LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK 50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53, LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; and LENNAR CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> TETRA TECH, INC.; TETRA TECH EC, INC.; UNITED STATES OF AMERICA; and DOES 1–50, <br><br> Defendants. | Case No. 3:20-cv-01485-JD <br><br> **FIRST AMENDED COMPLAINT AGAINST TETRA TECH AND THE UNITED STATES FOR:** <br> **(1) INTENTIONAL MISREPRESENTATION (AGAINST TT)** <br> **(2) NEGLIGENCE (AGAINST TT)** <br> **(3) NEGLIGENCE (AGAINST US)** <br> **(4) NEGLIGENT HIRING, SUPERVISION, RETENTION (AGAINST TT)** <br> **(5) NEGLIGENT HIRING, SUPERVISION, RETENTION (AGAINST US)** <br> **(6) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TT)** <br> **(7) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST US)** <br> **(8) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST TT)** <br> **(9) EQUITABLE INDEMNIFICATION (AGAINST TT)** <br> **(10) EQUITABLE INDEMNIFICATION (AGAINST US)** <br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. PARTIES ........................................................................................................... 5

III. JURISDICTION AND VENUE ......................................................................... 6

IV. FACTS .............................................................................................................. 7

    A. History of the Hunters Point Naval Shipyard ......................................... 7

    B. Transfer and Redevelopment of the Shipyard ........................................ 7

    C. Navy Awards Contracts to Tetra Tech to Perform Work at HPNS ........ 9

    D. Tetra Tech Perpetrates Widespread Fraud Under the Navy's Supervision ........... 10

        1. Tetra Tech Makes False Statements at "Completion" of Its Work ................ 12

        2. Tetra Tech Investigates Itself ................................................ 15

        3. Former Tetra Tech Employees Plead Guilty to Federal Crimes at HPNS ...... 16

    E. Navy Continued to Award Contracts to Tetra Tech After Learning of Its Fraud .. 17

    F. The United States and Tetra Tech Concealed Information from Homebuilders ... 18

V. JURISDICTIONAL FACTS AND HARM TO HOMEBUILDERS ................... 21

    A. The Navy Failed to Fulfill Mandatory and Specific Oversight Duties ................. 21

        1. CERCLA and the NCP Imposed Mandatory Duties on the Navy ................... 22

        2. Federal Facility Agreement for Naval Station Treasure Island – Hunters Point Annex ........... 25

        3. Federal Acquisition Regulations ................................................ 40

        4. Uniform Federal Policy for Quality Assurance Project Plans ........................ 44

        5. Department of the Navy Environmental Readiness Program Manual ........... 44

        6. Naval Facilities Engineering Command Construction Quality Management Program Manual ........... 46

        7. Base-wide Radiological Work Plan ................................................ 53

        8. Contract Task Orders ................................................................ 66

    B. Harm Suffered by Homebuilders .......................................................... 68

VI. PRINCIPAL/AGENT LIABILITY ................................................................... 69

VII. CAUSES OF ACTION ................................................................................................ 70

    A.    FIRST CLAIM: INTENTIONAL MISREPRESENTATION AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) .......................... 70

    B.    SECOND CLAIM: NEGLIGENCE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ..................................................... 72

    C.    THIRD CLAIM: NEGLIGENCE AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54) ................ 73

    D.    FOURTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) 76

    E.    FIFTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54) ..................................................................... 78

    F.    SIXTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ........................................................................ 80

    G.    SEVENTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE UNITED STATES (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54) ................ 81

    H.    EIGHTH CLAIM: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS) ........................................................................ 84

    I.    NINTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE TETRA TECH DEFENDANTS (BY HPS DEVELOPMENT CO., BLOCK 50, BLOCK 51, BLOCK 53, BLOCK 54, AND LENNAR) ...................................................... 86

    J.    TENTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE UNITED STATES (BY BLOCK 50, BLOCK 51, BLOCK 53, BLOCK 54, AND LENNAR) ....... 87

VIII.    PRAYER FOR RELIEF ................................................................................ 88

IX.  DEMAND FOR JURY TRIAL ............................................................................. 89

1.     Housing in San Francisco is scarce and in demand. Developing the Hunters Point Naval Shipyard ("HPNS" or "the Shipyard") presented an opportunity to help address the city's housing shortage by transforming a former United States Navy base into a community featuring state-of-the-art residential, commercial, and recreational facilities. When Homebuilders[1] broke ground at the Shipyard, they did not set out merely to build houses. They committed to invest in the revitalization of a community that had been overlooked by private investors for decades. Homebuilders' and the public's confidence in the Navy's cleanup of the Shipyard is critical to the success of that revitalization given that historical operations had left behind radiological and other contamination in some areas. But fraud by the Navy's cleanup contractor, Tetra Tech, and negligence by the Navy in supervising Tetra Tech have put the Homebuilders' investment and the development of the Shipyard at risk—to the detriment of both the Homebuilders and the Shipyard community.

2.     In 1991, the Navy announced plans to close HPNS, ensure it was safe for commercial and residential development, and then—only then—transfer the land in phases for redevelopment. Homebuilders received assurances from the Navy and City of San Francisco that HPNS had been cleaned up properly and that portions were ready for residential development. Based on those assurances, Homebuilders broke ground and began developing portions of the Shipyard.

3.     In 2002, the Navy, acting as part and on behalf of the United States of America (hereinafter referred to as the "United States," "the Government," or "the Navy") hired contractor Tetra Tech EC, Inc., a subsidiary of Tetra Tech, Inc. (collectively, "Tetra Tech"), to test for and remediate contamination resulting from historical Navy activities at the Shipyard, for which the Navy paid Tetra Tech hundreds of millions of dollars. Homebuilders and the public, including

---

[1] For convenience, we refer to Plaintiffs CPHP Development, LLC ("CPHP Development"); HPS Development Co., LP ("HPS Development Co."); HPS1 Block 50, LLC ("Block 50"); HPS1 Block 51, LLC ("Block 51"); HPS1 Block 53, LLC ("Block 53"); HPS1 Block 54, LLC ("Block 54"); HPS1 Block 55, LLC ("Block 55"); and HPS1 Block 56/57, LLC ("Block 56/57") as "Homebuilders" or "Homebuilder Plaintiffs." Homebuilders are subsidiaries of Plaintiff Lennar Corporation ("Lennar").

1   the communities surrounding HPNS, relied on the Navy to properly hire, supervise, and oversee

2   Tetra Tech in this important work and believed that Tetra Tech was completing the work it was

3   hired to do.

4         4.      Relying on the Navy's supervision of Tetra Tech and consistent reassurances that

5   Tetra Tech was properly handling the cleanup of radiological and other contamination,

6   Homebuilders began Phase I of its Shipyard redevelopment.  In 2010, the San Francisco Board of

7   Supervisors approved a "Candlestick Point/Hunters Point Phase II" redevelopment, under which

8   Homebuilders would build 10,500 residential units, generate 1,500 construction jobs each year

9   during the building phase, and create more than 10,000 permanent jobs—many of which would

10  be filled by local residents.  Homebuilders agreed to invest billions of dollars in infrastructure and

11  public works for the Hunters Point community.  Although low-income residents are often

12  displaced by new real estate developments, the Homebuilders committed to offer more than 3,000

13  high quality homes as affordable housing units.

14        5.      Construction began in 2013 on a part of the Shipyard referred to as "Parcel A" or

15  the "Hilltop," where Homebuilders have built roughly 400 residences as part of the Phase I

16  redevelopment.  To date, Homebuilders have contributed at least $7.3 million to job training and

17  affordable housing for Hunters Point residents.

18        6.      Homebuilders have spent hundreds of millions of dollars developing Parcel A,

19  building homes, engaging in entitlement planning work, incurring additional debt, and obtaining

20  City approvals, among other investments, in anticipation of building new homes.  In making these

21  investments, Homebuilders relied on the representations from the Navy and Tetra Tech that the

22  required clean-up work had been performed and would continue to be performed properly.

23        7.      The Navy's gross negligence and Tetra Tech's fraud and criminal conduct,

24  however, have put the entire project in jeopardy.  Homebuilders learned for the first time that they

25  had been victims of years of negligence and fraud when federal criminal plea agreements from

26  two former Tetra Tech employees were first made public in May of 2018.  The plea agreements

27  disclosed that not only had Tetra Tech not properly completed the work it promised to do, but

28

FIRST AMENDED COMPLAINT AGAINST
TETRA TECH AND THE UNITED STATES
CASE NO. 3:20-CV-01485-JD

Tetra Tech had, while under the Navy's oversight, performed work negligently, cut corners, and fabricated testing data on a wide scale to reduce its own costs and maximize its own profits.

8. The unsealing of the guilty pleas revealed to Homebuilders, home purchasers, Hunters Point residents, and the broader public for the first time the scope, extent, and magnitude of Tetra Tech's misconduct and the Navy's negligent failure to supervise Tetra Tech. Homebuilders learned that the Navy ignored signs of Tetra Tech's misconduct. The Navy botched its duty to ensure Tetra Tech carried out the ultrahazardous work of cleaning up radiological and other toxic contamination, failing in such basic duties and requirements as being present on-site to supervise Tetra Tech and conducting meaningful reviews of Tetra Tech's cleanup work and testing submittals. The revelations of May 2018 came after the Navy covered up Tetra Tech's fraud for years, reassuring Homebuilders and the public that Parcel A was safe for development and that surrounding parcels would be transferred without significant delay.

9. In negligently supervising Tetra Tech, the Navy violated mandatory and specific duties set forth by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the National Contingency Plan ("NCP"), and the Federal Facility Agreement for Naval Station Treasure Island – Hunters Point Annex ("FFA"), among dozens of other statutes, regulations, policy manuals, and documents. These authorities outline mandatory and specific duties imposed on the Navy that Navy representatives, including Navy Quality Assurance Officers ("QAO") charged with oversight at Hunters Point, violated repeatedly. These derelictions of duty included failing to ensure and document that Tetra Tech (1) complied with chain-of-custody ("COC") requirements; (2) transported valid soil samples to the laboratory; (3) properly collected soil samples; (4) investigated and remediated survey units that exceeded release criteria; (5) surveyed 100 percent of all survey units for gamma radiation; and (6) conducted all radiological surveys properly. The number and magnitude of the Navy's failures, described in detail in the Jurisdictional Facts in Section V, *infra*, have come to light through court-ordered discovery that Homebuilders have taken over the last seven months.

10. The disclosure of Tetra Tech's negligent, fraudulent, and criminal conduct at HPNS rocked public confidence in development work at Hunters Point, generating public outrage and a political firestorm. Two Tetra Tech employees went to Federal prison. The United States' criminal investigation of Tetra Tech is apparently ongoing, and the United States itself is pursuing violations of the False Claims Act against Tetra Tech based upon Tetra Tech's widespread fraud in its work at the Shipyard under contract with the Navy. (*See United States of America, et al. v. Tetra Tech, Inc*., Case No. 3:13-cv-3835-JD (the "U.S. Complaint in Intervention" or "U.S. Compl.").) Tetra Tech's conduct has caused thousands of local residents and many Hilltop home purchasers to file dozens of lawsuits against Homebuilders and others. And development of the parcels surrounding the Hilltop has been delayed indefinitely.

11. The Navy historically used Parcel A for officer housing and not for activities that would have resulted in radiological contamination. Consistent with those facts, Tetra Tech was not tasked with, and did not do, any soil remediation work on Parcel A. Nevertheless, Tetra Tech's fraud and the Navy's negligence has caused financial and reputational harm to Homebuilders from the stigma now attached to the entire Shipyard from the botched cleanup. These harms include delayed development, depressed sales, and dozens of lawsuits against Homebuilders.

12. Homebuilders continue to suffer harm, even as further testing and scientific evidence confirms there is no safety risk to homeowners or contractors at Parcel A. In 2018 and 2019, the California Department of Public Health ("CDPH") performed a Radiological Health and Safety Survey of The Hilltop and concluded "no radiological health and safety hazards to the residents" were observed. Independent scientists from the University of California, San Francisco and the University of California, Berkeley audited the CDPH's survey and concluded that the tests chosen "were appropriate as a health and safety survey." And in November of 2020, after evaluating nearly three decades of data concerning Parcel A, the United States Environmental Protection Agency ("EPA") issued a fact sheet stating:

> The Hunters Point Naval Shipyard Superfund site (HPNS) does not include Parcel A. Historically, the Navy used this area for residential and administrative

purposes. Based on information gathered since 1991, the [EPA] is confident Parcel A is suitable for work, recreation and residential use. As such, EPA removed Parcel A from being part of the HPNS on the National Priorities List of contaminated sites (or Superfund list).

13.     The repeated findings of independent experts and regulatory oversight agencies establishing that Parcel A is itself safe for residents has not spared Homebuilders from the harm arising from the stigma and uncertainty now attached to the Shipyard as a result of the wrongful conduct of Tetra Tech and the failed supervision by the Navy.  Both Tetra Tech and the Navy must be held accountable so that Homebuilders are made whole and can build the housing and amenities that the people of Hunters Point have long awaited.

## II.     PARTIES

14.     Defendant Tetra Tech, Inc. ("TTI") is a Delaware corporation with its headquarters and principal place of business in Pasadena, California.  TTI does business in the State of California, including in San Francisco, and was involved in testing and remediating the soil and buildings at the Shipyard.

15.     Defendant Tetra Tech EC, Inc. ("TTEC") is a wholly owned subsidiary of Tetra Tech, Inc., incorporated in Delaware, with its principal place of business in San Diego, California.  TTEC does business in California, including in San Francisco, and was involved in testing and remediating the soil and buildings at the Shipyard.

16.     Defendant the United States of America is named based upon the activities and liability of its Department of the Navy.  The United States is responsible for transfer of the Shipyard pursuant to the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

17.     Homebuilders are ignorant of the true names and capacities of Defendants sued as Does 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Homebuilders will amend this Complaint to allege the true names and capacities of these Defendants when ascertained.  Each of the fictitiously named Defendants is, or will be, responsible for the occurrences alleged in this Complaint and for Homebuilders' injuries, both existing and prospective.  Each Doe Defendant legally and proximately caused damage to

Homebuilders. Each and every Doe Defendant had a duty to Homebuilders to use reasonable care in performing the tasks related to radiological investigation and remediation of the Shipyard.

18. Plaintiffs CPHP Development, LLC; HPS1 Block 50, LLC; HPS1 Block 51, LLC; HPS1 Block 53, LLC; HPS1 Block 54, LLC; HPS1 Block 55, LLC; and HPS1 Block 56/57, LLC are limited liability companies incorporated in the State of Delaware. HPS Development Co., LP is a limited partnership. These entities are subsidiaries of Lennar Corporation and do business in the State of California, including in or around San Francisco. These entities own or owned certain real property in the Shipyard and have been harmed by Defendants' negligent and/or fraudulent activities.

### III. JURISDICTION AND VENUE

19. This is a civil action against the United States brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b).

20. Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1441(a) because the conduct giving rise to this action occurred in part on a federal enclave within the Shipyard.

21. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of property that is the subject of the action is situated in this .

22. Assignment to the San Francisco Division of the Northern District of California is proper, per Northern District of California Civil Local Rule 3-2(c), because the events giving rise to this complaint occurred in San Francisco County.

23. Plaintiffs CPHP Development, Block 50, Block 51, Block 53, Block 54, and Lennar properly exhausted their administrative remedies under the Federal Tort Claims Act against the United States. On June 26, 2019, the United States received a completed written demand on Standard Form 95 from each of CPHP Development, Block 50, Block 51, Block 53, Block 54, and Lennar for specified damages, and in which each of these Plaintiffs gave notice of tort claims against the United States under the Federal Tort Claims Act ("FTCA"). The United

States did not respond "within six months" concerning the disposition of any of the claims. This failure shall "be deemed a final denial of the claim[s]" for purposes of the Federal Tort Claims Act under 28 U.S.C. § 2675.

## IV.    FACTS

### A.    History of the Hunters Point Naval Shipyard

24.    The Hunters Point Naval Shipyard was located on a promontory in southeastern San Francisco and consists of approximately 936 acres. The Navy purchased the property in 1939 and used the site for ship repair during World War II and the Korean War. The Navy deactivated the Shipyard in 1974. In 1991, the Defense Base Closure and Realignment Commission recommended the closure of the Shipyard pursuant to the terms of the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687. Special statutory authorization for the Navy to convey the Shipyard to the City (or local reuse organization approved by the City) for such consideration and under such terms as the Secretary of the Navy considers appropriate was included in Section 2824(a) of the National Defense Authorization Act for Fiscal Year 1991 (Pub. L. No. 101-510), as amended by Section 2834 of the National Defense Authorization Act for Fiscal Year 1994 (Pub. L. No. 103-60).

25.    In 1992, the Navy signed a FFA with the EPA and the State of California to facilitate remediation of the Shipyard. The FFA "establishes a procedural framework and schedule for developing, implementing and monitoring" response actions at Hunters Point in accordance with governing federal statutes and regulations. (FFA at §§ 1.1(b), 6.1.)

26.    Pursuant to the FFA, the Navy is the lead agency responsible for the HPNS remediation. As lead agency, the Navy has ultimate responsibility for the investigation and cleanup of HPNS, community involvement, and communicating its work to the public.

### B.    Transfer and Redevelopment of the Shipyard

27.    On March 31, 2004, the Navy and the City and County of San Francisco Redevelopment Agency ("SFRA") executed a Conveyance Agreement to establish the process for conveying HPNS to the City and County of San Francisco for reuse. The Conveyance Agreement

provides for the Shipyard to be transferred in phases. Each portion of the Shipyard is scheduled to be transferred after the Navy completes environmental remediation on that portion and is able to issue a Finding of Suitability to Transfer ("FOST") for each specific portion of the Shipyard that receives regulator confirmation of the Navy's findings that the area has been sufficiently remediated.

28.     On July 14, 1997, the City and County of San Francisco approved a Redevelopment Plan for the Shipyard by Ordinance No. 285-97.

29.     On April 22, 1998, the SFRA issued a Request for Qualifications for the conveyance, management, and redevelopment of the Shipyard. On March 30, 1999, the SFRA determined that an affiliate of Lennar, Lennar - BVHP LLC, was the most qualified of the developer teams that had submitted responses and selected Lennar - BVHP LLC as the master developer for the entire Shipyard.

30.     On June 1, 1999, the SFRA and Lennar - BVHP LLC entered into an Exclusive Negotiations Agreement setting forth the terms and conditions under which the parties would negotiate the conveyance, management, and redevelopment of the Shipyard.

31.     On July 22, 2003, the SFRA approved the Conceptual Framework for Phase I of the development of the Shipyard. Phase I called for Lennar - BVHP LLC to build approximately 1,600 residential units, at least 32% of which would be affordable to low- and moderate-income residents, and a mix of approximately 30% rental units and 70% for-sale units, commercial space, community development facilities, and active and passive open space.

32.     Lennar - BVHP LLC and the SFRA entered into a Disposition and Development Agreement dated December 2, 2003, formally recognizing that Lennar - BVHP LLC and the SFRA were "committed to developing the entire Shipyard."

33.     In 2004, the United States Department of the Navy issued a FOST for Parcel A and transferred Parcel A to the City of San Francisco.

34.     In 2005, the SFRA conveyed the majority of Parcel A to Lennar - BVHP LLC. HPS Development Co. succeeded Lennar - BVHP LLC and sold land to the Block entities as vertical developers.

35.     Homebuilders broke ground on the first new homes in Parcel A in 2013, expended hundreds of millions of dollars in infrastructure and development costs, and built over 300 homes by May 2018.

36.     At least two plaintiffs—Block 55 and Block 56/57—currently own real property in the Shipyard that was formerly owned by the United States government and occupied by the United States Navy.  HPS Development Co. owns property that is slated for homebuilding and other redevelopment.  Block 55 and Block 56/57 own real property that has been partially redeveloped—some homes have been built and sold on their former property, and more homes are currently being built and sold on their current property.

37.     At least four plaintiffs—Block 50, Block 51, Block 53, and Block 54—previously owned and redeveloped real property in the Shipyard, including by building and selling homes, but have completed all sales and no longer own any property.  These four entities, along with Block 55 and Block 56/57, have been sued by those who bought homes from them.  Those homeowners also sued Lennar.

**C.     Navy Awards Contracts to Tetra Tech to Perform Work at HPNS**

38.     From 2003 to 2014, Tetra Tech entered into approximately 15 different contracts with the Navy to perform services related to radiological sampling and remediation of radioactive materials at the Shipyard.  Under these contracts, as well as governing federal law such as the Defense Base Closure and Realignment Act, regulations, and Navy policy guidance, the United States was obligated to supervise and oversee remediation of the Shipyard to ensure proper remediation and timely transfer to entities such as Homebuilders.

39.     The Navy awarded "Task Orders" to govern the completion of particular tasks under each contract.  (U.S. Compl. at ¶¶ 22-23.)  Each Task Order was subject to specific work

plans that set forth the standards applicable to Tetra Tech's work and defined the Navy's oversight role.

40.　　Through at least 2009, the Navy periodically awarded "cost-plus-award-fee" contracts for Tetra Tech's work at the Shipyard.  These contracts "obligated the Navy to pay Tetra Tech its allowable costs for providing the services described in the scope of work, plus a discretionary award fee, up to a maximum amount." (U.S. Compl. at ¶ 26.)  Payment on cost-plus-award-fee contracts are based on a "judgmental evaluation of the Government, sufficient to provide motivation for excellence in contract performance." (*Id.*, citing Federal Acquisition Regulation ("FAR") § 16.305.)  "A contractor may earn an award fee if its overall cost, schedule, and technical performance is satisfactory." (*Id.*, citing FAR § 16.401.)

41.　　Additionally, the Navy awarded Tetra Tech "fixed price" contracts from 2008 through at least 2014. (*Id.* at ¶¶ 33-42.)  The fixed-price contracts provided "maximum incentive for the contractor to control costs," obligating the Navy to "pay a maximum fixed amount for the services required under the contracts, regardless of Tetra Tech's costs." (*Id.*, citing FAR § 16.202-1.)  Its fixed-price contracts with the Navy incentivized Tetra Tech to maximize profits by cutting corners and completing tasks as quickly as possible.

D.　　**Tetra Tech Perpetrates Widespread Fraud Under the Navy's Supervision**

42.　　From at least 2005 to 2018,[2] Tetra Tech engaged in a widespread pattern and practice of deliberate falsification and failed to comply with federal regulations, government policies, and Navy-approved and adopted work plans, sampling plans, and quality assurance project plans.

43.　　Tetra Tech whistleblowers identified some of Tetra Tech's systematic fraudulent activity, submitting declarations under seal in both a False Claims Act case (*United States ex rel. Jahr, Bowers, Andrews, Jackson v. Tetra Tech, EC et al.*, Case No. 13-cv-3835) and in a petition

---

[2] The full scale of Tetra Tech's fraud is still unknown.  For instance, former HPNS workers have alleged that falsification of chains of custody began before 2009 and continued until at least September 2012.  *See* Greenaction Pet. at 9; *see also* U.S. Compl. at ¶ 6 ("During the period between at least June 2006 and January 2018, Tetra Tech submitted, or caused to be submitted, materially false claims to the Navy for fraudulent testing and reporting at Hunters Point.")

to the Nuclear Regulatory Commission (*Greenaction for Health and Environmental Justice v.*

*Tetra Tech*, Petition to Revoke Materials License No. 29-31396-01 pursuant to 10 CFR § 2.206

("Greenaction Pet.")).  The whistleblowers' testimony includes specific admissions that Tetra

Tech:

- Manipulated and falsified building scan data, in lieu of providing actual radiation detection results from all buildings at HPNS.  (Duplicated strings of data have been confirmed in surveys later conducted in at least 14 of 28 buildings.)

- Accelerated conveyor belt processing of potentially contaminated soil through a radiation scanner in order to decrease the potential for identifying radiological contamination in the soil.  According to the whistleblowers, Tetra Tech increased the pace of conveyor belt scans by up to six to nine times the approved speed.

- Disabled the conveyor belt system's radiation detection alarm to avoid detection of radiation in the soil.  These alarms functioned to provide alerts when high radiological levels were detected on conveyor belts.

- Decreased the sensitivity of scanners at portal monitors (designed to detect high levels of gamma radiation in trucks leaving HPNS) and scanned through the steel sides of the trucks rather than over the top of the soil to limit detection of radiation in soil leaving the Shipyard.

- Intentionally and fraudulently collected soil from areas known to be clean or have lower radioactivity and falsely stated that the samples were from investigation units, rather than survey units, in order to reduce or eliminate any required remediation work.

- Falsified chain-of-custody forms to support the false sample collection information.

- Destroyed samples, data, and analytical results when the results were above the established release criteria.

- Used tow array scanning devices at Radiological Screening Yards ("RSY") at speeds significantly higher than permitted in attempt to reduce the probability of radiation detection.

- Intentionally used handheld detectors improperly to reduce the probability of radiation detection.

- Blocked the shipment of samples to an offsite quality assurance lab if there was a high chance that the release criteria would be exceeded.

- Diluted soil before scanning it to reduce the probability of radiation detection.

- Hired workers who did not meet minimum qualification standards required under contracts between the Navy and Tetra Tech.

### 1. Tetra Tech Makes False Statements at "Completion" of Its Work

44. Each time Tetra Tech purportedly completed radiological work on a parcel of the Shipyard, the Navy directed it to prepare a Radiological Removal Action Completion Report ("Rad-RACR") for that parcel. The purpose of the Rad-RACRs was to "summarize the results of the radiological work activities performed for" each parcel of the Shipyard, including affirming that radiological work was complete and that any remaining "residual radioactivity levels . . . meet the established release criteria." Tetra Tech knew or should have known that completed and signed Rad-RACRs were necessary before each parcel could be transferred by the Navy to the City of San Francisco and Homebuilders for redevelopment.

45. Tetra Tech prepared at least four Rad-RACRs. The first two were dated March 2, 2011 and related to Parcels UC-1 and UC-2, as well as Parcel G. The third was dated December 16, 2011 and related to Parcel D-2. The fourth was dated March 2, 2012 and related to Parcel B. Parcels UC-1, UC-2, D-2, and B are all adjacent to (but not on) Parcel A. All three Rad-RACRs were signed by William Dougherty, listed as the "TtEC Project Manager," and contained material misstatements. Homebuilders did not know and had no reason to know of the material misstatements.

46. In the May 2, 2011 Rad-RACR relating to UC-1 and UC-2, Tetra Tech explained that it had conducted "storm drain and sanitary sewer removal actions" on UC-1 and UC-2, to "protect the public health, welfare, and the environment from actual or potential releases of radiologic contaminants." Tetra Tech's Executive Summary concluded:

> "The completed remedial actions were protective of human health and the environment, complied with federal and state statutes and regulations that are applicable or relevant and appropriate, and were cost-effective. In addition, the removal actions resulted in a reduction of the potential risks to levels below remediation goals associated with potential exposures to the radionuclides of concern. Based on the results of the Parcels UC1 and UC2 storm drain and sanitary sewer removal actions, residual dose and risk modeling efforts, implementation of the as low as reasonably achievable (ALARA) process, and the radiological survey and release of Building 819, the classification of 'radiologically impacted' may be removed from Parcels UC1 and UC2 and no further actions are required."

47.     Tetra Tech knew this representation about Parcels UC-1 and UC-2 was incomplete, misleading, and false.  Though unbeknownst to Homebuilders, Tetra Tech knew it had failed to comply with applicable statutes and regulations, had not verified that risks of exposure to radionuclides were below goals, and had not conducted complete removal actions.

48.     Tetra Tech supported its "no further action" conclusion with numerous representations in the Executive Summary of the Rad-RACR for Parcels UC-1 and UC-2, including:

- "Excavated soil from Parcels UC1 and UC2 was transported to selected screening pads in Radiological Screening Yard 2 (RSY2) for dewatering and radiological processing.  The radiological survey process resulted in a 100 percent surface scan."

- "Areas of excavated soil placed on the screening pads that showed the potential presence of radiation levels greater than the established investigation limits were further evaluated, and biased soil samples were collected, as appropriate.  Any contamination identified was characterized and remediated."

- "A total of 2,631 soil samples were collected from the Parcels UC1 and UC2 storm drains and sanitary sewer excavated soil during processing in RSY2."

- "During the removal action activities, a total of 798 soil samples were collected from the 20 trench survey units that resulted from the excavation of the storm drain and sanitary sewers in Parcels UC1 and UC2."

49.     Tetra Tech knew that its factual assertions listed in the Rad-RACR for Parcels UC-1 and UC-2 were incomplete, misleading, and false.

50.     In the Parcel D-2 Rad-RACR, Tetra Tech explained that it had conducted a building survey and "storm drain and sanitary sewer radiological removal actions" on Parcel D-2 to "protect the public health, welfare, and the environment from actual or potential releases of radiological contaminants."  Tetra Tech's Executive Summary concluded that "[t]he information provided in this RACR, the seven [Survey Unit Project Reports], and the Building 813 [Final Status Survey] results support the [Navy's] conclusion that Parcel D-2 is ready for unconditional, unrestricted radiological free release."

51.     Tetra Tech knew its statement regarding Parcel D-2 was incomplete, misleading, and false.  Tetra Tech knew it had not verified that Parcel D-2 was "ready for unconditional, unrestricted radiological free release."

52.     Tetra Tech represented in the Executive Summary of the Rad-RACR that: "The revised [Survey Unit Project Reports] demonstrate that identified residual radioactivity levels inside the excavated trenches and within the overburden or excavated soils and/or imported fill used as backfill meet the established release criteria."  Tetra Tech knew when it made this statement that it was incomplete, misleading, and false.

53.     In the Parcel B Rad-RACR, Tetra Tech explained that it conducted radiological survey and remediation of storm drain systems, sanitary sewer systems, buildings, and former building sites.  Tetra Tech's Executive Summary concluded:

> "The information summarized in this Radiological RACR, each of the 70 [Survey Unit Project Reports], and the building/structure and former building site radiological results support the [Navy's] conclusion that Parcel B is ready for unconditional, unrestricted radiological free release.  The potential risks associated with exposure to residual [radionuclides of concern] on Parcel B have been reduced to levels below the release criteria and remediation goals and present no threat to human health or the environment."

54.     Tetra Tech knew this representation regarding Parcel B was incomplete, misleading, and false.

55.     Nevertheless, Tetra Tech represented in the Executive Summary of the Parcel B Rad-RACR that its conclusion was supported by facts, including:

- "The 5,432 truckloads of soil derived from the excavation of the Parcel B storm drain and sanitary sewers transferred to the RSYs for radiological processing were spread on specially constructed screening pads . . . .  During processing in the RSYs, gamma scans were performed for each of the survey units processed in the RSYs.  Radioactive material identified during the gamma scan activities was collected, segregated, and stored in appropriate containers for subsequent disposal by the DON radiological waste contractor.  Areas of soil that showed the potential presence of radiation levels greater than the established investigation limits were further evaluated, and biased soil samples were collected, as appropriate. Identified radiological contamination was characterized and remediated."

- "Radiological surveys were performed on a total of 1,443 sections of pipe and 137 manholes during the Parcel B removal action."

- "Gamma scans were performed on the exposed trench surfaces and numerous soil samples were collected from the sidewalls and bottom of the excavated trenches to determine whether radiologic contamination was present.  A minimum of 18 systematic soil samples were collected from each of the 70 Parcel B trench survey units and analyzed by the laboratory using gamma spectroscopy.  As necessary, remediation was performed to remove any identified radiologic contamination followed by the collection and analysis of verification soil samples."

- "During the Parcel B removal action, a total of 5,588 soil samples (including investigative, characterization, verification, and FSS samples) were collected from the 70 trench survey units and analyzed by the laboratory."

- "Radiological surveys were performed for each of the impacted Parcel B buildings/structures and former building sites, which typically included surface gamma scans, static measurements, and swipe samples or soil samples collected at discrete locations."

56.     Tetra Tech knew that these factual assertions were incomplete, misleading, and false.  Homebuilders relied on the Rad-RACRs prepared by Tetra Tech in investing in and planning redevelopment of the Shipyard.  At no time did Tetra Tech or the Navy disclose to Homebuilders that these statements from the Rad-RACRs were incomplete, misleading, and/or false.  Homebuilders built residences on Parcel A in reliance on the statements in the Tetra Tech Rad-RCRs, along with other representations and warranties by Tetra Tech and the Navy.

**2.     Tetra Tech Investigates Itself**

57.     The Government maintains that it became aware of potential data falsification in October 2012, when the Navy's Radiological Affairs Support Office ("RASO") identified discrepancies between two sets of systematic sampling results.  (Greenaction Pet. at 2.)  "This difference in lab results raised the prospect that the post-remediation samples were taken from a different site than the first two sets of systematic samples, that is, a different location from that claimed on chain-of-custody ("COC") documents."  (*Id.* at 7.)

58.     After learning that Tetra Tech submitted false data, the Navy granted Tetra Tech's request to investigate its own fraud.  Melanie Kito, the Navy's Lead Remedial Project Manager ("RPM") at HPNS, testified in an EPA Criminal Division Interview that "if a contractor is doing a poor job, they can try to fix the problem and do a report about it."  (EPA Criminal Investigation Division, Investigative Activity Report, Interview of Melanie Kito (Nov. 9, 2016) at 2, hereinafter "M. Kito Interview.").  Ms. Kito stated that the Navy RASO may have allowed Tetra Tech to self-investigate "so that Tetra Tech could identify the root cause of the problem."  *Id.*

59.     Tetra Tech documented the results of its self-investigation, which Tetra Tech

undertook at its sole expense, in a report titled *Investigation Conclusion Anomalous Soil Samples*

*at Hunters Point Naval Shipyard* (April 2014) ("Anomalous Samples Report").

60.     The Anomalous Samples Report indicates that during its investigation, "Tetra

Tech EC, Inc. (TtEC) identified additional survey units at [HPNS] that exhibited anomalous soil

sample results.  TtEC investigated each set of anomalous results; resampled and completed

additional remediation, where necessary; and revised and resubmitted reports for these areas."

(Anomalous Samples Report at ES-1.).

61.     According to the Anomalous Samples Report, "there is one feasible explanation

for [the anomalous] samples . . . .  That explanation is that the persons listed as the sample

collectors on the chain-of-custody forms, either by themselves or in conjunction with others,

collected soil samples in areas outside the designated survey units." (*Id*. at 18.)

62.     In November 2016, the EPA Criminal Division asked Ms. Kito "if there was

discussion about double-checking Tetra Tech's work" after Tetra Tech completed its

investigation and report.  Per the EPA, "Kito said that *the Navy relied on Tetra Tech*" (M. Kito

Interview at 3) (emphasis added), notwithstanding the fact that Tetra Tech was the same

contractor the Navy believed had already lied about the work to be investigated.

63.     Ms. Kito's statements reflect a dangerously lax and largely unsupervised

relationship between Tetra Tech and the Navy—a dynamic that both parties deliberately withheld

from Homebuilders.

**3.      Former Tetra Tech Employees Plead Guilty to Federal Crimes at HPNS**

64.     In 2017, unbeknownst to Homebuilders and following a confidential investigation

by the United States Department of Justice ("DOJ"), Stephen Rolfe and Justin Hubbard pled

guilty to destruction, alteration, or falsification of records in federal investigations.  Mr. Rolfe and

Mr. Hubbard admitted they substituted clean soil in place of legitimate samples from the areas

designated for testing.  Mr. Rolfe admitted he had instructed his subordinates to substitute clean

soil for legitimate samples on other occasions in 2012.  Mr. Rolfe and Mr. Hubbard's pleas and

sentencing were sealed and kept secret from Homebuilders and the public until they were unsealed by this Court on May 2, 2018.

65. Homebuilders learned for the first time key information about Tetra Tech's conduct upon the May 2018 unsealing of former Tetra Tech employees' criminal pleas, including that:

a. Samples were taken to examine whether radiological contamination remained in the soil. Tetra Tech oversaw and directed the falsification of soil samples from areas other than the Hilltop. Specifically, RCT Supervisors Mr. Rolfe, Mr. Hubbard, Mr. Dougherty, and Tetra Tech Construction Superintendent Dennis McWade instructed RCTs and others to destroy soil samples from contaminated areas and their related documentation and to take new samples from areas known to be not contaminated. Tetra Tech employees and subcontractors submitted false samples under the direction of Mr. Hubbard and Mr. Rolfe.

b. Tetra Tech gave unqualified employees responsibility for overseeing sampling and testing at the Shipyard. As a result, soil samples were collected and tested improperly. Tetra Tech hired unqualified individuals to save money. Tetra Tech also fired employees who threatened to reveal its improper conduct.

66. At all relevant times, Tetra Tech knew that its work at the Shipyard was intended to prepare the Shipyard for redevelopment by Homebuilders into residential and commercial properties. Tetra Tech knew that at least as early as 2004, the City of San Francisco had selected an affiliate of Lennar as the master developer for the Shipyard and that affiliates or subsidiaries of Lennar would build residences on Parcel A. Tetra Tech knew, at least as early as 2013, that Homebuilders had begun construction of residences on Parcel A.

**E. Navy Continued to Award Contracts to Tetra Tech After Learning of Its Fraud**

67. The Navy had a mandatory duty under the FAR not to award contracts to contractors with unsatisfactory performance records, including poor records of business ethics and integrity. Official Navy policy also required that no payment be made for defective work.

68.     Nevertheless, the Navy continued to award contract task orders and pay Tetra Tech for work at HPNS for several years *after* the Navy became aware of soil sample falsification. (*See United States of America, ex rel. Jahr, et al. v. Tetra Tech EC*, 3:13-cv-03835-JD, Defendant Tetra Tech's Motion to Dismiss Complaint in Intervention ("Tetra Tech MTD"), ECF No. 50 at 3, 5 (citing U.S. Compl.).)  The Navy "continued to award TtEC additional work at Hunters Point *for many years* after the investigation concluded."  (*Tetra Tech v. United States Environmental Protection Agency*, Case No. 4:20-cv-08100, ¶ 143 (emphasis added).)

69.     The Navy retained Tetra Tech as a contractor on an unrestricted Environmental Multiple Award Contract, despite acknowledgement by the Base Realignment and Closure ("BRAC") Environmental Coordinator that the "root problem" with Tetra Tech was its "lack of Quality Assurance/Quality Control (QA/QC)."  (EPA Criminal Investigation Division, Investigative Activity Report, Interview of George Patrick "Pat." Brooks (Sept. 27, 2016) ("P. Brooks Interview").)

**F.     The United States and Tetra Tech Concealed Information from Homebuilders**

70.     Homebuilders reasonably relied on the Navy to supervise and oversee Tetra Tech in the remediation of the Shipyard.  The Navy is subject to numerous statutory, regulatory, and contractual obligations to ensure a proper investigation and effective remediation.  The Navy was obligated to prevent misconduct such as that perpetrated by Tetra Tech and was under an obligation to be truthful and complete with Homebuilders (and others) about what Tetra Tech had done and not done and the impact it would have on redevelopment of the Shipyard.  The Navy and Tetra Tech, however, concealed, covered up, and minimized Tetra Tech's misconduct.

71.     Although the misconduct began earlier, Homebuilders did not learn and could not reasonably have learned of the scope, extent, or magnitude of the misconduct until on or around May 2, 2018, when the indictments against Mr. Hubbard and Mr. Rolfe were unsealed.  Before that time, the only government enforcement action of which Homebuilders were aware had been taken concerning Tetra Tech's misconduct was a $7,000 fine that the Nuclear Regulatory Commission ("NRC") levied, before reducing the fine amount to $0.  This minor fine, coupled

1    with the Navy's downplaying of the Greenaction Petition and NRC investigation and the failure

2    to disclose the extent of Tetra Tech's fraud, created an impression that any misconduct was minor

3    in scope.

4         72.    Prior to May 2018, Homebuilders communicated with the Navy and diligently

5    sought out real-time information about the progress of the cleanup efforts to plan for the timely

6    development under the transfer schedule provided by the Navy.  Although the Navy was aware or

7    should have been aware of the full extent of Tetra Tech's misconduct, it did not inform

8    Homebuilders of the extent, scope, or magnitude of Tetra Tech's misconduct, that the misconduct

9    persisted, or that the misconduct threatened to delay significantly the transfer schedule for other

10   portions of HPNS where amenities that could be used by Hilltop residents were planned.

11        73.    In fact, the Department of Justice had commenced a criminal investigation and was

12   actively investigating Tetra Tech and its employees for years, which culminated with the criminal

13   indictments that remained under seal until May 2018.  The Navy consistently failed to disclose

14   the full extent of Tetra Tech's misconduct or the type and scope of investigation, even when

15   responding to inquiries by Homebuilders and others about the potential for delay.

16        74.    For example, in 2017, five years after the Navy discovered discrepancies in Tetra

17   Tech's work, the Navy prepared a *Draft Radiological Data Evaluation Findings Report for

18   Parcels B and G Soil* (Sept. 2017) ("Draft Report").  The Draft Report was intended to "review

19   the historical data collected by [Tetra Tech] at HPNS, assess the potential for data falsification or

20   manipulation, and recommend follow-up data collection to validate previous decisions regarding

21   the property condition."  (*See* Draft Report at p. ii.)

22        75.    The Navy provided the Draft Report to the U.S. EPA, California Department of

23   Toxic Substances Control ("DTSC"), and the California Department of Public Health for their

24   independent review with a technical team including national experts in health, physics, geology,

25   and statistics.  The Navy did not provide the Draft Report to Homebuilders.

26        76.    In a December 2017 confidential email to the Navy, the EPA indicated that the

27   Navy severely downplayed the extent of Tetra Tech's fraud in its Draft Report.  For instance,

28

while the Navy recommended resampling in only 15% of soil survey units and trenches, fill, and building sites in Parcel B; the EPA, DTSC, and CDPH "found signs of potential falsification, data manipulation, and/or data quality concerns that call into question the reliability of soil data in an *additional 76% of survey units*, bringing it to approximately 90% the total suspect soil survey units in Parcel B." The regulatory agencies recommended resampling of 97% of survey units in Parcel G, whereas the Navy's only deemed 49% of that area suspect.

77. Recognizing the Navy's failures, the EPA urged the Navy to provide "a more detailed discussion about data quality and the resampling effort . . . to provide assurance that any area not being resampled has defensible data." (*See* EPA Dec. 2017 Letter to Navy.)

78. The EPA further expressed its concerns in a March 2018 letter to the Navy, where the EPA found that the "Conceptual Site Model" or "CSM" in the Navy's *Draft Work Plan, Radiological Survey and Sampling* did "not provide a sufficient identification" of certain "sources of contamination and/or site conditions." (*Id*. at 2.) The EPA remarked: "The CSM statement that all known sources of contamination at the site have been removed *does not accurately reflect site conditions*. Please modify this statement to represent site conditions more accurately with respect to the listed uncertainties in the CSM." (*Id*. at 3, emphasis added.)

79. A few months later, on September 21, 2018, the EPA sent the Navy a letter commenting on the Navy-approved *Draft Fourth Five-Year Review* (July 2018). (*See* Letter from Lily Lee, RPM, U.S. EPA Region IX to Derek J. Robinson, BRAC Environmental Coordinator, Department of the Navy (Sept. 21, 2018).) The letter criticized the Navy's management of re-sampling and cleanup work, admonishing its failure to be upfront about the falsified soil sampling that Tetra Tech committed throughout HPNS.

80. In the comments, EPA Region IX complained that the Navy's review failed to "adequately discuss the Tetra Tech EC Inc. potential contractor manipulation and/or falsification of radiological data at Hunters Point, and its effect on the protectiveness of the radiological remedies. Some of the fraudulent activity has been confirmed through enforcement actions . . . . [T]his issue has significantly undermined trust in the Navy, and stakeholders are frustrated by the

*Navy delays and want more communication and transparency.* This document should address the issue up front beginning with the Executive Summary and throughout the entire document wherever relevant." (*Id.* at 2 (emphasis added).)

81.     Furthermore, despite knowing of Tetra Tech's wrongful conduct, the Navy permitted Tetra Tech to continue its work at the Shipyard.

82.     It was not until May 2018 that Homebuilders were informed of the scope, extent, and magnitude of Tetra Tech's misconduct or the United States' investigation into that misconduct—and even then, the disclosure came by way of unsealed plea agreements. By that time, of course, Homebuilders had already incurred hundreds of millions of dollars in expenditures and had made significant progress developing the property.

83.     Through reasonable diligence, Homebuilders could not have discovered earlier the facts underlying the causes of action herein because they had been concealed, covered up, misrepresented, and/or minimized by Tetra Tech and the Navy.

## V.     JURISDICTIONAL FACTS AND HARM TO HOMEBUILDERS

### A.     The Navy Failed to Fulfill Mandatory and Specific Oversight Duties

84.     On November 19, 2021, the Court dismissed Homebuilders' initial complaint against the United States based on its finding that the allegations against the United States provided insufficient information regarding the mandatory and specific duties the United States violated. Thereafter, Homebuilders and the United States engaged in discovery regarding the jurisdictional issues the United States had raised in its initial motion to dismiss, including production of documents and the deposition of Navy witness Lawrence Lansdale, the Environmental Director of the Department of the Navy Base Realignment and Closure Program Management Office for the Naval Facilities Engineering Command. The following allegations are in large part derived from the facts Homebuilders learned through that discovery process.

85.     The Navy has the primary responsibility for the closure, cleanup, and ultimate transfer of the former HPNS property. As explained by Mr. Lansdale, the Navy's policy is to enter into contracts for the type of investigation and remediation work required for that transfer

with independent environmental contractors, which in this case included Tetra Tech, among others. The Navy's primary role is to ensure that its contactors complied with requirements necessary to the adequate performance of all investigation and remediation work.

86. As detailed below, federal regulations, Navy policy manuals, HPNS project plans, and contractual requirements impose oversight duties on the Navy to ensure that its contactors appropriately performed all investigation and remediation work. The acts and omissions detailed below were catastrophic failures by the Navy that the Navy and Tetra Tech obscured, such that property developers like Homebuilders could not reasonably be expected to have discovered them.

**1. CERCLA and the NCP Imposed Mandatory Duties on the Navy**

87. CERCLA regulates the remediation of hazardous waste at uncontrolled or abandoned waste sites. *See* 42 U.S.C.S. § 9604.

88. CERCLA and the subsequent Superfund Amendments and Reauthorization Act of 1986 ("SARA") establish a series of programs for the cleanup of hazardous waste disposal and spill sites nationwide. One such program applicable to the Navy is the Defense Environmental Restoration Program ("DERP"), which is codified in SARA Section 211 (10 U.S.C. § 270I). DERP is subject to and must be consistent with CERCLA. (*See* Navy/Marine Corps Installation Restoration Manual 1992, 16.) Through the DERP, the Department of Defense conducts environmental restoration activities. The Department of Defense (which includes the Department of the Navy) must follow the same cleanup regulations that apply to private entities.

89. The EPA developed the NCP in response to CERCLA's enactment. The NCP defines the organizational structure and procedures for preparing for and responding to hazardous substance releases. *See* 42 U.S.C.S. § 9605.

90. When the EPA determines that clean up action can be done properly and promptly by another responsible party, the EPA may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with CERCLA. *See* 42 U.S.C.S. § 9604.

91.     Pursuant to CERCLA and the FFA, the Navy was required to comply with all regulations that would otherwise apply to the EPA.  Furthermore, "[n]o department, agency, or instrumentality of the United States may adopt or utilize any such guidelines, rules, regulations, or criteria which are inconsistent with the guidelines, rules, regulations, and criteria established by the Administrator under this chapter."  *See* 42 U.S.C.S.§ 9620.

92.     The NCP requires the lead agency of a remediation site to assemble and evaluate existing data from a site, including the results of any site inspections, preliminary assessments, removal actions, and the National Priorities List listing process (40 C.F.R. § 300.430(b)), and to then use that information to develop a remedial investigation plan to characterize the nature of, and threat posed by, hazardous materials at a site.  *See* 40 C.F.R. § 300.430(b)–(d).

93.     As the lead agency, the Navy—not Tetra Tech—had ultimate responsibility for complying with these statutory and regulatory requirements.

94.     CERCLA requires the Navy to "attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which assures protection of human health and the environment."  The Navy failed to meet this standard.

95.     According to the Government, "Tetra Tech falsified or caused the falsification of soil surveys, as described above, and falsified or caused the falsification of building surveys, as described below, in connection with its work in Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3 at dozens of survey units . . . ."  (U.S. Compl. at ¶ 61.)

96.     Attachments to the United States' Complaint in Intervention lists 236 reports and 156 invoices spanning nearly a decade, from 2009 to 2018, that the Government alleges contain false or fraudulent data.

97.     The extent and duration of Tetra Tech's fraud make clear that the Navy could not possibly have met its obligations under CERCLA.  The Navy had no discretion to abandon these duties under the applicable statutes and regulations, including CERCLA and the NCP.

98.    The RPM is responsible for ensuring "that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response, to the extent practicable, consistent with the requirements of § 300.155 of this part." 40 C.F.R. § 300.135.

99.    In turn, 40 C.F.R. § 300.155 requires: "When an incident occurs, it is imperative to give the public prompt, accurate information on the nature of the incident and the actions underway to mitigate the damage." The Navy's RPMs and community relations personnel should "coordinate with available public affairs/community relations resources to carry out this responsibility by establishing, as appropriate, a Joint Information Center bringing together resources from federal and state agencies and the responsible party."

100.    In addition, prior to the initiation of Remedial Design ("RD"), the lead agency is required to develop a community relations plan ("CRP," also referred to as a "Community Involvement Plan" or "CIP"). "The community relations requirements specified in §§ 300.415, 300.430, and 300.435 apply to removal, remedial, and enforcement actions and are intended to promote active communication between communities affected by discharges or releases and the lead agency responsible for response actions." 40 C.F.R. § 300.155.

101.    The EPA has determined that the Navy's Community Involvement Plan at Hunters Point posed serious concerns. The Navy's CIP commits to survey the community every two years about its community outreach and involvement program in order to ". . .ensure that the actions that are implemented continue to meet the needs of the HPNS community." However, in 2020, the EPA noted that it was "unsure if the Navy's current community outreach and involvement program is meeting the needs of the Bayview Hunters Point community, especially in light of the surveying and evaluation process by which you decided to continue dissolution of the Restoration Advisory Board ["RAB"]." The EPA determined that the Navy's recent evaluation regarding the RAB decision was not sufficiently robust. Rather, the Navy failed to

provide complete documentation of the process to the EPA. Nor did the Navy adequately evaluate how its program was meeting the needs of the community. (*See* Letter from Enrique Manzanilla, EPA, Director Superfund Division, to Laura Duchnak, Director BRAC Program Management Office (Aug. 27, 2020).)

102. The Navy has not complied with these requirements. The Navy did not communicate with the public in 2012 after first learning of Tetra Tech's fraud. The Navy did not consider the interests or the concerns of the public in this regard, nor did the Navy provide prompt and accurate information in light of the incident that occurred. The Navy's failures in this regard are a direct violation of its duties under CERCLA and the NCP.

**2. Federal Facility Agreement for Naval Station Treasure Island – Hunters Point Annex**

103. The FFA is "binding upon EPA, the State of California, and the Navy." (FFA §§ 2.1.) The general purpose of the FFA is to "*ensure* that the environmental impacts associated with past and present activities at the Site are thoroughly investigated and appropriate remedial action taken as necessary to protect the public health, welfare and the environment." (FFA § 1.1(a) (emphasis added).)

104. Additionally, the FFA is intended to "[a]ssure compliance, through this Agreement, with RCRA and other federal and State hazardous waste laws and regulations for matters covered herein." (*Id.* at § 1.2(e) (emphasis added).) To that end, the FFA fully integrates the "Navy's CERCLA response obligations and RCRA corrective action obligations which related to the release(s) of hazardous substances, hazardous wastes, pollutants, or contaminants covered by [the FFA]." (FFA at § 17.1.)

105. The FFA imposes ultimate responsibility on the Navy to "undertake, seek adequate funding for, fully implement[,] and report on" the investigation and remediation of contaminants at Hunters Point. (*Id.* at § 6.2.) As such, the Navy "*shall be responsible* for ensuring that its contractors comply with the terms and conditions of this Agreement." (*Id.* at § 2.3 (emphasis

added).)  Moreover, "the Navy has ultimate responsibility for meeting its respective deadlines or schedule" under the Agreement.  (*Id.* at § 18.3.)

106.    The FFA notes that "[f]ailure of a Party to provide proper direction to its contractors *and any resultant noncompliance with this Agreement by a contractor* shall not be considered a Force Majeure event . . . ."  (FFA at § 2.3 (emphasis added).)  The parties to the FFA were *required* to give proper direction to contractors, and failure of a contractor to comply with federal and State hazardous waste laws and regulations would be considered noncompliance by the parties to the FFA.

107.    The FFA requires that the Navy's mandatory oversight role be far more than passive or tangential.  It provides that the Navy "shall [] designate a Remedial Project Manager and an alternate . . . for the purpose of overseeing the implementation of this agreement."  (*Id.*)  The Remedial Project Manager is "responsible *on a daily basis* for assuring proper implementation of the [Remedial Investigation/Feasibility Study] and the [Remedial Action/Remedial Design]."  The Remedial Project Manager is broadly "responsible for day-to-day field activities at the Site" altogether.  To that end, the Navy's Remedial Project Manager "shall be present at the Site or reasonably available to supervise work during all hours of work performed at the Site."  (*Id.* at §§ 18.1, 18.5.)  The Navy failed to comply with these mandatory and specific requirements.

>                    a.    **The Quality Assurance Officer Failed to Satisfy Its Duties Under the FFA**

108.    "In order to provide quality assurance and maintain quality control regarding all field work and sample collection," the FFA requires the Navy to "designate a Quality Assurance Officer (QAO) who ***will ensure*** and document that all work is performed in accordance with approved work plans, sampling plans and [QA Plans]."  (*Id.* at § 20.1 (emphasis added).)  In addition, the QA Officer "***shall maintain*** for inspection a log of quality assurance field activities and provide a copy to the Parties upon request."  (*Id.* (emphasis added).)

109.     The Navy QAO failed to ensure and document that all work at the Shipyard was performed in accordance with approved work plans, sampling plans, and Quality Assurance Project Plans or "QAPPs."  For instance, the Navy QAO failed to ensure and document that (1) Tetra Tech complied with COC requirements; (2) all soil samples were transported to the laboratory; (3) soil samples were collected properly; (4) survey units that exceeded release criteria were investigated and remediated; (5) survey units were 100 percent gamma surveyed; and (6) survey scans were conducted properly.

**(1)     Navy QAO's Failure to Ensure and Document Compliance with Chain-of-Custody Requirements**

110.     COCs are used to document the proper collection and transportation of material samples.  COCs provide documentary evidence to authenticate who, where, and when samples were collected, transported, and analyzed.  The EPA requires signed and dated COC documentation to verify that the appropriate personnel maintained custody of samples from the time of collection through analysis and storage, in order to prove that the samples were not tampered with or altered.  (EPA Dec. 2017 Letter at 4.)

111.     The work plans, sampling plans, and QAPPs applicable to HPNS set forth several requirements governing the procedure for completing and transmitting COCs:

a.     "An overriding consideration for data sampling from laboratory analyses is the ability to *demonstrate that the data are legally defensible, i.e., that the samples were obtained from the locations stated and that they reached the laboratory without alteration*.  To accomplish this, evidence of collection, shipment, laboratory receipt, and laboratory custody until disposal **will be documented** *through the COC record*."  (*Final Sampling Plan and Quality Assurance Project Plan* (Oct. 2007) ("Oct. 2007 Plan") at § 4.1.4 (emphasis added);[3] *see also Final Sampling Plan and Quality Assurance Project Plan: Base-wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) ("Jul. 2010

---

[3] Navy QAO Narciso Ancog reviewed, signed, and approved the 2007 *Final Sampling Plan and Quality Assurance Project Plan* on October 4, 2007.  This document is attached as Appendix B to the *Base-wide Radiological Work Plan*, Rev. 1 (Oct. 5, 2007).

Plan") at p. 165 [containing the same language];[4] *Final Sampling Plan and Quality*

*Assurance Project Plan: Basewide Radiological Support* (Jan. 2011) ("Jan. 2011 Plan") at

p. 169 [containing the same language].)[5]

b.      For chains of custody, "*At a minimum*, each sample container *will be* labeled with

the following . . . sample collection date (month/day/year), time of collection (24-hour

clock) from the start of sampling."  (Oct. 2007 Plan at § 4.1.3.)

c.      "To establish the documentation necessary to trace sample possession from the

time of collection through analysis, the COC record *will be* completed and *will*

*accompany* every sample."  (*Id.* (emphasis added).)

d.      "Sample collection records *will include* field logbooks and COCs."  July 2010

Plan at Attachment 2, p. 9, emphasis added.)

e.      "Field data from the COCs (date and time collected, sample identification, etc.)

*will be* entered into the TtEC database by the Project Chemist."  (*Id.* at p. 74; *see also* Oct.

2007 Plan at B.8-2.)

f.      "A copy of the COCs *will be* faxed/emailed to the Project Chemist on a daily basis

for review and communication with the laboratory."  (Jul. 2010 Plan at 73 (emphasis

added); Jan. 2011 Plan at p 81 [same].)

g.      "Samples *will be* recorded on COC documentation."  (Jul. 2010 Plan at

Attachment 2 (*Hunters Point Shipyard Standard Operation Procedures*), p. 6 (emphasis

added).)

h.      "Field forms for this project *will include* COC forms."  (Oct. 2007 Plan at B.4-2.)

i.      "Field documents and COC records *will be* reviewed to ensure that all entries are

printed or written in indelible black or blue ink, dated, and signed.  Sampling operations

---

[4] Navy QAO Narciso Ancog reviewed, signed, and approved the 2010 *Final Sampling Plan and Quality Assurance Project Plan* on July 20, 2010.  This document is attached as Appendix A to the *Final Project Work Plan*, Rev. 4 (July 30, 2010).

[5] Navy QAO Narciso Ancog reviewed, signed, and approved the 2011 *Final Sampling Plan and Quality Assurance Project Plan* on January 14, 2011.  This document is attached to a January 21, 2011 *Final Execution Plan*.

will be reviewed and compared to this SAP and other applicable SOPs. Use of proper sample containers, proper handling of samples, and *adequate documentation of the sampling operation will be verified*." (*Id*. at B.9-1 (emphasis added).)

112. In addition, several of the QAPPs for the Shipyard contain "sample" COC records, which require Tetra Tech, among other things, to identify the sample ID, the date the sample was collected, the time the sample was collected, the location where the sample was collected, who collected the sample, and to whom it was relinquished. (*See, e.g.*, Jul. 2010 Plan at Attachment 1 [sample COC record].)

113. The Navy QAO failed to ensure and document that all work at the Shipyard was performed in accordance with the COC requirements set forth in the Oct. 2007 Plan, Jul. 2010 Plan, and Jan. 2011 Plan, among others.

114. Tetra Tech failed to complete COCs for various survey units at HPNS. The Navy QAO failed to ensure and document that COC records were completed for and accompanied "every sample" in accordance with the Oct. 2007 Plan, Jul. 2010 Plan, and Jan. 2011 Plan, among others. (*See* EPA Dec. 2017 Letter to Navy at 3-4.)

115. The Navy QAO also did not ensure and document that samples were obtained from the locations stated in the COC form in accordance with the Oct. 2007 Plan, Jul. 2010 Plan, and Jan. 2011 Plan, among others. Instead, post-remediation samples were collected in a location different from that claimed on the COC documents.

116. In his plea agreement, Mr. Rolfe conceded that "soil locations reported in the chain-of-custody forms and survey unit tracking sheets" for certain samples "were false, that is, that the locations reported on the forms regarding where the soil came from were untrue." (*United States of America v. Stephen C. Rolfe*, No. CR-17-0123-JD, Plea Agreement of Stephen C. Rolfe ("Rolfe Plea Agreement") at 3; *see also* U.S. Compl. at ¶ 62 [Rolfe "admitted . . . he knew that the soil locations reported on the Chain-of-Custody Record forms were false"]; *see id*. at ¶ 57 ["Tetra Tech submitted these falsified soil samples to the lab accompanied by a Tetra Tech

Chain-of-Custody Record falsely identifying the Survey Unit (*and therefore the location from which the soil was collected*) of each sample"] (emphasis added).)

117.    The Navy QAO's failure to ensure and document that samples were obtained from the locations stated in the COC is further confirmed by Tetra Tech's 2014 Investigation Report, which concluded that "persons listed as the sample collectors on the [COC] forms, either by themselves or in conjunction with others, collected soil samples in areas outside the designated survey units." (2014 Investigation Report at 18; *see also* Greenaction Pet. at 1 ["Tetra Tech employees and the radiological subcontractors it directly supervises were involved in . . . fake sampling, in which soil samples – *potentially thousands of them* – were reported to have been taken at one location when they were actually taken from another"] (emphasis added).)

118.    And unbeknownst to Homebuilders, between November 18, 2011 and June 4, 2012, when tasked with obtaining soil samples to ascertain the amount of residual radioactivity in specific locations within Parcel C, Tetra Tech employees instead obtained soil samples *from other areas* that were suspected to be less contaminated. The Tetra Tech employees then represented (on related COC records*)* that the samples had been obtained from the specified locations.

119.    The Navy QAO failed to ensure and document that COCs identified the actual time that samples were taken in accordance with the Oct. 2007 Plan, Jul. 2010 Plan, Jan. 2011 Plan, and other similar plans. This is evidenced through sworn declarations submitted by Bert Bowers, the Radiation Safety Officer at HPNS, and Anthony Smith, a Senior Health Physics Specialist at HPNS, as well as the Greenaction Petition to Revoke the Materials License of Tetra Tech.

120.    For example, according to the Greenaction Petition, "COCs for anomalous samples purport they were collected in exact five-minute intervals, precisely on the five-minute mark." (*See* Greenaction Pet., at 8.) COCs that identify Jeff Rolfe as the sampler claim he took almost 50 samples over a span of a couple days in *exact* five-minute intervals. (*Id.*) Other COCs claim samples were taken *precisely* every three minutes without deviation. (*Id.*) However, "according to experienced [Health Physics Specialists] . . . soil samples cannot be taken with such

rigid regularity. The need to prevent cross-contamination of samples and sampling equipment from one sample location to another precludes it; [Health Physics Specialists] need to follow exacting practices to decontaminate all sampling equipment between samples, making five-minute intervals ***impossible***." (Greenaction Pet. at 9 (emphasis added).) Justin Hubbard indicated in an interview that "[o]ne sample could take 40 minutes." (*Id.* at 8 [citing interview by Tetra Tech in connection with Anomalous Samples Report].)

121. Experienced Health Physics Specialists have explained the sampling interval "*would have raised immediate red flags* that either the COCs were filled out in error, which would violate proper COC procedures, or that sampling was done fraudulently." (Declaration of Bert Bowers in Support of Petition to Revoke the License of Tetra Tech EC, Inc. ("E. Bowers Declaration") at 38 (emphasis added); *see also* Declaration of Anthony Smith in Support of Petition to Revoke the License of Tetra Tech EC, Inc. ("A. Smith Declaration") at 10 ["Looking at the COC forms from Hunters Point displays that the forms are falsified . . . . In my experience, it is impossible to take soil samples every five minutes if you follow proper procedures"].)

122. Some COCs reported that samplers were collecting soil in two places at one time in a given day. Others stated that samplers took more collections than would have been physically possible in a single day. (*See* A. Smith Declaration, p. 10.)

123. The Navy QAO negligently failed to ensure and document that COCs were completed in accordance with work plans, sampling plans, and QAPPs.

> **(2)   Navy QAO's Failure to Ensure and Document that Soil Samples Were Transported to the Laboratory**

124. The work plans, sampling plans, and QAPPs applicable to HPNS contained several requirements governing the procedure for transporting soil samples to the laboratory for analysis:

125. "Samples *will be* delivered for analysis to an on-site laboratory via a box, cooler, or similar container (ice is not required if only radiological analysis will be performed) along with the completed COC." (*Final Sampling Plan and Quality Assurance Project Plan: Base-wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010), Attachment 2 at 9 (emphasis added); *see*

*also Final Field Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007), Attachment 2 at 9.)

126. For samples shipped to an off-site laboratory, "samples *will be* transported to the laboratory via courier or FedEx. The courier who receives samples will sign the COC and accept the samples. For samples shipped via FedEx, the COC will be packaged within the cooler, and the sender's copy of the airbill will serve as custody documentation and will be maintained on-site in the project files." (*Final Sampling Plan and Quality Assurance Project Plan: Base-wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 217 (emphasis added); *see also Final Field Sampling Plan and Quality Assurance Project Plan* (Oct. 5, 2007) at B.4-4 ["Samples *will be* transported to the laboratory via hand delivery, laboratory-provided courier, FedEx, UPS, or DHL (which may be referred to generically as a commercial carrier)"] (emphasis added).)

127. The Navy QAO failed to ensure and document that Tetra Tech performed all work at the Shipyard in accordance with the requirements set forth in the above work plans, sampling plans, and QAPPs with respect to transporting soil samples for analysis to on-site and off-site laboratories.

128. Tetra Tech's RCTs and field workers discarded samples that were known or suspected to be too "hot" (i.e., above the cleanup standard) along with their COCs, instead of transporting them to the laboratory in conformance with the above requirements under the Oct. 2007 Plan, Jul. 2010 Plan, Jan. 2011 Plan, and other similar plans. (Greenaction Pet. at 1, 34.)

129. Tetra Tech's onsite executive, the Project Manager, was not only aware of sample destruction, but directed it. (Greenaction Pet. at 35; *see also* Draft Report at 2 ["Onsite soil sample results were reviewed and shipment of samples to the offsite lab was blocked if there was a high chance that the release criteria would be exceeded"]; U.S. Compl., ¶ 56 ["Tetra Tech managers instructed RCTs to discard soil samples collected from certain Survey Units at Hunters Point"].)

130.    The Navy QAO failed to ensure and document that soil samples were transported to the on-site and off-site laboratories in accordance with the Oct. 2007 Plan, Jul. 2010 Plan, Jan. 2011 Plan, and other similar plans.

### (3)    Navy QAO's Failure to Ensure and Document Proper Collection of Soil Samples

131.    Tetra Tech prepared Task Specific Plans ("TSPs") for survey and remediation work performed under the Base-wide Work Plans.

132.    TSPs are a form of work plan.  They are intended to supplement the information performed under the Base-wide Plans.  (*See, e.g.*, 2005 Work Plan at 1-3.)  Each TSP provides relevant location-specific data and identifies variances and/or additions to the Base-wide Plan.  (*Id.*; *see also* U.S. Compl. at ¶ 25 [TSPs "detail the specific work plan for conducting soil samples and radiological surveys of building surfaces, as well as the standards applicable to the work"].)  Each TSP for HPNS was "prepared by Tetra Tech, and approved by the Navy, with concurrence by the EPA, DTSC, and CDPH."  (U.S. Compl. at ¶ 25.)

133.    TSPs provide the details for the Final Status Survey for each survey unit at HPNS.  Final Status Surveys are used to demonstrate that identified residual radioactivity levels in survey units meet release criteria and to remediate any soil that contains radionuclides at levels that exceed release criteria.  Final Status Surveys are conducted in conformance with the Base-wide Work Plans.

134.    At HPNS, the TSPs "identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations."  (*United States of America v. Justin E. Hubbard*, No. CR-17-0278-JD, Plea Agreement of Justin E. Hubbard ("Hubbard Plea Agreement") at 3.)

135.    "A survey unit is a physical area consisting of structures or land areas of specified size and shape for which a separate decision will be made as to whether or not that area exceeds the release criteria.  This decision is made as a result of the [Final Status Survey].  As a result, *the*

1  *survey unit is the primary entity for demonstrating compliance with the release criteria.*"  (*Base-*

2  *wide Radiological Work Plan*, Rev. 1 (Oct. 5, 2007) at 4-4 (emphasis added).)

3       136.    The Navy QAO failed to ensure and document that Tetra Tech performed all work

4  at the Shipyard in accordance with the TSPs for HPNS.  Specifically, the Navy QAO failed to

5  ensure and document that Tetra Tech took all samples from the survey unit locations identified in

6  the TSPs.

7       137.    The Navy QAO's failure to ensure and document that all samples were taken from

8  the survey unit locations identified in the TSPs is demonstrated in numerous documents,

9  including guilty pleas of Stephen Rolfe and Justin Hubbard.  For example, in his plea agreement,

10  Mr. Rolfe stated:

11      During 2012, I told the RCTs on my team to get "clean dirt" from areas known to
    be clean and taken ***from outside the marked survey unit areas*** to use as substitute

12      samples for the dirt from the marked survey unit.  I did this so that the survey unit
    would pass the laboratory analysis and not require further remediation . . .  I

13      directed the RCTs to switch soil for samples 81-100 for Survey Unit 22, taken on
    August 23, 2012.  On that occasion, I falsified data on the survey unit tracking

14      sheet in that I stated on the form the soil came from within that Survey Unit when I
    knew it did not.  I also know that the sampling data from Survey Unit 22

15      incorporated into the map and analyses sent by Tetra Tech to the U.S. Navy on
    August 29, 2012 ***was false***.  I did not receive extra compensation for substituting

16      "clean" soil for potentially contaminated soil in a survey unit.  My motivation
    came from pressure applied by the Tetra Tech supervisors.  One told me on

17      multiple occasions to "get the hell out of that area," in reference to a particular
    survey unit that was not testing clean.  Another told me on more than one occasion

18      that we were "not remediating the whole goddam site."  An Assistant HPNS
    Project Manager told me on numerous occasions to "get clean dirt."  ***I understood***

19      ***these statements as a direction to go outside the appropriate survey unit and get***
    ***dirt from other areas that was known to be clean, that is not containing***

20      ***excessive levels of radiation***.

21  (Rolfe Plea Agreement at 3-4 (emphasis added).)

22       138.    Justin Hubbard stated in his plea agreement:

23      During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I
    obtained "clean" dirt from an area north of Buildings 253 and 211 at HPNS and

24      substituted it for dirt taken from survey units in the North Pier area of HPNS.  To
    effect this illegal switching, I drove my company truck to the area north of

25      Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil
    from an area ***I knew to be outside the relevant marked survey unit***.  I then drove

26      the clean dirt back to a "conex box"-style trailer.  Once I was inside the conex, I
    emptied the "legitimate" soil samples previously collected by RCTs from their

27      sampling bags into an empty bucket, and substituted the clean serpentinite soil into
    each sampling bag . . .  On or about May 31, 2012, ***I fraudulently switched soil*** for

28

four survey units on the North Pier of HPNS: Survey Units l, 8, 10, and 11.  For Survey Unit 1, I specifically recall replacing the soil samples 28-47 with soil I had collected from a clean area.

(Hubbard Plea Agreement at 3-4 (emphasis added).)

139.    The United States informed the Court that in the Navy Final Status Survey Reports, Final Survey Unit Project Reports, final Removal Action Completion Reports, and/or Characterization Survey Result Reports, "Tetra Tech falsely stated that soil samples were properly collected from designated survey units, when, in fact, samples of soil that Tetra Tech knew to be 'clean' were collected from locations outside of the designated survey units and submitted to the laboratory for analysis.  In the Reports, Tetra Tech stated the soil sample analytical results as if the soil was properly collected."  (U.S. Compl. at ¶ 70; *see also id*. at ¶ 59 [Tetra Tech "switched real samples with fake clean dirt *between 800 and 1000 times*"] (emphasis added); Greenaction Pet. at 12 ["HPs were directed by their supervisors to obtain false samples *nowhere near the area intended to be sampled*, but rather in at least three remote locations known from prior sampling to contain 'clean' soil. Tetra Tech management pressured its supervisors to have the HPs engage in fraudulent sampling that would guarantee lab results under the free release levels so it could get fully paid without incurring the full costs of the cleanup"] (emphasis added).)

140.    Finally, Tetra Tech's 2014 Investigation Report concluded that "persons listed as the sample collectors on the [COC] forms, either by themselves or in conjunction with others, collected soil samples in areas outside the designated survey units."  (2014 Investigation Report at 18.)

141.    The Rolfe and Hubbard plea agreements, the NRC enforcement action, Tetra Tech's 2014 Investigation Report, and the Government's statements in submissions to this Court demonstrate that the Navy QAO failed to ensure and document that all work was performed in accordance with the TSPs.

142.    Tetra Tech employees took soil samples from outside designated survey units potentially thousands of times.

### (4) Navy QAO's Failure to Ensure That Survey Scans Were Conducted Properly

143.    The 2007 Work Plan provides, "Scan surveys are an integral part of the survey program conducted to determine radiological contamination levels.  The surveys are an evaluation technique performed by moving a detection device over a surface at a *specified speed* and *distance above the surface* to detect radiation.  It will be used to identify areas that may require additional survey measurements."  (*See* 2007 Work Plan at 8-1.)

144.    The ability of the scanning device to accurately detect radiological contamination at the desired concentration is a result of many factors, among which is the amount of time the sample is exposed to the scanning device and the distance the device is held from the sample.

145.    The scanning speed is a critical component in effectively providing reliable results.  Therefore, the scan speed is predetermined and listed in Project Work Plans and TSPs and must be followed.  (*See, e.g.*, 2007 Work Plan at §§ 8.2.1 [scan surveys for alpha/beta radiation], 8.2.2 [scan surveys for gamma radiation].)

146.    Changing something as critical as the scan speed is a major modification to sampling plans and requires prior approval by the Navy.  Increasing the scan speed, thereby reducing the amount of time the sample is exposed to the device, would have a negative bias on radiological detections.

147.    The Navy QAO failed to ensure and document that scanning devices were used at the speeds approved in Base-wide Work Plans and TSPs.

148.    Tetra Tech accelerated a conveyor belt system, used to run potentially contaminated soil through a radiation scanner, in order to decrease identification of radiological contamination of the soil.  The conveyor belt system was accelerated up to six to nine times the approved speed.  Tetra Tech also took actions to cripple the conveyor belt system's ability to detect radiation by intentionally disabling its radiation detection alarm.

149. Tetra Tech pulled scanning devices (tow array) at RSYs at speeds much faster than allowed under proper procedure in order to intentionally reduce the probability of radiation detection.

150. Tetra Tech manipulated the scan speed of these devices **hundreds** of times.[6]

151. These facts demonstrate that the Navy QAO clearly failed to ensure and document that all work was performed in accordance with work plans because Tetra Tech manipulated scan speeds in contravention of the approved speeds set forth in Base-wide Work Plans and TSPs.

152. Accordingly, the Navy QAO acted negligently by failing to ensure and document that Tetra Tech performed work in compliance with applicable work plans, sampling plans, and QAPPs in contravention of the FFA.

153. The Navy QAO also acted negligently by failing to discover the widespread fraud perpetrated by Tetra Tech because he failed to perform mandatory duties under the FFA. There is no policy decision underlying the Navy QAO's failure to discover these widespread deficiencies.

154. Likewise, no social, economic, or political policy is implicated in the Navy QAO's decision whether to ensure and document that work was performed in accordance with approved work plans, sampling plans, and QAPPs.

155. Work plans, sampling plans, and QAPPs are highly technical documents. For example, the *Uniform Federal Policy for Quality Assurance Project Plans* explains QAPPs are comprehensive documents that identify technical steps that must be taken to ensure the quality of environmental data.

156. Federal policy provides that a QAPP is "a formal document describing in comprehensive detail the necessary quality assurance (QA), quality control (QC), and other

---

[6] *See* Declaration of Archie Jackson in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at 5 ("There were other unprofessional practices taking place. One such practice was taking soil scans too quickly. Soil was surveyed for gamma radiation on the RSY screening pads by spreading soil over a pad to a thickness of about 6 inches. A 'towed array,' containing radiation detection equipment was pulled over this pad by a small tractor. This had to be performed at a slow speed; if it was too fast, valid results could not be obtained. But I saw HPs performing soil surveys operating the towed array too fast. I saw this happen at RSY-2, RSY-3 and RSY-4. My best estimate from my own observations is that scanning too fast happened hundreds of times.")

FIRST AMENDED COMPLAINT AGAINST
TETRA TECH AND THE UNITED STATES
CASE NO. 3:20-CV-01485-JD

*technical* *activities* that must be implemented to ensure that the results of the work performed will

satisfy the stated performance criteria.  A QAPP presents the steps that should be taken ***to ensure***

***that*** **environmental data** ***collected are of the correct type and quality required for a specific***

***decision or use***.  It presents an organized and systematic description of the ways in which QA and

QC should be applied to the collection and use of **_environmental data_**.  A QAPP ***integrates***

**technical** ***and quality control aspects*** of a project throughout its life cycle, including planning,

implementation, assessment, and corrective actions." (*See Uniform Federal Policy for Quality*

*Assurance Project Plans*, Part 1: UFP-QAPP Manual, Final Version 1 (March 2005) at vii

(emphasis added).)

157.    Likewise, TSPs, a form of work plan, are highly technical documents that provide

details for surveys of buildings and areas at HPNS in accordance with scientific approaches and

methodologies in Base-wide Work Plans, Standard Operating Procedures, Accident Prevention

Plans, and Site Safety and Health Plans to determine if residual radioactivity is present at the

Shipyard above established release criteria.

158.    The conduct of ensuring and documenting that radiological investigation and

remediation work is performed in conformance with these highly technical documents involve

matters of scientific and professional judgment.

159.    The Navy QAO must use his or her scientific and professional judgment in

applying technical training and expertise in determining how to ensure that "all work is

performed in accordance with approved work plans, sampling plans, and QAPPs," including that

(1) proper chain-of-custody requirements are followed; (2) all soil samples are transported to the

laboratory for analysis; (3) soil samples are collected in conformance with applicable QAPPs and

work plans; (4) survey units that exceeded release criteria are investigated and remediated;

(5) survey units are 100 percent gamma surveyed; and (6) survey scans are conducted properly.

(FFA § 20.1.)

160.    The failure of the Navy QAO to ensure and document that Tetra Tech performed work in compliance with applicable work plans, sampling plans, and QAPPs were not policy judgments that Congress intended to protect from FTCA liability.

161.    The Navy QAO's ministerial failure to ensure the quality of Tetra Tech's work has rendered that work unreliable or indefensible, which has significantly impeded Homebuilders' ability to develop its property without facing considerable economic and reputational harm.

b.    **The Navy Remedial Project Manager Also Failed to Satisfy Its Duties under the FFA**

162.    Under the FFA, the Navy's RPM "***shall be responsible on a daily basis*** for ***assuring*** proper implementation of the RI/FS and the RD/RA in accordance with the terms of the Agreement." (FFA § 18.4.)  To accomplish this, the FFA grants the Navy RPM authority to take samples to ensure that sampling and other field work is performed in accordance with the terms of any final work plan and QAPP.  (*Id.*)

163.    The Navy RPM had a duty, independent of any obligation of Tetra Tech, to ensure that sampling, field work, and other day-to-day activities were performed in accordance with final work plans and QAPPs.

164.    Moreover, the final work plans and QAPPs contained several requirements related to sampling and field work.  Specifically, among other things: (1) COC records must contain the date, time, and location the sample was collected and accompany every sample; (2) soil samples must be transported to on-site or off-site laboratories in conformance with specified procedures; (3) soils samples must be taken from designated survey units; (4) survey units must be further investigated and remediated if samples exceed release criteria; (5) survey units must be 100 percent gamma surveyed; and (6) survey scans must be conducted at approved speeds.

165.    The Navy's RPM failed to satisfy its duties.  For instance, the RPM failed to "assur[e] proper implementation of the [Remedial Investigation/Feasibility Study] and the [Remedial Action/Remedial Design]" and was not "present at the Site or reasonably available to supervise work during all [work] hours."  In his 2017 plea agreement, Stephen Rolfe admitted

that while working at Hunters Point, he directed field workers to falsify sampling data on numerous occasions. Navy witness Lawrence Lansdale testified that these instances of fraud occurred either during the Remedial Investigation or the Remedial Action process, indicating that the Navy failed to assure the "proper implementation" of those processes. And as mentioned above, the fraud Mr. Rolfe directed does not stand in isolation. Had the Navy's Remedial Project Manager actually been "present at the site" or even "reasonably available to supervise" as required by mandatory regulations, duties, and policies, Tetra Tech's fraud would have been readily detected (and, accordingly, prevented).

166.    In addition, various documents, including the Government's Complaint in Intervention, the Greenaction Petition, declarations from whistleblowers, the 2014 Investigation Report, correspondence from the EPA, and the Navy's Draft Report have detailed how Tetra Tech falsified COC records, blocked the transport of "hot" samples to on-site and off-site laboratories, took soil samples from outside designated survey units potentially thousands of times, failed to further investigate and remediate survey units that exceeded release criteria, failed to 100 percent gamma-survey all survey units, and failed to use approved scan speeds hundreds of times.

167.    The Navy's RPMs and QAOs did not have discretion to deviate from their assumed duties and allow Tetra Tech's fraud to go unchecked. Nor were their respective failures susceptible to social, economic, or political policy considerations as contemplated by the discretionary function exception.

168.    The Navy RPM's and QAO's continuous failures to adequately carry out the duties defined in the FFA are described in further detail in the sections below.

### 3.    Federal Acquisition Regulations

169.    Contracts between the Navy and environmental contractors such as Tetra Tech are governed by the FAR, 48 C.F.R. § 1, *et seq.* Under 48 C.F.R. § 9.103(a), "contracts shall be awarded to [] responsible prospective contractors only." The Navy has no discretion to award contracts to contractors who are not "responsible prospective contractors."

170. Under section 9.103(b) of the FAR, contracting officers must make an "affirmative determination of responsibility" before making a purchase or award to a contractor. *See* 42 C.F.R. § 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contractor shall make a determination of non-responsibility." (emphasis added).)

171. For the Navy to affirmatively determine whether a contractor is "responsible," and therefore eligible for a Navy contract, the contracting officer must find that the contractor satisfies seven elements set forth in the FAR. *See* 48 C.F.R. § 9.104-1. For instance, the contractor "*must*" have "a satisfactory performance record" and "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1(c)-(d).

172. The FAR specifically defines what it means to have a "satisfactory performance record." Under 48 C.F.R. § 9.103-3(b), "A prospective contractor that is or recently has been seriously deficient in contract performance *shall be presumed to be nonresponsible*, unless the contracting officer determines that the circumstances were properly beyond the contractor's control, or that the contractor has taken appropriate corrective action. *Past failure to apply sufficient tenacity and perseverance to perform acceptably is strong evidence of nonresponsibility. Failure to meet the quality requirements of the contract is a significant factor to consider in determining satisfactory performance*. The contracting officer shall consider the number of contracts involved and the extent of deficient performance in each contract when making this determination." (emphasis added).

173. The Navy failed to adhere to the duties established under the FAR. Specifically, no later than November 2012, the Navy was on notice that Tetra Tech's employees had taken soil samples from areas outside of designated survey units but had represented those samples as having come from the appropriate locations, based on a draft report submitted to the Navy by Tetra Tech in response to data discrepancies identified in October 2012. In August 2013, the Navy received further notice that Tetra Tech's employees, at the direction of Tetra Tech

management, routinely engaged in intentional fraudulent conduct by switching soil samples taken from the designated survey units with soil that had been identified as "clean." (*See United States of America ex rel. Jahr*, Case No. 3:13-cv-03835 (N.D. Cal. 2013).) Nevertheless, the Navy continued to award Tetra Tech contracts to perform remediation work at HPNS until at least 2014, in spite of an obvious absence of information clearly indicating that Tetra Tech is a "responsible" contractor.

    a.    On July 10, 2012, the Navy awarded contract number N62473-10-D-0809, task order 0012 to Tetra Tech in support of Phase II of Parcel C remediation, focusing on sanitary sewer and storm drain lines and radiologically-impacted ship berths and sites. Task Order 0809-0012 was a firm fixed-price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $9,846,298 for providing the services required under the contract, regardless of Tetra Tech's costs. After five contract modifications, the total contract value awarded was **$10,487,802**.

    b.    On September 19, 2012, the Navy awarded contract number N62473-12-D-2006, task order 0004 to Tetra Tech, which required Tetra Tech to perform and report on surveys to analyze the radiological contamination in Buildings 253 and 211 in Parcel C and to identify and bound the areas of contamination. Task Order 2006-0004 was a firm fixed-price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $5,892,247 for the services required under the contract, regardless of Tetra Tech's costs. After two contract modifications, the total contract value awarded was **$7,255,881**.

    c.    On August 13, 2013, the Navy awarded contract number N62473-10-D-0809, task order 0015, which addressed recommendations in a Health Risk Assessment for radiologically-impacted sanitary sewer and storm drain lines in Parcel E. Task Order 0809-0015 was a firm fixed-price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $4,894,307 for the services required under the contract, regardless of Tetra Tech's costs. After two contract modifications, the total contract value awarded was **$5,061,910**.

d. On September 23, 2014, the Navy awarded contract number N62473-10-D-0809, task order 0016 to Tetra Tech, which was in support of Phase III of Radiological Remediation and Support of Parcel C. Task Order 0809-0016 was a firm fixed-price contract that, as modified, obligated the Navy to pay Tetra Tech a maximum fixed amount of **$669,812** for the services required under the contract, regardless of Tetra Tech's costs.

174. In fact, the Navy admitted that Tetra Tech was still a contractor in 2016 on an unrestricted EMAC, even though at that time Navy BRAC Environmental Coordinator Pat Brooks had identified that the root cause of the remediation issues as of 2016 was Tetra Tech's lack of quality assurance and quality control. (*See* P. Brooks Interview.)

175. In addition to its own claims of fraud against Tetra Tech, the Navy has admitted that a massive fraud would not constitute satisfactory performance.

176. Thus, the Navy, through its quality assurance supervisors and contracting personnel, violated the FAR by continuing to make purchases from and award contracts to Tetra Tech even though it knew, as early as 2012, that Tetra Tech was not a responsible contractor and that there was no legitimate basis to make an affirmative determination that Tetra Tech was a responsible contractor.[7]

177. The Navy's contracting personnel did not have discretion under the FAR to retain a contractor with unsatisfactory performance. Nor did the FAR afford discretion not to evaluate Tetra Tech's performance according to required and specific criteria. The Navy's failure to adequately implement the FAR's mandatory protocols, intended to prevent the hiring of

---

[7] In a press release, the Department of Justice remarked that its Complaint in Intervention against Tetra Tech "will ensure that the Navy's contractors retained to work in the Northern District of California are held accountable for any failures to comply with the contract that was intended to make certain critical testing was completed. We will ensure compliance with all contractual obligations for which the government has paid." (United States Attorney's Office, Northern District of California, *United States Joins Lawsuits Against Tetra Tech EC Inc. Alleging False Claims in Connection with Shipyard Cleanup*, Oct. 26, 2018.) Despite the Department of Justice's promise to "ensure compliance with all contractual obligations," Tetra Tech is *still* an active government contractor. The Speaker of the House of Representatives, Nancy Pelosi, has remarked that Tetra Tech should not receive any more federal contracts: "Why would you trust them after they let this happen?" (Jason Fagone and Cynthia Dizikes, *SF Shipyard Scandal: Pelosi Calls for Federal Probes*, S.F. Chronicle (Aug. 2, 2018, 8:30 AM).)

unsatisfactory contractors, is not susceptible to social, economic, or political policy considerations as contemplated by the discretionary function exception.

**4. Uniform Federal Policy for Quality Assurance Project Plans**

178. The Uniform Federal Policy for Quality Assurance Project Plans ("Uniform Policy") is an intergovernmental manual that sets out a single national policy for use by government agencies, including the Navy, in planning, implementing, and evaluating quality management systems for environmental cleanup programs. The Uniform Policy mandates the creation of Quality Assurance Project Plans ("QA Plans") for environmental cleanups, consisting of "formal document[s] describing in comprehensive detail the quality assurance (QA), quality control (QC), and other technical activities that must be implemented to ensure that the results of the work performed will satisfy the stated performance criteria." The Uniform Policy provides a "common set of guidelines and expectations" for QA Plans and requires that "all" QA Plans, "at a minimum, address all elements detailed" in the Uniform Policy.

179. The Uniform Policy establishes the Navy's ultimate responsibility for proper data collection and characterizes the underlying considerations as technical in nature. Section 1.3.1 of the Uniform Policy explains that the "lead organization," here, the Navy, "is responsible for all phases of environmental data collection as well as for ensuring that the organization, personnel, contractors, and subcontractors perform work as prescribed" in the QA Plan. The Uniform Policy also requires QA Plan approval by a Quality Assurance Officer ("QA Officer"), who must be a technical expert and must employ their technical knowledge in assessing whether QA Plans satisfy the requirements of the Uniform Policy. As the Uniform Policy makes clear, the Navy's quality assurance role, as delineated in QA Plans or their functional equivalents, has already been decided and exclusively involves matters of professional and scientific judgment, rather than any policy judgments by QA Officers or other employees overseeing the QA Plan's implementation.

**5. Department of the Navy Environmental Readiness Program Manual**

180. The activities of all divisions of the Navy must comply with the requirements established under the Navy's Environmental Readiness Program Manual ("Environmental

Manual"), OPNAV M-5090.1C (January 10, 2014). The Navy's Environmental Manual provides Navy policy and assigns responsibility for the planning and implementation of programs to meet Navy environmental objectives.

181. Chapter 1 of the Environmental Manual establishes the organization and coordination of the environmental duties the Navy is required to comply with. Under Section 1-4, the Environmental Manual delineates the compliance responsibilities for different divisions of the Navy, also referred to as "commands." Of particular relevance to HPNS, the Naval Facilities Engineering Command ("NAVFAC") is assigned a number of specific duties. In particular, the Commander of NAVFAC is designated as "the Navy's primary technical authority and primary execution agent in support of Navy installation COs for environmental planning, compliance, restoration, and natural and cultural resources management for Navy shore facilities" like HPNS.

182. Section 1.4-7 of the Environmental Manual establishes the following specific responsibilities applicable to the Commander of NAVFAC:

- Establishing and assuring adherence to technical standards and policy;
- Ensuring the safety, environmental compliance, and competency of work delivered to Navy; and
- Ensuring consistent application of environmental policy and coordinating all environmental planning and compliance within the appropriate Navy REC and area environmental coordinator.

183. Section 7-3.4 forbids Navy workers from engaging in any prohibited practices, which are defined in pertinent part as "fabrication, falsification, or misrepresentation of data." The United States acknowledged through sworn testimony that no Navy policy grants the Navy discretion to violate this mandate or to let its contractors break those rules.

184. The Navy failed to adhere to the duties established under the Environmental Manual, as established by the testimony of multiple former workers at HPNS, including the criminal plea agreements of Justin Hubbard and Stephen Rolfe, as well as independent investigations of Tetra Tech's work conducted by other federal agencies.

185.    In particular, the Commander of NAVFAC, as well as Navy personnel operating under their command, failed to "assure adherence to technical standards," "ensure the competency of work delivered to the Navy," or "ensure consistent application of environmental policy."  As former New World Environmental employee Anthony Smith has testified, Tetra Tech workers performing building scans for radiation persistently falsified building scan data at the behest of Tetra Tech management by either holding scanners in one spot for prolonged periods of time or even leaving scanners on while generating data, sometimes for upwards of thirty minutes.  Likewise, plea agreements from former Tetra Tech workers Justin Hubbard and Steven Rolfe disclose that Tetra Tech workers routinely switched soil samples from the area under investigation with soil from areas known to be "clean" inside of "conex" trailers at the Hunters Point site.  These and other forms of misconduct on Tetra Tech's part resulted in the EPA's determination that up to 97% of Tetra Tech's work in some areas at HPNS was falsified or suffered from data management concerns.

186.    The Navy negligently failed to uphold its duty under Section 7-3.4 when it published several documents that included fabricated, falsified, or misrepresented data, including through publication of Remedial Investigation reports representing the data collected during the time that Stephen Rolfe was ordering employees to falsify data samples.

187.    The Navy lacked discretion to deviate from its specific and mandatory duties under the Environmental Readiness Program.  Such deviations were not susceptible to social, economic, or political policy considerations as contemplated by the discretionary function exception.

**6.      Naval Facilities Engineering Command Construction Quality Management Program Manual**

188.    NAVFAC serves as the Navy's facilities, installation, and contingency engineers. NAVFAC's duties include oversight of contractors hired to accomplish Navy facilities' construction and redevelopment goals, including the investigation and remediation of former Navy installations.  The requirements for carrying out those duties are established by NAVFAC's

Construction Quality Management Program Manual ("Construction Manual"), NAVFAC 0525-LP-037-7202. The Navy's operations at HPNS are required to comply with the duties set forth in the Construction Manual.

189.     As the Construction Manual explains, its purpose is to "define[] NAVFAC's policy for construction quality management" and "outline[] the concepts, requirements, and procedures used to execute Construction Quality Management (CQM) Program," which "implements the Contractor's Quality Control (QC) and the Government's Quality Assurance (QA) Systems, tools designed to support the management of NAVFAC's construction and environmental restoration work." "All NAVFAC construction type contracts, for work to be performed in the United States and its territories, will comply with the requirements and procedures outlined in this manual." All contracts for remediation work at HPNS are therefore required to comply with the requirements and procedures established in the Construction Manual. Chapter 3 of the Construction Manual sets out the procedures for implementing the Navy's QA system for government contracts. Section 3.3 sets out the role of NAVFAC quality assurance personnel in overseeing contractor work. First, NAVFAC's "Quality Assurance Representative (QA Rep)" is established as "the primary point of contact at the jobsite level between the Contractor and the Government." Construction Manual 3.3.1. In order to carry out that responsibility, the Construction Manual further states that "the QA Rep should visit the work site each day" but that "[a]t a *minimum*, he *must* visit the work site *once a week* to maintain awareness of the project status." (Construction Manual at § 3.3.1.1 (emphasis added).)

190.     The QA Rep also maintains primary responsibility to ascertain the completeness and accuracy of the contractor's "production" and "quality control" reports. The QA Rep "must daily review all Contractor reports and inform his supervisor of any errors or omissions. . . . Reports inconsistent with the QA Rep's personal knowledge must be reconciled immediately." The QA Rep must review all reports "immediately upon receipt to ensure their accuracy and completeness."

191.    The Construction Manual also describes *how* the Navy QA Reps should "review" all Contractor Production and Quality Control Reports:

> The QA Rep should check the following when reviewing reports: phases of construction (preparatory, initial, and follow-up) under way on the day of the report, and the specific location of the work performed. Results of quality control procedures and inspections, including the nature of deficiencies observed and the corrective action proposed by the Contractor. This should include dimensional checks and validation of work elements along with safety violations and the location of such inspections . . . Test results, including failures and remedial action to be taken. When test results cannot be completed by the time the report is submitted, a notation should be made that the test was performed, and the approximate date results will be available. Delayed test results should be submitted with the report on the date received.

(*Id*. at § 3.4.2.)

192.    And to the extent the QA Rep identifies "[i]ncorrect or erroneous information," it is required to comment on that information and take appropriate follow-up action. "Failure to take exception to incorrect information contained in the report constitutes constructive acceptance of the Contractor's version of events." (Construction Manual at § 3.4.2.)

193.    Accordingly, the Navy's QA Reps had a mandatory and specific duty to review all Contractor Production and Quality Control Reports immediately upon receipt to ensure their accuracy and completeness, comment and follow-up on incorrect or erroneous information, and inform supervisors of errors or omissions.

194.    On information and belief, the Navy's QA Reps did not "immediately upon receipt" review all of Tetra Tech's Production and Quality Control Reports to ensure their accuracy and completeness, did not comment and follow-up on incorrect and erroneous information, and did not inform their supervisors of errors or omissions.

195.    Tetra Tech's Production and Quality Control Reports contained several inaccuracies that the QA Reps would have identified had they (1) properly reviewed the reports and (2) done so "immediately upon receipt."

196.    For example, Tetra Tech's daily Production and Quality Control Reports did not completely or accurately describe the work being performed, the location of work performed (such as soil collection), and results of quality control procedures and inspections. Many building

scans were manipulated and falsified, and the radiation detection activities reported did not occur. This is evident from the duplicative data in the survey results Tetra Tech submitted to the Navy. The data indicates that Tetra Tech's daily reports for at least half of all buildings surveyed would have been inaccurately reporting that these buildings were being scanned and completed when they were not. Similarly, daily reports on the location and completion of soil sampling activities likewise were not accurate. Daily reports on soil sampling and testing activities also could not have been complete without including the unapproved collection of soils outside designated survey units.

197. Furthermore, based on information and belief, the Navy QA Reps did not comment upon numerous forms of incorrect and erroneous information contained in Tetra Tech's Production and Quality Control Reports related to the hundreds—and potentially thousands—of instances of data falsification and manipulation.

198. Section 3.3.1.1 further establishes "specific duties" that NAVFAC's QA Rep must carry out. Those "specific duties" include:

- Observing enforcement of safety provisions during normal site visits;
- Making or arranging for inspections to be performed by the Government;
- Inspecting critical items and monitoring specific testing;
- Making sufficient site visits to determine adequacy of QC System performance, which includes spot-checking workmanship and observing testing procedures;
- Obtaining and reviewing the daily QC and Production reports in a timely manner and taking necessary action;
- Preparing Construction Contract Non-compliance Notices; and
- Witnessing final tests and making final inspections for acceptance.

199. In reviewing quality control reports from the contractor specifically, the QA Rep is required to "note any disagreement or question regarding the accuracy and completeness of the report," which "must be returned to the Contractor for resolution and appropriate reporting in subsequent Contractor reports or by another acceptable method." (Construction Manual 3.4.1.1.)

200.    Under the Construction Manual, where deficiencies in a contractor's work are identified, the QA Rep is required to "assure the deficiency is corrected." If a deficiency "is not corrected within 24 hours, the [contractor] is required to track the deficiency on the Rework Items List," and if they fail to do so, "the QA Rep shall issue a Construction Contract Non-Compliance Notice."

201.    The Construction Manual, which binds the Navy, also makes clear that (i) Tetra Tech "must not be allowed to build upon defective work" and (ii) "no payment shall be made for nonconforming work."

202.    The Navy failed to adhere to the duties established under the Construction Manual, as established by the testimony of multiple former workers at HPNS, including the criminal plea agreements of Justin Hubbard and Stephen Rolfe, as well as independent investigations of Tetra Tech's work conducted by other federal agencies.

203.    In particular, the Navy's QA representatives did not consistently "visit the work site once a week to maintain awareness of the project status" and did not make "sufficient site visits to determine adequacy of QC System performance." As former Tetra Tech employee Anthony Smith has testified, Tetra Tech workers performing building scans for radiation persistently falsified building scan data at the behest of Tetra Tech management by either holding scanners in one spot for prolonged periods of time or even leaving scanners on while generating data, sometimes for upwards of thirty minutes. Likewise, plea agreements from former Tetra Tech workers Justin Hubbard and Steven Rolfe disclose that Tetra Tech workers routinely switched soil samples from the area under investigation with soil from areas known to be "clean" inside of "conex" trailers at the Hunters Point site.

204.    Had the Navy's representatives appropriately made the "minimum" weekly site visits to "determine adequacy of QC System performance," those and other obvious violations of site safety protocols would have been easily detected and eliminated.

205.    Had the Navy fulfilled its duties and obligations, it would have been apparent to the Navy that Tetra Tech was (1) changing the scan speed on the radiation detection scanner's

conveyor belt system to a level that was "well above established standards;"[8] (2) locking the conveyor belt so that the belt speed could not be changed;[9] (3) using hand sensors shielded by thick steel scoops that were ineffective at detecting hazardous radioactive contamination;[10] (4) using unqualified laborers instead of Health Physics Specialists to perform soil sample collection "***hundreds of times***;"[11] (5) taking soil scans on the Radiological Screening Yard screening pad too fast "***hundreds of times***;" (6) falsifying COCs and blocking the shipment of "hot" samples to laboratories; (7) collecting soil from different areas know to be clean or have lower radioactivity and falsely representing over a period of years that "potentially ***thousands***" of samples had come from areas being investigated in order to reduce or eliminate the remediation work required;[12] (8) failing to conduct further investigation and remediation when samples from survey units exceeded release criteria; and (9) failing to take 100 percent gamma surveys of all survey units.

206. The Navy's QA representatives consistently failed to review all of Tetra Tech's production and quality control reports, identify errors and omissions, and take appropriate corrective actions. Following an independent review of Tetra Tech's data after additional

---

[8] *See, e.g.*, E. Bowers Declaration at p. 12 ("It is common knowledge that the detectors become much less effective when the scan speeds are increased . . . . The radiation detectors at these speeds would not be able to detect and alarm for radioactive contamination at the health and radiation safety criteria that the Navy and regulators had set for Hunters Point").

[9] *See* Declaration of Robert McLean in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at p. 4 ("[T]he belt speed was locked at far too fast a speed well above the established standards.").

[10] *Id*. at p. 5.

[11] *See, e.g.*, Declaration of Archie Jackson in Support of Petition to Revoke the License of Tetra Tech EC, Inc. at p. 4 ("The above incident at RSY-2 was not the only time I observed laborers performing soil samples, it occurred hundreds of times. Laborers were not supposed to collect samples- HPs were supposed to collect samples. This was one of the work issues at Hunters Point I objected to and brought to the attention of my supervisors, to no avail.")

[12] *See, e.g.*, Greenaction Pet. at 2 ("The soil sampling fraud involved multiple Health Physics Specialists and supervisors. It began at the direction of top Tetra Tech onsite management and took place over a period of years rather than weeks or months. Thousands of samples may be involved, not just the few dozen originally identified by the Navy. Furthermore, the fraud involved a host of activities, not just the soil sampling addressed in the Anomalous Samples Report. Rather, the fraud spanned virtually all radiological remediation functions for which Tetra Tech was responsible.")

FIRST AMENDED COMPLAINT AGAINST
TETRA TECH AND THE UNITED STATES
CASE NO. 3:20-CV-01485-JD

allegations of wrongdoing came to light in 2016 and 2017, the EPA noted that for one parcel, "in nearly a third of trench units, gamma scans of soil surfaces after excavation showed a need for further biased soil samples to be collected, but they were not." Had the Navy's QA representatives adequately fulfilled their duties to review Tetra Tech's reports, the failure to collect additional soil samples would have been noted and required correction.

207.    The Navy's QA representatives failed to assure that identified deficiencies in Tetra Tech's work were corrected. In April 2014, Tetra Tech issued a report acknowledging a limited number of soil samples had been switched with soil taken from outside the areas under investigation but describing those as isolated incidents that had been fully resolved. Although the Navy was aware of allegations from other Tetra Tech workers that Tetra Tech's soil sampling issues were more widespread, it nevertheless accepted Tetra Tech's account of events, failed to conduct its own investigation of Tetra Tech's data quality, and continued to award Tetra Tech contracts for remediation work at HPNS. Later independent investigations carried out on behalf of the EPA determined that up to 97% of Tetra Tech's soil remediation data was fraudulent or failed to comply with applicable remediation standards. By failing to uphold its duty to assure that identified deficiencies in Tetra Tech's work were corrected, the Navy permitted Tetra Tech's misconduct to persist and harm Homebuilders' interests. Had the Navy complied with its QA duties and obligations, its QA system would have detected the fraud, alerted Navy contracting personnel, and Tetra Tech could have been terminated immediately. But the Navy's negligent application of its QA system failed to do so, to Plaintiffs' and the public's detriment.

208.    If the Navy's QA Reps had performed their duties under the Construction Manual, they would have discovered these deficiencies in the performance of Tetra Tech's work at HPNS, many of which occurred "***hundreds***" or potentially "***thousands***" of time, Tetra Tech would not have been able to build upon its defective work, and the Navy would not have compensated Tetra Tech while it was defrauding the public.

209.    The Construction Manual's imposition of specific and mandatory duties deprived the Navy of discretion to permit the extensive falsification that Tetra Tech committed under the

Navy's supervision. The Navy's failures were technical in nature and not susceptible to social, economic, and political policy consideration.

### 7. Base-wide Radiological Work Plan

210. In order to carry out and provide further clarity to the basic duties established under the FFA, the Navy established a Base-wide Radiological Work Plan ("Base-wide Plan") for HPNS. The Base-wide Plan delineates survey, decontamination, and related quality assurance procedures to be implemented in support of the radiological release of sites within HPNS. As the Base-wide Plan makes clear, the Navy has primary responsibility for the successful completion of Tetra Tech's remediation work at HPNS.

### a. Navy RPM's Duties Under the Base-wide Plan

211. Section 3.2.15 sets out the Navy Remedial Project Manager's oversight role, which incorporates the "primary responsibility within the DON for day-to-day management of Tetra Tech's remediation activities under this [] Plan *and for their successful completion*." Accordingly, Section 3.2.15 holds the Navy Remedial Project Manager responsible for, among other things:

- Ensuring that the project scope of work requirements are fulfilled;
- Providing formal technical direction to the Tetra Tech project team;
- Coordinating with the Radiological Affairs Support Office and Remedial Project Managers of other projects being performed in radiologically impacted areas to ensure proper controls are in place; and
- Acting as lead interface with agencies on non-radiological issues.

212. The Navy's Remedial Project Manager failed to ensure the "successful completion" of Tetra Tech's work at HPNS. The Navy acknowledged that, before it could certify invoices for each work item, the Navy was required to ensure that the invoiced work was complete and accurate. However, Ms. Kito—the Navy's Lead Remedial Project Manager during the period when Tetra Tech employees acknowledged falsifying remediation data—admitted in an interview with the EPA Criminal Division that she would "blindly approve" Tetra Tech's invoices before they were submitted to the Navy's financial personnel for payment. Had the

Remedial Project Manager reviewed those invoices as required to ensure "successful completion" of Tetra Tech's work before certifying them for payment, Tetra Tech would not have been able to continue building on its defective work. In fact, even after Tetra Tech admitted to having submitted fraudulent samples in connection with invoiced work, the Navy continued to rely on Tetra Tech's representations rather than independently scrutinize its work.

b. **The Navy's Radiological Site Manager's Duties Under the Base-wide Plan.**

213. Section 3.2.16 of the Base-wide Plan sets out the Navy Radiological Site Manager's oversight role, which incorporates "primary responsibility within the [Department of Navy] for the technical accuracy and the regulatory conformance of work performed under this Base-wide Plan." The Radiological Site Manager "oversees all radiological work at the HPS." In carrying out this role, the Base-wide Plan and the attached Quality Assurance Plan task the Site Manager with a number of specific duties, including:

- Reviewing radiological laboratory data on a routine basis;
- Performing on-site reviews of all radiological site operations including the on-site laboratory;
- Performing quality reviews on chain-of-custody forms to ensure samples are collected in accordance with the Work Plan;
- Ensuring that all necessary sample results are provided and are consistent with proposed radiological actions;
- Comparing radiological data with the requirements of the Work Plan and Task-specific Plans to ensure that all proper conditions have been met to implement the action requested; and
- Ensuring compliance with applicable MARSSIM requirements.

214. The Navy's Radiological Site Manager failed to ensure the technical accuracy and regulatory conformance of Tetra Tech's work. The Radiological Site Manager had a nondiscretionary, nondelegable duty to "review radiological laboratory data on a routine basis." Nevertheless, the Radiological Site Manager during the time period at issue in this case, Laurie Lowman, would at times fail to review radiological laboratory and instead delegate that work to other Navy employees who did not work in the Radiological Affairs Support Office. And more

fundamentally, as the United States has itself alleged, laboratory data produced by Tetra Tech showed significant amounts of "[d]uplicated strings of data," which in some instances showed that "the exact time, *to the second*, that the reading was taken was also duplicated." Had the Radiological Site Manager carried out the duty to "routinely" review this data, these discrepancies would have immediately been clear.

215. The Radiological Site Manager also failed to adequately "perform quality reviews" on chain-of-custody forms to ensure samples conformed with plan specifications. Former Tetra Tech employee Anthony Smith testified that a review of those forms would have allowed the reviewer to "easily identify" discrepancies on Tetra Tech's chain-of-custody documentation, both because the time intervals at which the forms indicated samples were taken was implausibly close together and because the forms routinely contained differences in handwriting indicating that multiple individuals had filled out the forms, in direct violation of approved protocols. Had the Radiological Site Manager carried out the duty to "perform quality reviews on [chain-of-custody forms] to ensure samples are in accordance with the Work Plan," those and other discrepancies on Tetra Tech's documentation would have been easily identified and required correction.

216. Had the Navy RSM reviewed all on-site laboratory data, she would have discovered that (1) laboratory results for various radionuclides were all low, with multiple negative results, which clearly indicated data quality issues; (2) biased sample results were lower than other data sets (biased samples are supposed to be collected in locations of highest scan results, so they would be expected to be higher, not lower, than other data sets collected in random locations); (3) on-site and off-site lab results differed by more than 10 times, indicating that samples from the on-site lab were tampered with and the on-site lab and off-site quality assurance lab were not analyzing the same sample; (4) the presence of low soil K-40 concentrations (< 5 picocuries per gram) relative to the higher mean survey soil K-40 concentrations indicated that clean formation soil samples were being substituted for the

potentially impacted surface soil survey samples; and (5) there were duplicated strings of data, which is unusual and would be a red flag to the reviewer.[13]

217.    The EPA has informed the Navy that there were "*extensive* data quality issues" at the Shipyard (EPA Dec. 2017 Letter at 10, emphasis added)—data quality issues that the Navy would have discovered had the Navy RSM reviewed all on-site laboratory data.

218.    In addition to the Navy RSM's negligent implementation of the Base-wide Work Plans, the Navy RSM also failed to implement and comply with requirements under Navy-approved and adopted sampling plans and QAPPs.

219.    Sampling plans and QAPPs required the Navy RSM to: (1) "perform[] on-site reviews of all radiological site operations including the on-site laboratory;" (2) "perform[] quality reviews on COCs to ensure samples are handled in accordance" with the Work Plan and SAP; (3) "ensur[e] that all necessary sample results are provided and consistent with proposed radiological actions;" (4) "ensur[e] that the radiological data reported is consistent with the intent for which the data was provided;" and (5) "compar[e] radiological data with the requirements of the Work Plan, Task-specific Plans, and SAP to ensure that all proper conditions have been met to implement the action requested."  (*See Final Sampling Plan and Quality Assurance Project Plan* (Oct. 2007) at Table B.2-1; *Final Sampling Plan and Quality Assurance Project Plan: Base-wide Storm Drain and Sanitary Removal*, Rev. 4 (July 2010) at 28.)

220.    The Navy RSM failed to comply with these mandatory requirements.

221.    First, the Navy RSM did not perform on-site review of all radiological site operations including the on-site laboratory.  This is demonstrated by the numerous deficiencies

---

[13] Duplicated strings of data from a data validation standpoint refers to a repeated consecutive string of analytical results for different field samples, collected at different locations, and analyzed at different times.  Given the heterogeneity of soil and or solid samples, and given that the allowable variability in the analytical method for the analysis of the same sample (laboratory duplicate) is $\pm 30\%$, a repeated string of analytical results (for different samples) is unusual and should be a red flag to a data reviewer/validator and warrant further investigation.  The causes of data duplication can include sample switching, sample mislabeling, improper recording of field scan data, or improper loading of data into an electronic format, all of which Tetra Tech was engaged in.

associated with radiological site operations that the Navy RSM would have readily discovered had she performed on-site review of all radiological site operations.

222.    In addition, the Navy RSM's failure to conduct on-site review of the on-site laboratory is demonstrated by the numerous deficiencies associated with the laboratory's operations, which the Navy RSM would have discovered had she performed these reviews.

223.    According to a whistleblower, Tetra Tech allowed untrained laborers to work in the on-site laboratory and process soil samples:

> In October 2011, I observed two laborers working in the lab, who obviously had not been adequately trained. Their names were Luis and Alfredo (I do not recall their last names). They were "pounding" dirt for radioactive sample testing using a mortar and pestle *with their bare hands* to prepare samples for analysis and were not wearing gloves or face masks. They were apparently unaware not only of the radiation exposure they were risking, but also the *danger of cross contaminating the samples*. This indicated that *they were not properly* trained to handle. When I asked them what they were doing, they replied that Robin Fluty, one of the lab managers liked them and that they were allowed to help out *all the time* . . . I *never saw the laborers working the lab in a manner that would reflect proper procedures were being followed*. I was very concerned that they were risking their health and the integrity of other samples.

(*See* Declaration of Susan V. Andrews in Support of Petition to Revoke Materials License at 11 (emphasis added).)

224.    In addition, there is evidence that Tetra Tech routinely destroyed laboratory samples, which the Navy RSM would have discovered had she performed reviews of the on-site laboratory. (*See, e.g.*, Greenaction Pet. at 18-19 ["Tetra Tech RSOR Taylor ordered Andrews to go to the laboratory and obtain the smears and their associated records and destroy them . . . Andrews did what she was told. She went to the lab, obtained the smears and records and destroyed them"]; *id*. at 34 ["inconvenient data were manipulated or destroyed"].)

225.    Second, the Navy RSM did not perform quality reviews on COCs to ensure samples are handled in accordance with work plans and sampling plans. Tetra Tech's falsification of COCs was so widespread and persistent that the Navy RSM would have discovered this fraud had she performed quality reviews on COCs to ensure they were handled in accordance with work plans and sampling plans.

226.    Third, the Navy RSM did not ensure that all necessary sample results were provided and consistent with proposed radiological actions.  Tetra Tech did not provide the "necessary sample results" to support the "free-release" of radiologically impacted areas at the Shipyard because Tetra Tech, among other things, collected soil from different areas known to be clean or have lower radioactivity and falsely stated the samples had come from areas being investigated in order to reduce or eliminate the remediation work required to meet release criteria. The Navy RSM failed to ensure that "all necessary sample results were provided" because Tetra Tech's sample results were falsified and were not indicative of the actual level of radioactivity in designated survey units.

227.    The Navy RSM further failed to ensure that Tetra Tech's sample results were "consistent with proposed radiological actions" because falsified sample results taken from areas that did not need to be remediated cannot support investigation and remediation of radiologically impacted areas.

228.    Fourth, the Navy RSM did not ensure that the radiological data reported was consistent with the intent for which the data was provided because the radiological data was falsified.

229.    Fifth, the Navy RSM did not compare radiological data with the requirements of the work plans, TSPs, and sampling plans to ensure that all proper conditions were met.  Had the Navy RSM actually compared the radiological data with the requirements of the work plans, TSPs, and sampling plans, the Navy RSM would have discovered multiple red flags, including that: (1) laboratory results for various radionuclides were all low, with multiple negative results, which indicated data quality issues; (2) survey unit project reports were missing gamma static and scan results; (3) biased sample results were lower than other data sets; (4) on-site and off-site lab results differed by more than 10 times; (5) the presence of low soil K-40 concentrations ($< 5$ picocuries per gram) relative to the higher mean survey soil K-40 concentrations indicated that clean formation soil samples were being substituted for the potentially impacted surface soil survey samples; (6) there were duplicated strings of data, which is unusual and would be a red

flag to the reviewer; and (7) in nearly a third of all 63 Parcel G trench units, post-remediation gamma scans indicated a need for biased samples to be collected, but they were not. (*See* EPA Dec. 2017 Letter.)

230. All these actions demonstrate a widespread failure of the Navy's RSM to follow applicable requirements under work plans, sampling plans, and QAPPs.

231. Ms. Lowman, the Navy's RSM, had a conflict of interest in that her son worked for Tetra Tech, which compromised her ability to objectively review or evaluate the results provided by Tetra Tech.

232. Ms. Lowman abruptly retired shortly after information regarding Tetra Tech's falsification of soil data came to light.

233. The Navy RSM negligently failed to discover patent deficiencies in work performed by Tetra Tech because she failed to perform her mandatory duties under the Base-wide Work Plans, sampling plans, and QAPPs, as set forth above. There was no policy consideration underlying the Navy RSM's failure to discover these widespread deficiencies.

### c. Navy QAO's Duties Under the Base-wide Plan

234. Section 3.2.17 of the Base-wide Plan sets out the Navy QA Officer's oversight role, which includes "primary responsibility for ensuring that the contract-required quality assurance (QA) measures are in place and effective for the work performed." As such, the QA Officer's duties and authority under Section 3.2.17 include:

- Reviewing and approving Sampling and Analysis Plans;
- Providing quality-related directives through the Contracting Officer Representative;
- Providing technical and administrative oversight of TtEC surveillance audit activities; and
- Authorizing the suspension of project execution if quality assurance requirements are not adequately followed.

235. The QA Officer failed to adequately "review and approve Sampling and Analysis Plans," provide appropriate "quality-related directives," or suspend Tetra Tech's project execution once it became clear that "quality assurance requirements [were] not adequately

followed." As former Navy employee Pat Brooks acknowledged in an interview with the EPA Criminal Division, the "root problem" underlying Tetra Tech's performance issues was the "lack of Quality Assurance/Quality Control." Quality Assurance is the Navy's primary responsibility in overseeing the remediation work at HPNS. The failures of the QA Officer and other Navy supervisors to adequately fulfill that role are evidenced by, among other things, the fact that approximately 97% of sampling data has been called into question by the EPA after an independent evaluation of Tetra Tech's work. Had the Navy appropriately fulfilled its "quality assurance" role, Tetra Tech's misconduct would have been identified and required correction.

### d. Navy ROICC's Duties Under the Base-wide Plan

236. Section 3.2.18 sets out the oversight duties of the Resident Officer in Control of Construction ("Resident Officer") and their staff, who "have the primary responsibility for providing *on-site* quality assurance and safety oversight of contractors performing work at HPS." The Plan details the Resident Officer's duties in this respect, which include:

- Verifying that all work has been completed per contract and technical specifications prior to final government acceptance;
- Performing ongoing field inspections to verify that all work is in compliance with both contract and technical specifications;
- Notifying the contractor of any work that is not in compliance;
- Reviewing contractor daily reports for completeness and accuracy; and
- Attending Preparatory Phase, Initial Phase, Pre-final, and Final Acceptance Inspections.

237. The Navy's ROICC did not comply with these mandatory obligations.

238. The ROICC and associated staff failed to carry out the duty to "review[] contractor daily reports for completeness and accuracy," "verify[] that all work has been completed per contract and technical specifications prior to final government acceptance" or "perform[] ongoing field inspections."

239. As discussed in the U.S. Complaint in Intervention, "For the radiological investigation and remediation at HPNS, the Relevant Contracts and MARSSIM required Tetra Tech to take the following steps for each survey unit: (1) determine the boundaries of the survey

unit; (2) collect soil samples for laboratory analysis in order to characterize the survey unit; (3) if laboratory results demonstrate that the soil is above release criteria, remediate survey unit by removing and disposing of soil; (4) collect soil samples for laboratory analysis from locations that tested above release criteria to ensure that remediation was effective; (5) further remediate if necessary; and (6) collect final status survey soil samples for laboratory analysis. The Relevant Contracts require Tetra Tech to 'perform remediation and additional excavation until remediation goals have been met and or appropriate risk levels have been reached.'" (U.S. Compl. at ¶ 45.)

240. As explained by the United States, "The Relevant Contracts [also] required Tetra Tech to provide radiological investigation of buildings at Hunters Point by conducting alpha, beta, and gamma radiation scans of building surfaces using radiation detection instruments. The Relevant Contracts and MARSSIM required Tetra Tech to take the following steps: (1) scan and remove material, equipment, and building debris; (2) determine the Class, and therefore size, of survey units (Class 1 survey units, defined as having reasonable potential for contamination above release criteria, are divided into areas of less than 100 square meters; Class 2 survey units, defined as having reasonable potential for contamination but below release criteria, are divided into areas less than 1,000 square meters); (3) conduct radiation scans by moving detectors across surfaces at required speeds; (4) download data from detection instruments; (5) correct survey results for naturally occurring background radiation; (6) evaluate data to determine whether the survey unit exceeds release criteria; (7) remediate, remove and dispose of material, if necessary; and (8) repeat the above steps until release criteria are met." (*Id*. ¶ 46.)

241. The Navy's ROICCs failed, however, to verify that all work had been completed per these contract specifications prior to final government acceptance because, among other things: (1) Tetra Tech did not remediate survey units by removing and disposing of soil when laboratory results demonstrated that the soil was above release criteria; instead, Tetra Tech refused to treat survey units as radioactively contaminated despite lab results and sensor readings indicating that samples were "screaming hot" (Greenaction Pet. at 18);[14] (2) Tetra Tech did not

---

[14] *See also* U.S. Compl. at ¶ 61 ("Rolfe admitted that Tetra Tech management at Hunters Point directed him to get his crew 'the hell out' of a survey unit that was testing above the release

take samples in order to characterize the survey unit, and instead took background soil samples from radiologically impacted areas that could not be used to characterize survey units because they were not indicative of actual background levels; (3) Tetra Tech did not collect soil samples for laboratory analysis from locations that tested above release criteria to ensure that remediation was effective, and instead collected soil samples from clean areas (potentially thousands of times); and (4) Tetra Tech did not conduct radiation scans by moving detectors across surfaces at required speeds, and instead increased the scan speed on radiation scanners and pulled scanning devices and manipulated the scan speed on hand-held radiation detection devices in one spot or just set it down in one spot for up to 30 minutes while readings were recorded. (*See, e.g.*, U.S. Compl. at ¶ 69 ["The Relevant Contracts and MARSSIM required Tetra Tech to conduct building radiation scans by *moving* detectors across surfaces at required speeds"].)

242. As former Tetra Tech employee Anthony Smith has testified, Tetra Tech workers performing building scans for radiation persistently falsified building scan data at the behest of Tetra Tech management by either holding scanners in one spot for prolonged periods of time or even leaving scanners on while generating data, sometimes for upwards of thirty minutes. As the United States has itself alleged, laboratory data produced by Tetra Tech arising from those scans showed significant amounts of "[d]uplicated strings of data," which in some instances showed that "the exact time, *to the second*, that the reading was taken was also duplicated." Likewise, plea agreements from Justin Hubbard and Steven Rolfe disclose that Tetra Tech workers routinely switched soil samples from the area under investigation with soil from areas known to be "clean" inside of "conex" trailers at the Hunters Point site. Because of these and other forms of misconduct on Tetra Tech's part, an independent review conducted under the auspices of the EPA determined that up to 97% of Tetra Tech's work at HPNS was falsified or suffered from data management concerns. Had the Resident Officer and associated staff performed "ongoing field

_____

criteria, told him that they were 'not remediating the whole goddam site,' and directed him on numerous occasions 'to get clean dirt").

inspections" and verified that all work was "completed per contract and technical specifications," Tetra Tech's misconduct would have been identified and required correction.

243.     The Navy's ROICCs also did not notify Tetra Tech of any of the widespread instances of data falsification and manipulation, as evidenced by the Navy's continued awarding of contract work to Tetra Tech at HPNS.

244.     Nor did the Navy's ROICCs adequately review Tetra Tech's daily reports for completeness and accuracy.  As discussed at length herein, there were numerous deficiencies in Tetra Tech's daily reports that the Navy's ROICCs would have discovered had they actually reviewed Tetra Tech's daily reports for completeness and accuracy.  The Navy would have alerted contracting personnel of fraud had its QA system detected any, and the contracting officers could have then determined whether retention of Tetra Tech was appropriate.

245.     The Final Execution Plan for Base-wide Radiological Support ("Final Execution Plan") is a site-specific work plan to be used in conjunction with the Base-wide Plan.  The Final Execution Plan attaches task-specific plans that detail the specific procedures for implementing a particular category of work.  Among them are a Sampling and Analysis Plan and Project Contractor Quality Control Plan, each of which impose materially identical requirements on the Navy as are delineated in the Base-wide Plan.  Both attachments reiterate the specific duties underlying the Navy Remedial Project Manager, Radiological Site Manager, QA Officer, and Resident Officer's "primary responsibility" for ensuring effective quality assurance over Tetra Tech's work and its successful completion.  (*Id.*, Attachment 1 (Sampling Plan) at § 2; Attachment 2 (Quality Control Plan) at § 2.)  Section 2 emphasizes that such duties were imposed to "ensure high quality work" at the site.

246.     The duties encompassed by the Base-wide Plan and reiterated by the Final Execution Plan were intended to ensure that the Navy effectively supervised Tetra Tech's cleanup work at HPNS.  At every personnel level, however, the Navy failed to fulfill those duties.  It did so without discretion, and in a manner not susceptible to social, economic, or political policy considerations.

e. **Navy's Conflicts of Interest**

247. The Navy's RSM at HPNS was responsible for overseeing the radiological remediation conduct and progress of Tetra Tech.

248. During the period of time that Tetra Tech was committing widespread fraud at the site, the Navy's RSM in charge of reviewing Tetra Tech's work was Laurie Lowman.

249. Ms. Lowman had authority to make decisions that impact the sampling, testing, and operations and results of Tetra Tech in the nuclear radiological remediation processes at HPNS.

250. Ms. Lowman was unable to objectively review and oversee Tetra Tech, however, because her son, Thorpe Miller, though unqualified, was hired as a Radiological Data Analyst responsible for this work.

251. As a Radiological Data Analyst, Mr. Miller received towed array information that identified the intensity of the radioactivity of the Survey Unit soils. Mr. Miller received the lab analysis of the samples of the Survey Unit soils taken under Tetra Tech supervision. Mr. Miller had responsibility to review the towed array information with the resulting laboratory test results from the Survey Unit soil samples.

252. Tetra Tech whistleblowers and Mr. Miller's direct supervisors believed that Mr. Miller's previous employment was in retail and that he did not have the requisite experience for work on a radiological remediation site.

253. The Navy and Ms. Lowman knew that Mr. Miller did not have the training or experience to fulfill his role as Radiological Data Analyst. Yet he was granted a significant pay raise within one year of his employment.

254. Tetra Tech Project Managers specifically directed changes to be made to Mr. Miller's evaluations to support this increase.

255. Tetra Tech's hiring of Mr. Miller created a conflict of interest and as a result Ms. Lowman, RASO, and the Navy favored Tetra Tech due to the employment of Ms. Lowman's son by Tetra Tech.

256.     Tetra Tech was aware of the conflict of interest and its potential influence on the Navy.

257.     The Navy, including the Navy's Lead RPM, Melanie Kito, were also aware of this conflict of interest.

258.     Tetra Tech and a Tetra Tech Contractor, IO Environmental, subsequently collaborated to have Miller formally "resign" from Tetra Tech, be "hired" and paid through IO Environmental as an "employee" but perform the same work for Tetra Tech, at the same Tetra Tech work desk and office at HPNS, to hide the conflict of interest.  The resignation from Tetra Tech and immediate hire of Miller by IO Environmental was all orchestrated by Tetra Tech to continue to curry favor with the Navy's RSM Lowman, but hide the obvious conflict of interest.

259.     The Navy was also aware of the conflict of interest and investigated but did not remedy the situation.

260.     On September 2011, Tetra Tech significantly changed and weakened the procedures for use of radiation detection portal monitor and procedures and standards for review of a truck with a load of soil and debris that failed thee portal monitor screening.  This was against applicable regulations or multi-agency agreements.

261.     As understood by those whistleblowers present on the site, Ms. Lowman did not object but rather assisted Tetra Tech in the effort to hide its failures because of her conflict of interest.

262.     Although the Navy, via Ms. Lowman, received inconsistent information between the towed array radiological readings and the lower laboratory results, Lowman did not contest the accuracy of the soil Survey Unit sampling processes overseen by her son and failed to call into question the testing of the soil samples.

263.     High percentages of the soil removed from HPNS were deemed "cleared" and used as backfill into the Hunters Point trenches after Mr. Miller was in positions of responsibility over the RSY pad processing.  For example, a total of 1,023 cubic yards of soil were processed on the RSY pads from units 190 and 187 from Parcel UC3.  The oversight of Miller for the RSY pad

processing resulted in only 10 remediated cubic yards of RAD contaminated soil, or less than .01% of the soil. Having such a low level of soil remediated was a substantial cost savings to Tetra Tech under the firm fixed-price contracts with the Navy.

264. Thus, it is clear that Navy RSM Lowman did not provide adequate oversight to the remediation on the ground, as was required of that role.

265. Ms. Lowman was clearly aware of her failures, which, on information and belief, is why she retired shortly after RASO began looking into the issue of anomalous soil samples.

266. The Navy violated its responsibility to fulfill the specific and mandatory duties delegated to its RASO. No social, political, or economic policy supports its failures in this respect.

267. The Navy's inability to effectively oversee Tetra Tech allowed their fraud to continue throughout the site unmitigated, including by allowing unapproved procedures for radiation detection.

**8.** **Contract Task Orders**

268. Each specific environmental remediation task carried out by Tetra Tech at HPNS was governed by Contract Task Orders ("Task Orders") between the Navy and Tetra Tech. Each of those Task Orders sets forth a Statement of Work that defined the scope of Tetra Tech and the Navy's responsibilities under the contract. While the primary focus of the Statement of Work is on Tetra Tech's duties to perform appropriate environmental remediation, certain provisions establish mandatory, specific requirements that the Navy must fulfill under the Task Order.

269. In a Task Order for radiological remediation work on Parcel E under Navy contract number N62473-10-D-0809, dated September 22, 2010, Section 3 sets forth a number of "Special Conditions" that the parties must comply with. In particular, Section 3.10 explains that "No contractor personnel are to enter any location without first obtaining clearance from the Navy." Section 3.25 further explains that the "Navy shall review all pertinent records provided by the contractor to authorize persons to enter and/or work at the site." Likewise, in a Task Order for radiological surveys of buildings on Parcel C under Navy contract number N62473-12-D-

2006, dated September 19, 2012, the Navy was required to "review all pertinent records provided by the contractor to authorize persons to enter and/or work at the site" under Section 3.21.

270.    Navy Task Orders also provided that "[t]he Navy *shall* inspect all the work in progress and at completion." The Navy has admitted that this is a mandatory duty.

271.    Additionally, the Scope of Work for several task orders further states that "any discrepancies *shall* be noted on the Daily Activities Form."

272.    The Navy does not have any discretion to refuse to note discrepancies in the Daily Activities Form.

273.    The United States conceded that this is a mandatory requirement.

274.    The Navy failed to adhere to its mandatory, specific duties under these and other Task Orders. As multiple former Tetra Tech workers have testified, numerous employees providing environmental remediation services at HPNS lacked the requisite training or background to qualify for employment in their positions. Nevertheless, they were permitted by Tetra Tech and the Navy to work at HPNS for years on end. Had the Navy complied with its duty to "review all pertinent records" in order to authorize those individuals to work at HPNS, those individuals would never have been permitted to perform any environmental remediation work at HPNS.

275.    The Navy utterly failed to follow its mandatory duty to inspect all the work in progress and at completion, evidenced by the widespread nature of Tetra Tech's fraud at the Shipyard. One of the most severe examples of Tetra Tech's fraud was collecting soil from different areas know to be clean or have lower radioactivity and falsely stating the samples had come from areas being investigated in order to reduce or eliminate the remediation work required. But the Navy's Lead RPM informed the EPA Criminal Division that the California Department of Public Health, not the Navy, was monitoring sample collection at HPNS.

276.    Based on information and belief, the Navy also breached its mandatory duty to note major discrepancies related to Tetra Tech's fraudulent performance of work at HPNS on the Daily Activities Forms. Notably, "decisions motivated solely by laziness or careless inattention

'do not reflect the kind of considered judgment grounded in social, economic, and political policy' that the discretionary function exception is intended to shield." (*See* Congressional Research Service, The Federal Tort Claims Act (FTCA): A Legal Overview, No. R45732, Nov. 20, 2019.)

**B.**  **Harm Suffered by Homebuilders**

277.    Tetra Tech's conduct has caused massive harm to Homebuilders, even though there is no scientific evidence of safety risks to residents of Parcel A and surrounding neighborhoods.

278.    Tetra Tech's misconduct has caused interruption of the development of the Shipyard and impacted the sale of completed units.  Tetra Tech's misconduct has delayed the development of the surrounding community, including the development of extensive public open spaces and retail and other commercial spaces that would make the Shipyard a more desirable place to live and increase property values.

279.    The Navy's negligent failure to supervise Tetra Tech also has caused harm to Homebuilders.  The Navy's supervisory negligence has interrupted Homebuilders' development of the Shipyard and impacted sales of completed units.  The Navy's negligence has delayed the development of the surrounding community, including the development of extensive public open spaces and retail and other commercial spaces that would make the Shipyard a more desirable place to live and increase property values.

280.    Homebuilders have incurred substantial costs in responding to the effects of Tetra Tech's misconduct and the United States' negligence, including costs associated with a host of lawsuits brought against Homebuilders arising out of this matter and increased construction and other delay costs.

281.    In 2018, the CDPH performed a Radiological Health and Safety Survey to ensure Parcel A-1 (Hilltop) residents were not exposed to unsafe levels of radiation in light of the recent discovery of Tetra Tech's data falsification.  The CDPH issued a final report on February 5, 2019,

which found that "[u]pon completion of this radiation survey, no radiological health and safety hazards to the residents of Parcel A-1 were observed."

282.     This finding was audited by a committee of independent scientists at the University of California, San Francisco ("UCSF") and the University of California, Berkeley ("UCB").  In its final audit report, dated January 17, 2020, the committee "judge[d] the gamma scanning of the surface soil of Parcel A performed by the Radiological Health Branch of the CDPH to be appropriate as a health and safety survey."

283.     Despite the corroborated findings of these independent scientific experts, home sales have suffered, development at the Shipyard has been interrupted, the value of the property has been diminished, and Homebuilders continue to suffer harm as a result of Tetra Tech's negligence and fraud and the Navy's negligence.

284.     Plaintiffs have been (wrongly) sued by homeowners and nearby residents, accusing them of selling homes that have lost value on account of the May 2018 revelations of Tetra Tech misconduct and of developing property that caused nearby residents physical and psychological harm.

## VI.     PRINCIPAL/AGENT LIABILITY

285.     Tetra Tech is liable for the acts of its employees, subcontractors, and other agents involved in fabricating the radiological investigation at HPNS.  The risk that Tetra Tech's employees and agents, and the employees and agents of its subcontractors, would engage in the wrongful acts described herein was an inherent and foreseeable consequence of Tetra Tech's conduct.

286.     The acts and omissions by agents and employees of Tetra Tech, made in furtherance of fabricating the radiological investigation at the Shipyard, were undertaken pursuant to the direction and control, and with the permission, consent, and authorization of, Tetra Tech.

287.     The Tetra Tech employees, subcontractors, and other agents that executed the improper radiological investigation described herein were acting within the scope of their employment and/or contractual obligations.  Activities such as collecting soil samples and

conducting building surveys were primary functions of their employment and/or contractual obligations.

288.     Tetra Tech ratified the acts of its agents and employees by continuing to employ them and instructing them to repeat the same wrongful conduct.

289.     TTI is liable for the acts of its wholly owned subsidiary, TTEC. TTI has admitted that TTEC's acts should be attributed to TTI due to their close relationship. For example, TTI stated that "[TTI's] and [TTEC's] routine business practices generally, and their respective particular actions in connection with the subject Project were at all material times taken on behalf and at the direction of the other in their roles as parent and wholly-owned subsidiary, and as business units of the same company."

290.     TTI and TTEC were closely connected. Some individuals who serve as officers of TTI also serve as officers of TTEC. TTEC and TTI routinely act very closely and in concert in carrying out business operations. TTEC has conducted business as a business unit of TTI and has been a vehicle for TTI to enter into contracts with the United States Government. TTI exercises full management and control over TTEC. Occasionally, TTEC and TTI enter into subcontracts on behalf of one another regardless of which entity had formal contractual privity with the Government. Some or all revenues received by TTEC are attributed to TTI and some or all obligations of TTEC are discharged by TTI.

291.     Tetra Tech has indicated that TTI received at least one contract related to the Shipyard. TTEC and TTI personnel were jointly involved in managing, controlling, and directing the investigation at the Shipyard. Tetra Tech is liable for the acts of its subcontractors and agents and their employees.

### VII.     CAUSES OF ACTION

**A.     FIRST CLAIM: INTENTIONAL MISREPRESENTATION AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

292.     Homebuilders re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

293.     In the Rad-RACRs, Tetra Tech intentionally misrepresented critical facts, which it knew to be false, about its investigation of the Shipyard.  Tetra Tech repeatedly and knowingly misrepresented that it had conducted radiological surveys, sampling, and investigation throughout the Shipyard, such that it had determined that certain areas of the Shipyard were not contaminated (or at risk of contamination) with radiation above safe levels.  Tetra Tech knew these misrepresentations were false when made or made the representations recklessly and without regard for their truth.

294.     Tetra Tech knew and intended that Homebuilders would rely on Tetra Tech's misrepresentations.  Tetra Tech (a) held itself out to the public as a reliable environmental remediation company; (b) knew that its investigation and remediation work was necessary for Homebuilders' redevelopment work; and (c) knew that the Navy was distributing the Rad-RACRs to Homebuilders.

295.     Tetra Tech knew that Homebuilders were relying on Tetra Tech's misrepresentations when Homebuilders began building homes at the Hilltop.

296.     Homebuilders relied on Tetra Tech's intentional misrepresentations at the time they were made.

297.     Tetra Tech knew that public discovery of Tetra Tech's misrepresentations would delay development at the Shipyard, increase construction costs, and negatively impact Homebuilders and the overall development.

298.     As a direct and proximate result of Tetra Tech's fraudulent deceit, Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**B. SECOND CLAIM: NEGLIGENCE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS)**

299.    Homebuilders re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

300.    Tetra Tech's work was initiated by the United States and was intended to, and did, affect Homebuilders.  Tetra Tech was aware that its work was intended to prepare the Shipyard for redevelopment into residential and commercial space.  Tetra Tech was aware that an affiliate of Lennar was selected as the master developer and that Homebuilders would take title to and develop Parcel A.

301.    Tetra Tech owed a duty to Homebuilders to exercise reasonable and ordinary care in investigating and remediating the Shipyard and to avoid causing economic and other injury to Homebuilders.  That duty arises from the nature of the work Tetra Tech was contracted to perform and the interdependency of Tetra Tech's work and the redevelopment of the Shipyard for residential and commercial purposes.

302.    Tetra Tech negligently, carelessly, tortiously, and wrongfully breached its duty to Homebuilders through misconduct including, but not limited to, falsifying soil samples and building surveys, destroying and falsifying records, and hiring and failing to supervise unqualified employees and contractors.

303.    It was reasonably foreseeable that Tetra Tech's misconduct would significantly delay and/or hinder redevelopment of the property, deter property buyers and lenders, and harm Homebuilders.

304.    Tetra Tech's conduct is ethically and morally blameworthy because Tetra Tech placed its profits ahead of the safety of others and the development of badly needed housing in San Francisco.  Tetra Tech has no reasonable excuse for these failures, which have delayed the development of the Shipyard and harmed Homebuilders.

305.    Tetra Tech's conduct violated statutes and regulations, including at least:

- 10 C.F.R. 20.1501(a), which requires that each Nuclear Regulatory Commission licensee "shall make or cause to be made, surveys of areas, including the subsurface,

that . . . are reasonable under the circumstances to evaluate the magnitude and extent of radiation levels; and concentrations or quantities of residual radioactivity; and the potential radiological hazards of the radiation levels and residual radioactivity detected."

- 10 C.F.R. 20.2103, which provides that licensees "shall maintain records showing the results of surveys" required by the regulations.

- 18 U.S.C. § 1519, which states that "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

306.    Pursuant to California Code of Evidence § 669, Tetra Tech's negligence is presumed under the doctrine of negligence per se because it violated these laws.

307.    Homebuilders' harm resulted from conduct that the foregoing statute and regulations were designed to prevent, and Homebuilders are within the class of persons they are intended to protect.

308.    The acts and omissions of Tetra Tech were conducted with malice, fraud, deceit, and/or oppression as described in this Complaint.

309.    Homebuilders have been harmed as a direct and proximate result of Tetra Tech's negligence and gross negligence.

310.    As a direct and proximate result of Tetra Tech's negligence and gross negligence, Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**C.    THIRD CLAIM: NEGLIGENCE AGAINST THE UNITED STATES** (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54)

311.    CPHP Development LLC, Block 50, Block 51, Block 53, and Block 54 re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

312.    The Navy owed a duty to CPHP Development, Block 50, Block 51, Block 53, and Block 54 to exercise reasonable and ordinary care to avoid causing economic and other injury to

them. That duty arises from the regulations, policy manuals, site-specific work plans, and contracts between the Navy and Tetra Tech for the completion of remediation work at HPNS, as well as the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense Base Closure and Realignment Act of 1990. Moreover, the Navy agreed to ensure effective environmental investigation of the Shipyard and remediation for redevelopment by companies such as CPHP Development, Block 50, Block 51, Block 53, and Block 54 when it executed a Conveyance Agreement in 2004 with San Francisco and the SFRA to establish the process for conveying the Shipyard for redevelopment. The Navy repeatedly confirmed its obligations through the FOST process, as well as communications to CPHP Development, Block 50, Block 51, Block 53, and Block 54, the public, and public officials—even though those communications failed to provide notice of the extensive fraud perpetrated by Tetra Tech under the United States' supervision.

313. The Navy had a duty of care to CPHP Development, Block 50, Block 51, Block 53, and Block 54 as third parties with significant and foreseeable financial interest dependent on the Navy's contractor, Tetra Tech, sufficiently performing its testing and remediation obligations under the Navy's supervision.

314. It was foreseeable that the Navy's misconduct would significantly delay and/or hinder redevelopment at the Shipyard, deter property buyers and lenders, and harm CPHP Development, Block 50, Block 51, Block 53, and Block 54.

315. The United States negligently, carelessly, tortiously, and wrongfully breached its duty to CPHP Development, Block 50, Block 51, Block 53, and Block 54 through misconduct that included, but is not limited to, negligent supervision of Tetra Tech and Tetra Tech's employees and negligent enforcement of rules instituted to prevent any fraudulent activities by Tetra Tech.

316. The Navy's negligence was in direct violation of specific and mandatory duties that did not afford any discretion in their enforcement. Under Section 1.3.1 of the Uniform

Policy, the Navy "is responsible for all phases of environmental data collection as well as for ensuring that the organization, personnel, contractors, and subcontractors perform work as prescribed" in the QA Plan. Under Section 1.4-7 of the Environmental Manual, the Navy is required to ensure "the competency of work delivered to the Navy" and "consistent application of environmental policy." That required, among other things, that the Navy's Remedial Project Manager "be present at the Site or reasonably available to supervise work during all hours of work performed at the Site" and "assur[e] proper implementation" of the Remedial Investigation/Feasibility Study "on a daily basis" (FFA §§ 18.1, 18.5); that the Navy's QA Rep visit HPNS on a weekly basis and daily review "production" and "quality control" reports from Tetra Tech (NAVFAC Construction Manual 3.3.1, 3.4.1.2); and that the Radiological Site Manager review radiological laboratory data on a routine basis and perform quality reviews on chain-of-custody forms (Base-wide Plan 3.2.16).

317. The Navy failed to comply with these and other duties governing its oversight role at HPNS. The Navy failed to supervise Tetra Tech's field activities as required. The RPM failed to "assur[e] proper implementation of the [Remedial Investigation/Feasibility Study]" by "blindly approv[ing]" Tetra Tech's invoiced work, in spite of the numerous instances of soil sampling fraud carried out by Tetra Tech. The QA Rep failed to visit HPNS on a weekly basis or review Tetra Tech's production and quality control reports daily, as evidenced by the EPA's independent evaluation that over 97% of Tetra Tech's data was falsified or unreliable. The Radiological Site Manager failed to adequately review radiological laboratory data "on a routine basis," which the United States has now admitted contains numerous duplicate strings of data that could not naturally occur, and also failed to adequately "perform quality reviews" on chain-of-custody forms to ensure samples conformed with plan specifications, which former workers have testified were obviously deficient on even a surface-level review. All such negligent conduct contributed to Homebuilders' harm.

318. The Navy's conduct is ethically and morally blameworthy because the Navy failed to adequately supervise Tetra Tech when at stake was the safety of the public and the

development of badly needed housing in San Francisco. The Navy has no reasonable excuse for its failure to supervise Tetra Tech, which has delayed the development of the Shipyard and harmed CPHP Development, Block 50, Block 51, Block 53, and Block 54.

319. The Navy's conduct is contrary to the public policy interests of the State of California because it erodes the public confidence in the reliability of environmental remediation work and deters potential developers from building much-needed housing on former military bases.

320. The United States (based upon the conduct of the Navy) is liable to CPHP Development, Block 50, Block 51, Block 53, and Block 54 for the damages described herein pursuant to the FTCA, 28 U.S.C. § 2674.

321. The United States' conduct violated its own authority to ensure proper environmental investigation and ultimate transfer of the Shipyard properties under the Defense Base Closure and Realignment Act of 1990 and related regulations.

322. Pursuant to California Evidence Code § 669, the United States' negligence is presumed under the doctrine of negligence per se because it violated these laws and related regulations.

323. CPHP Development, Block 50, Block 51, Block 53, and Block 54 have been harmed as a direct and proximate result of the Navy's negligence and gross negligence.

324. As a direct and proximate result the Navy's negligence and gross negligence, CPHP Development, Block 50, Block 51, Block 53, and Block 54 have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**D.** **FOURTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

325. Homebuilders re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

326. Tetra Tech owed a duty to Homebuilders to exercise reasonable care in hiring employees, independent contractors, and other agents; supervising them; and/or retaining them.

327. Tetra Tech breached its duty by hiring employees, independent contractors, and/or other agents that were unfit and incompetent. Tetra Tech also negligently failed to supervise those contractors and employees and negligently retained them after it became apparent to Tetra Tech that they were unfit and/or incompetent.

328. Tetra Tech knew or should have known that hiring, failing to supervise, and/or negligently retaining those individuals created a particular hazard or risk of fabricating the radiological investigation of the Shipyard. Because certain employees were unskilled at detecting radiological contamination and Tetra Tech had determined they were susceptible to pressure to fabricate certain aspects of the surveys and investigation, Tetra Tech purposefully assigned them to investigate potential contamination at the Shipyard in order to further its widespread data falsification.

329. Tetra Tech knew or should have known that those individuals were willing to or had a propensity to participate in fabricating surveys and other aspects of the radiological investigation.

330. The particular risk or hazard materialized when those employees fabricated surveys and other aspects of the radiological investigation.

331. The unfitness and incompetence of those employees was a factor in causing Homebuilders' harm.

332. As a direct and proximate result of Tetra Tech's negligent hiring, supervision, or retention, Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

**E.** **FIFTH CLAIM: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST THE UNITED STATES** (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54)

333.    CPHP Development, Block 50, Block 51, Block 53, and Block 54 re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

334.    The United States through the Navy owed a duty to CPHP Development, Block 50, Block 51, Block 53, and Block 54 to exercise reasonable care in hiring employees, independent contractors, and other agents, supervising them, and/or retaining them.  That duty arises from the Federal Acquisition Regulations and the Navy's contracts with Tetra Tech, as well as the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense Base Closure and Realignment Act of 1990.

335.    The United States breached its duty by retaining and continuing to contract with employees, independent contractors, and other agents that were unfit and incompetent, including Tetra Tech, Tetra Tech's employees, and individuals associated with Tetra Tech who were investigated by the United States.  In doing so, the Navy breached its specific and mandatory duty under the Federal Acquisition Regulations to "award[] [contracts] to [] responsible prospective contractors only."  For at least two years after Tetra Tech admitted to the Navy that it had committed fraud during the HPNS remediation, the Navy continued to award it contracts for that very same work.  The Navy also violated its specific and mandatory duty to "review all pertinent records" in order to authorize individuals to work at HPNS, as mandated by its Task Orders with Tetra Tech, allowing numerous unqualified individuals to perform environmental remediation work at HPNS for which they lacked adequate training.

336.    The United States knew or should have known that Tetra Tech was willing to or had a propensity to participate in fraudulent activities, fabricate surveys, and perform improper radiological investigation, including permitting unqualified and unethical workers to perform remediation work at HPNS.

337.     The United States knew or should have known that retaining and continuing to hire Tetra Tech for new contracts at the Shipyard—even after evidence of fraud surfaced that was not revealed to CPHP Development, Block 50, Block 51, Block 53, Block 54, or the public—violated the Navy's specific and mandatory duties and created a particular risk or hazard of continued misrepresentation and falsification of data at the Shipyard.

338.     The United States knew or should have known that Tetra Tech hired individuals that created a particular risk or hazard of fabricating the radiological investigation of the Shipyard.

339.     The Navy knew or should have known that those individuals were willing to or had a propensity to participate in fabricating surveys and other aspects of the radiological investigation.

340.     The particular risk or hazard materialized when those employees fabricated surveys and other aspects of the radiological investigation.

341.     The unfitness and incompetence of those employees was a factor in causing the harm to CPHP Development, Block 50, Block 51, Block 53, and Block 54.

342.     The unfitness and incompetence of Tetra Tech, who was repeatedly hired by the United States and whose contracts were renewed by the United States, was a factor in causing Homebuilders' harm.

343.     The United States (on behalf of the Navy) is liable to Homebuilders for the damages described herein pursuant to the FTCA, 28 U.S.C. § 2674.  As a direct and proximate result of the Navy's negligent supervision, Homebuilders have suffered and will continue to suffer damages in an amount to be proven at trial, such as increased construction costs, costs of delays to the overall development, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

## F. SIXTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS (BY HOMEBUILDER PLAINTIFFS)

344.     Homebuilders re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

345.     Homebuilders have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A of the Shipyard, banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A, and contractors and other business partners involved in the development of Parcel A.

346.     These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Homebuilders.

347.     Tetra Tech knew or should have known of these existing and prospective economic relationships.  Tetra Tech knew that the Shipyard was being developed for residential purposes and that Homebuilders intended to sell homes at the site to future homeowners.

348.     Tetra Tech owed a duty to Homebuilders to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Homebuilders.

349.     Tetra Tech knew or should have known that, if it failed to act with reasonable care, it would interfere with and disrupt the existing and prospective economic relationships Homebuilders had with potential homeowners, banks, and contractors.

350.     Tetra Tech breached that duty to Homebuilders through its misconduct.

351.     Tetra Tech was negligent and failed to act with reasonable care in connection with its work.

352.     Tetra Tech engaged in wrongful acts and/or omissions in connection with its work. Tetra Tech interfered with Homebuilders' existing and prospective economic relationships by, among other things, intentionally failing to investigate potential radiological contamination in the Shipyard and covering up, concealing, and minimizing the scope and extent of its misconduct. Tetra Tech's misconduct constituted an act that was independently wrongful of its interference

with Homebuilders' prospective economic relations. Among other things, the misconduct of Tetra Tech and its agents violated:

- 10 C.F.R. 20.1501(a), which requires that each Nuclear Regulatory Commission licensee "shall make or cause to be made, surveys of areas, including the subsurface, that . . . are reasonable under the circumstances to evaluate the magnitude and extent of radiation levels; and concentrations or quantities of residual radioactivity; and the potential radiological hazards of the radiation levels and residual radioactivity detected."

- 10 C.F.R. 20.2103, which provides that licensees "shall maintain records showing the results of surveys" required by the regulations.

- 18 U.S.C. § 1519, which states that "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

- Tetra Tech's statutory and common law duties of care.

353. As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, the existing and prospective economic relationships Homebuilders had with potential homeowners were interfered with and disrupted.

354. As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, Homebuilders have suffered and will suffer economic harm, injury, and losses, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

355. Tetra Tech's wrongful acts and/or omissions were a substantial factor in causing the harm, injury, and losses.

**G.** **SEVENTH CLAIM: NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE UNITED STATES** (BY CPHP DEVELOPMENT, BLOCK 50, BLOCK 51, BLOCK 53, AND BLOCK 54)

356. CPHP Development, Block 50, Block 51, Block 53, and Block 54 re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

357. CPHP Development, Block 50, Block 51, Block 53, and Block 54 have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A

of the Shipyard, banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A, and contractors and other business partners involved in the development of Parcel A.

358.     These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to CPHP Development, Block 50, Block 51, Block 53, and Block 54.

359.     The United States knew or should have known of these existing and prospective economic relationships.  The United States knew that the Shipyard was being developed for residential purposes and that CPHP Development, Block 50, Block 51, Block 53, and Block 54 intended to sell homes at the site to future homeowners.

360.     The United States owed a duty to the CPHP Development, Block 50, Block 51, Block 53, and Block 54 to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Homebuilders.  That duty arises from the regulations, policy manuals, site-specific work plans, and contracts between the Navy and Tetra Tech for the completion of remediation work at HPNS, as well as the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which was initiated pursuant to the Navy's decision to close the Shipyard for redevelopment pursuant to the Defense Base Closure and Realignment Act of 1990.  (*See supra*, at ¶¶ 87-276.)

361.     The United States knew or should have known that, if it failed to act with reasonable care, it would interfere with and disrupt the existing and prospective economic relationships CPHP Development, Block 50, Block 51, Block 53, and Block 54 had with potential homeowners, banks, and contractors.

362.     The United States breached its duty to act with reasonable care to avoid harming the existing and prospective economic relationships CPHP Development, Block 50, Block 51, Block 53, and Block 54 had with potential homeowners.

363.     The United States' negligence was in direct violation of specific and mandatory duties that did not afford any discretion in their enforcement, as noted above.  (*See supra*, at

¶¶ 87-276.)  Under Section 1.3.1 of the Uniform Policy, the Navy "is responsible for all phases of environmental data collection as well as for ensuring that the organization, personnel, contractors, and subcontractors perform work as prescribed" in the QA Plan.  That required, among other things, that the Navy's Remedial Project Manager "be present at the Site or reasonably available to supervise work during all hours of work performed at the Site" and "assur[e] proper implementation" of the Remedial Investigation/Feasibility Study "on a daily basis" (FFA §§ 18.1, 18.5); that the Navy's QA Rep visit HPNS on a weekly basis and daily review "production" and "quality control" reports from Tetra Tech (NAVFAC Construction Manual 3.3.1, 3.4.1.2); and that the Radiological Site Manager review radiological laboratory data on a routine basis and perform quality reviews on chain-of-custody forms (Base-wide Plan 3.2.16).

364.    The Navy failed to comply with these and other duties governing its oversight role at HPNS.  The Navy failed to supervise Tetra Tech's field activities as required.  The Navy's Remedial Project Manager failed to "assur[e] proper implementation of the [Remedial Investigation/Feasibility Study]" by "blindly approv[ing]" Tetra Tech's invoiced work, in spite of the numerous instances of soil sampling fraud carried out by Tetra Tech.  The QA Rep failed to visit HPNS on a weekly basis or review Tetra Tech's production and quality control reports daily, as evidenced by the EPA's independent evaluation that over 97% of Tetra Tech's data was falsified or unreliable.  The Radiological Site Manager failed to adequately review radiological laboratory data "on a routine basis," which the United States has now admitted contains numerous duplicate strings of data that could not naturally occur, and also failed to adequately "perform quality reviews" on chain-of-custody forms to ensure samples conformed with plan specifications, which former workers have testified were obviously deficient on even a surface-level review.  Each of these types of negligent conduct contributed to Plaintiffs' harm.

365.    The United States was negligent and failed to act with reasonable care in connection with its work.

366.    The United States engaged in wrongful acts and/or omissions in connection with its work.  The United States' interfered with Homebuilders' existing and prospective economic

relationships by, among other things, negligently hiring, supervising, and retaining Tetra Tech. The United States misconduct constituted an act that was independently wrongful of its interference with Homebuilders' prospective economic relations. Among other things, the misconduct of the United States facilitated its contractors' violations of Title 18 U.S.C. § 1519 (destruction, alteration, or falsification of records), 10 C.F.R. 20.1501(a), and 10 C.F.R. 20.2103, and violated the United States' duties of care arising from the regulations, policy manuals, site-specific work plans, and contracts between the Navy and Tetra Tech for the completion of remediation work at HPNS.

367.    As a direct and proximate result of the United States' wrongful acts and/or omissions, the existing and prospective economic relationships CPHP Development, Block 50, Block 51, Block 53, and Block 54 had with potential homeowners were interfered with and disrupted.

368.    As a direct and proximate result of the United States' wrongful acts and/or omissions, CPHP Development, Block 50, Block 51, Block 53, and Block 54 have suffered and will suffer economic harm, injury, and losses, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

369.    The United States' wrongful acts and/or omissions were a substantial factor in causing the harm, injury, and losses.

**H.    EIGHTH CLAIM: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE TETRA TECH DEFENDANTS** (BY HOMEBUILDER PLAINTIFFS)

370.    Homebuilders re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

371.    Homebuilders have existing and prospective economic relationships with individuals seeking to purchase homes in Parcel A of the Shipyard and with banks seeking to issue mortgages to those individuals for the purpose of purchasing homes on Parcel A.

372.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Homebuilders.

373.    Tetra Tech knew of these existing and prospective economic relationships. Tetra Tech knew that the Shipyard was being developed for residential purposes and that Homebuilders intended to sell homes at the site to future homeowners.

374.    Tetra Tech knew that, if it failed to act with reasonable care, the existing and prospective economic relationships Homebuilders had with potential homeowners were certain or substantially certain to be interfered with and disrupted.

375.    Tetra Tech engaged in wrongful acts and/or omissions in connection with its work. Tetra Tech interfered with Homebuilders' existing and prospective economic relationships by, among other things, intentionally failing to investigate potential radiological contamination in the Shipyard and covering up, concealing, and minimizing the scope or extent of its misconduct. Tetra Tech's misconduct constituted an act that was independently wrongful of its interference with Homebuilders' prospective economic relations. Among other things, the misconduct of Tetra Tech and its agents violated Title 18 U.S.C. § 1519 (destruction, alteration, or falsification of records), constituted fraud/deceit, and violated Tetra Tech's statutory and common law duties of care.

376.    As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, the existing and prospective economic relationships Homebuilders had with potential homeowners were interfered with and disrupted.

377.    As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, Homebuilders have suffered and will continue to suffer economic harm, injury, and losses, such as increased construction costs, costs of delays to the overall development, stigma damages, and costs associated with the lawsuits, including any judgments and settlement expenses incurred or to be incurred.

378.    Tetra Tech's wrongful acts and/or omissions were a substantial factor in causing the harm, injury, and losses.

**I.    NINTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE TETRA TECH DEFENDANTS** (BY HPS DEVELOPMENT CO., BLOCK 50, BLOCK 51, BLOCK 53, BLOCK 54, AND LENNAR)

379.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

380.    Due to the negligent and/or fraudulent conduct of Tetra Tech, HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar have been named as defendants to litigation.  These lawsuits generally allege that HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar are responsible to the plaintiffs in those actions for injuries resulting from Tetra Tech's conduct at the Shipyard.

381.    HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar deny any liability as to any claims arising from these claims and, to the extent liability is affixed, responsibility lies with Tetra Tech.  HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar are entitled to equitable indemnification and/or contribution from the Tetra Tech Defendants for the costs incurred in responding to claims arising from the conduct as alleged herein.

382.    Specifically, in the event liability should be established in any action described above involving HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar, which liability is expressly denied, such liability would arise by reason of the conduct and negligence and fraudulent actions of Tetra Tech.  Tetra Tech is therefore obligated and bound to defend, indemnify, and hold harmless HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar from and against any and all claims, losses, damages, attorneys' fees, judgments, and settlement expenses incurred or to be incurred in response to claims arising from the Tetra Tech Defendants' conduct as alleged herein.

383.    As a further direct and proximate result of the Tetra Tech Defendants' negligence and/or fraud, HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to

claims arising from the Tetra Tech Defendants' conduct as alleged herein, in an amount to be determined according to proof at trial.

384.     To prevent a multiplicity of actions, a determination of the comparative fault, if any, of HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar on the one hand and Tetra Tech on the other should be made at trial of this action herein.  If any party, in an action arising from Tetra Tech's conduct as alleged herein, recovers a judgment against HPS Development Co., Block 50, Block 51, Block 53, Block 54, and Lennar, then those entities are entitled to be indemnified by Tetra Tech for the amount of any damages awarded in favor of that party pursuant to and in accordance with the proportion of relative fault or liability attributed to Tetra Tech.

**J.     TENTH CLAIM: EQUITABLE INDEMNIFICATION AGAINST THE UNITED STATES** (BY BLOCK 50, BLOCK 51, BLOCK 53, BLOCK 54, AND LENNAR)

385.     Block 50, Block 51, Block 53, Block 54, and Lennar re-allege and incorporate by reference Paragraphs 1 through 291 above as if fully set forth herein.

386.     Due to the negligent and/or fraudulent conduct of the Navy, Block 50, Block 51, Block 53, Block 54, and Lennar have been named as defendants to litigation.  These lawsuits generally allege that Block 50, Block 51, Block 53, Block 54, and Lennar are responsible to the plaintiffs for injuries resulting from Tetra Tech's conduct at the Shipyard, which was made possible by the Navy's negligent hiring, failure to adequately supervise, and retention of Tetra Tech.

387.     Block 50, Block 51, Block 53, Block 54, and Lennar deny any liability as to any claims arising from these claims and, to the extent liability is affixed, responsibility lies with the United States.  Block 50, Block 51, Block 53, Block 54, and Lennar are entitled to equitable indemnification and/or contribution from the United States for the costs incurred in responding to claims arising from the conduct as alleged herein.

388.     Specifically, in the event liability should be established in any action described above involving Block 50, Block 51, Block 53, Block 54, and Lennar, which liability is expressly

denied, such liability would arise by reason of the conduct and negligence of the Navy. The United States is, therefore, obligated and bound to defend, indemnify, and hold harmless Block 50, Block 51, Block 53, Block 54, and Lennar from and against any and all claims, losses, damages, attorneys' fees, judgments, and settlement expenses incurred or to be incurred in response to claims arising from the Navy's conduct as alleged herein.

389. As a further direct and proximate result of the Navy's negligence and/or fraud, Block 50, Block 51, Block 53, Block 54, and Lennar have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to claims arising from the Navy's conduct as alleged herein, in an amount to be determined according to proof at trial.

390. To prevent a multiplicity of actions, a determination of the comparative fault, if any, of Block 50, Block 51, Block 53, Block 54, and Lennar on the one hand and the Navy on the other should be made at trial of this action herein. If any party, in an action arising from the Navy's conduct as alleged herein, recovers a judgment against Block 50, Block 51, Block 53, Block 54, and Lennar, then those entities are entitled to be indemnified by the United States for the amount of any damages awarded in favor of that party pursuant to and in accordance with the proportion of relative fault or liability attributed to defendants.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for relief as follows:**

391. For compensatory and special damages, according to proof at trial;

392. For equitable indemnification, according to proof at trial;

393. For interest thereon at the maximum legal rate;

394. For punitive damages;

395. For costs of suit and reasonable attorneys' fees incurred herein;

396. For an award holding Tetra Tech, Inc. and Tetra Tech EC, Inc. jointly and severally liable for all of the requested damages, costs, fees, and interest arising from Tetra Tech, Inc.'s and Tetra Tech EC, Inc.'s joint tortious conduct;

397. For an award holding the United States liable for all of the requested damages, costs, fees, and interest arising from the United States' tortious conduct; and

398. For any and all other relief the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

399. Plaintiffs demand a jury trial on all triable issues.


Dated: July 19, 2021

DANIEL M. PETROCELLI
DAVID MARROSO

O'MELVENY & MYERS LLP


By:    _/s/ David Marroso_
David Marroso

Attorneys for Plaintiffs CPHP DEVELOPMENT, LLC; HPS DEVELOPMENT CO., LP; HPS1 BLOCK 50, LLC; HPS1 BLOCK 51, LLC; HPS1 BLOCK 53, LLC; HPS1 BLOCK 54, LLC; HPS1 BLOCK 55, LLC; HPS1 BLOCK 56/57, LLC; and LENNAR CORPORATION